# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

LK NUTRITION, LLC,               )

              Plaintiffs,  )   Civil No. 12-cv-07905

     vs.                      )

PREMIER RESEARCH LABS, LP   )

and ROBERT J. MARSHALL,      )

individually,                )

             Defendants.  )


DEPOSITION OF PAUL DUGGAN

April 17, 2015

Chicago, Illinois

10:12 a.m.

Reported By:
Sheri E. Liss, CSR, RPR, CRR, CLR, RSA
Job No. 38448

DEPOSITION OF PAUL DUGGAN

1 the United States Coast Guard, United States Navy,
2 NOAA, which is National Oceanic and Atmospheric
3 Administration. We made ships, not boats. We
4 weren't making 30-foot boats in Belmont Harbor. Our
5 ships are being used around the world.
6     **Q. You're also on the board at TV Compass**
7 **Incorporated from 2003 and you state "until sale."**
8 **Do you recall when the sale of the**
9 **company was?**
10     A. Approximately 2009.
11     **Q. What kind of company is TV Compass?**
12     A. TV Compass was, I think it originated,
13 the formation in 1983. The founders invented the
14 universal remote control and took it public under
15 the name of Universal Electronics and then spun off
16 this division to create remote controls with a
17 screen, which are more ubiquitous now then when we
18 started, with a screen and Wi-Fi enabled so you
19 could interact with your remote control in a Wi-Fi
20 environment. And we had a patent on TV Guide, so
21 you would have the TV Guide on your remote.
22     Now it's on the screen if you have
23 a Direct TV or Comcast application. But -- which
24 interferes with your viewing. Here it's on your

DEPOSITION OF PAUL DUGGAN

1 remote and that's patented.
2     **Q. You're also on the board at Evolve**
3 **Solutions Incorporated from 2003 until sale.**
4 **Do you recall the date of sale of**
5 **Evolve Solutions?**
6     A. No. Approximately the same time -- it
7 was a spinoff, it was a subset of TV Compass where
8 it maintained a license to sell remotes in certain
9 categories and product areas that -- when we merged
10 with -- Evolve Communications merged with a company
11 called TV Compass, we kept the TV Compass name and
12 spun off Evolve Solutions with a license for certain
13 products just in the United States market.
14     **Q. So Evolve Solutions was still owned by**
15 **TV Compass?**
16     A. No. It was owned by -- the original
17 owners of Evolve Communications maintained a hundred
18 percent ownership of Evolve Solutions and in the
19 merger 60 percent of TV Compass.
20     **Q. And there is some agreement to that**
21 **effect, right?**
22     A. Yes.
23     **Q. What about EPAY Systems Incorporated?**
24 **You were on that board from 2008 and still are.**

DEPOSITION OF PAUL DUGGAN

1     **What is EPAY Systems?**
2     A. EPAY is an electronic pay. They have a
3 number of patented products but their principal
4 product is a time clock with five components. So if
5 your employees came in today to punch in they would
6 punch in with a biometric device, so they would
7 punch in with their thumb print. It has a screen on
8 it. It has a printer on it.
9     So if you punched in, today is
10 Friday, Cubs are playing today. If you would punch
11 in it would say "Good morning, Paul. Do you want
12 your paycheck?" And you would say yes.
13     So if you had ten remote locations
14 you wouldn't have to have a paycheck delivered, it
15 would be there electronically. It would print out.
16 It would eliminate payroll theft because you
17 couldn't punch me in without my thumb. And it has a
18 cellular device embedded in it so when I punch in it
19 goes out via cellular through the EPAY network to
20 your network so you know I punched in.
21     And it's got a patent on a
22 component screen, keyboard, printer, biometric
23 device, cell phone combination. And they compete
24 with companies like ADP, Paycheck, Kronos, in the

DEPOSITION OF PAUL DUGGAN

1 payroll space.
2     **Q. So throughout your career you've held**
3 **positions that essentially require your consulting**
4 **skills, correct?**
5     A. Yes.
6     **Q. Have you ever consulted for dietary**
7 **supplement companies?**
8     A. No.
9     **Q. Have you ever conducted business**
10 **valuation services for dietary supplement companies?**
11     A. No.
12     **Q. Have you had any experience in your**
13 **positions that we just discussed providing services**
14 **for a dietary supplement company?**
15     A. Not that I recall.
16     **Q. Like I said earlier, I know that you've**
17 **been deposed before because I actually deposed you**
18 **sometime last year, but how many depositions have**
19 **you given as an expert witness?**
20     A. Was I considered an expert witness in
21 that 30(b)(6) deposition? Would that be included
22 your definition?
23     **Q. I don't have a definition. I'm just**
24 **asking you --**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1
2    A.    Yes.
3    Q.    You've never seen her tax returns; is
4  that what you just stated?
5    A.    Correct.
6    Q.    How would you determine whether or not
7  Fitness Arts is a successful company?
8    A.    I'm looking at the volume of their
9  sales, half a million dollars a year in product
10  sales.
11   Q.    Do you know when Fitness Arts came into
12  business?
13   A.    About 1992. I list their sales here
14  from inception.
15   Q.    You don't know from memory?
16   A.    I just said I think '92, but I have the
17  answer here.
18   Q.    Okay. I have that document.
19   A.    2003.
20   Q.    So Fitness Arts was -- came into
21  existence in 2003; is that your testimony?
22   A.    Those are the first records I saw, so as
23  far as I know, the first sales were 2003. There may
24  have been more prior to that.
25   Q.    Do you know when Mia Scheid became

DEPOSITION OF PAUL DUGGAN

1
2  affiliated with Fitness Arts?
3    A.    No.
4    Q.    Do you know when Lee Kemp became
5  affiliated with Fitness Arts?
6    A.    No.
7    Q.    Do you know in what capacity he was
8  affiliated with Fitness Arts? I have the documents
9  so I don't need a recitation of that. I'm asking
10  you these questions.
11   A.    Do I know the date that he started
12  working with Fitness Arts? No.
13   Q.    Do you know in what capacity he was
14  affiliated with Fitness Arts?
15   A.    Product development, marketing.
16   Q.    And that's for Fitness Arts?
17   A.    Yes.
18   Q.    Do you know how many employees there are
19  at Fitness Arts?
20   A.    No.
21   Q.    So you don't know their names?
22   A.    I've dealt with them, specifically I've
23  dealt with their accountant, a Karen; I think it's
24  Karen Manna, M-a-n-n-a.
25   Q.    Any other employees that you recall?

DEPOSITION OF PAUL DUGGAN

1
2    A.    Not offhand, no.
3    Q.    What services does Fitness Arts provide?
4    A.    They sell nutritional products and
5  provide health and fitness services.
6    Q.    I'm going to ask that you put that
7  Exhibit 2 to the side for a second.
8    A.    Okay.
9    Q.    Do you know whether or not they provide
10  any other services?
11   A.    Such as?
12   Q.    Well, you stated nutritional supplements
13  and --
14   A.    Health and fitness services.
15   Q.    Health and fitness services.
16          Do you know whether or not they
17  provide any other services?
18   A.    I don't know.
19   Q.    When you say "health and fitness
20  service," what is does that encompass?
21   A.    They have a facility where there might
22  be health and fitness services performed.
23   Q.    When you say "fitness service" --
24   A.    Exercise, massage therapy, perhaps
25  infrared saunas. It could be any number of

DEPOSITION OF PAUL DUGGAN

1
2  services. Could be.
3    Q.    What do you base your knowledge of what
4  Fitness Arts, what services they provide, what do
5  you base that on?
6    A.    Their financial statements.
7    Q.    Anything else?
8    A.    Talking to Karen.
9    Q.    Did you list Karen as a person or a
10  material you relied upon in the preparation of your
11  report today?
12   A.    No. She provided me with the accounting
13  statements which are listed in here so I don't know
14  how many people prepared an accounting statement.
15   Q.    You said you spoke to her. That's
16  information you relied upon in determining what kind
17  of services that Fitness Arts provides?
18   A.    I spoke to her regarding the financial
19  statements and who the CPA was that prepared them so
20  I could talk to that person.
21   Q.    In your report, you state that Fitness
22  Arts' supplement sales progressed from 2001-2002
23  from $10,000 per year to $500,000 per year in sales
24  by 2011-2012.
25          Do you recall that?

15  (Pages 54 to 57)

DEPOSITION OF PAUL DUGGAN

1
2   Q. Between 2003 and now?
3   A. No.
4   Q. So this 2010 document shows sales
5  summaries from March 2010 to December 2010, correct?
6   A. Yes.
7   Q. It's not the full year, right?
8   A. It appears to be March through December.
9   Q. Right. So it's not the full year?
10   A. Correct.
11   Q. And you see at the top left-hand corner
12  a date of 3/5/2015?
13   A. Yes.
14   Q. Do you know what that indicates?
15   A. I'd have to guess.
16   Q. What would your guess be?
17   A. Is when they printed it.
18   Q. And this document is a little different
19  than the ones we've been looking at, correct? It
20  actually shows the amount of supplements sold and
21  the different types. So it shows that PRL Labs, the
22  sales for those supplements was around $450,000?
23   A. Yes.
24   Q. And it shows us the cost, right, which
25  is around $273,000?

DEPOSITION OF PAUL DUGGAN

1
2   A. Yes.
3   Q. It shows you the profit margin?
4   A. Yes.
5   Q. Are you familiar with the products that
6  PRL Labs sells to Fitness Arts?
7   A. No.
8   Q. Do you know whether or not there is a
9  particular product geared towards wrestlers?
10   A. No.
11   Q. Do you know what the consumer, the
12  typical consumer of PRL Labs supplements are?
13   A. No.
14   Q. What kind of customers come into Fitness
15  Arts?
16   A. I consider them to be retail consumers.
17   Q. Is there a particular age group?
18   A. I don't know.
19   Q. Particular gender?
20   A. I don't know.
21   Q. Do you know if Fitness Arts has a target
22  market?
23   A. I don't know.
24   Q. Does Fitness Arts specifically target
25  wrestlers?

**DEPOSITION OF PAUL DUGGAN**

1
2   A. I don't know.
3   Q. Do you know what percentage of customers
4  that bought PRL supplements were wrestlers?
5   A. I don't know.
6   Q. Or bought it for wrestling purposes?
7   A. I don't know.
8   Q. So you're aware that the supplements PRL
9  provided to Fitness Arts were a PRL line, correct?
10   A. Yes.
11   Q. They weren't branded with Fitness Arts?
12   A. I don't know.
13   Q. Do you have any knowledge as to whether
14  or not Fitness Arts has its own line of dietary
15  supplements?
16   A. I don't know.
17   Q. Did you ever inquire as to whether or
18  not Fitness Arts has its own line of dietary
19  supplements?
20   A. No.
21   Q. Do you know what kind of products
22  Fitness Arts sells besides PRL supplements?
23   A. No.
24   Q. Are you aware that PRL markets its
25  products nationwide including on a syndicated radio

**DEPOSITION OF PAUL DUGGAN**

1
2  broadcast?
3   A. No.
4   Q. Do you know whether or not Fitness Arts
5  does any marketing with respect to the PRL products?
6   A. No.
7   Q. So in 2010 it shows that the sale of the
8  PRL supplements generated a 40 percent, about,
9  profit margin for Fitness Arts, correct?
10   A. 39, right. About 40.
11   Q. Did you ever review the tax returns for
12  2010 of Fitness Arts?
13   A. No.
14   Q. I'm going to mark this as Exhibit 4.
15      (Whereupon, Duggan Exhibit 4
16      marked as requested.)
17      (Whereupon, the document was
18      tendered.)
19  BY MS. ALIKHAN:
20   Q. I'll represent to you that this was a
21  tax return from 2010 for Fitness Arts.
22      Did you cross-reference the sales
23  summary with the tax return of 2010?
24   A. No.
25   Q. Can you tell whether or not this is a

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1
2     A.   Right.  I took those pencilled out and
3  reduced the 520 in sales to the 501,000 in sales in
4  my sales recap on Page 12.
5     Q.   Do you know why this document looks
6  different than the once we've been looking at
7  before?
8     A.   No.
9     Q.   Do you know who created this document?
10    A.   No.
11    Q.   Can you tell it's for Fitness Arts?
12    A.   It was provided to me representing
13  Fitness Arts, but --
14    Q.   Nothing on the document indicates this.
15    A.   Other than I got it from Fitness Arts,
16  no.
17    Q.   Does this document show you the cost of
18  goods?
19    A.   No.
20    Q.   Does it show you the profit margins?
21    A.   No.
22    Q.   Do you know what percentage were PRL
23  products?
24    A.   No.
25         MS. ALIKHAN:  I'm going to mark this as

DEPOSITION OF PAUL DUGGAN

1
2  Exhibit 7, I believe.
3              (Whereupon, Duggan Exhibit 7
4              marked as requested.)
5              (Whereupon, the document was
6              tendered.)
7  BY MR. ALIKHAN:
8     Q.   May I ask what you're writing,
9  Mr. Duggan?
10    A.   Yes.  I have no memory so I'm writing
11  down Exhibit 5 is the balance sheet and Exhibit 6 as
12  P&L.
13    Q.   Okay.  Those documents are premarked so
14  there should be no confusion as to which is which.
15    A.   I'm writing it down because sometimes
16  you say don't look at it.  From my memory.  I'm
17  trying to speed the process up.  Exhibit 5 is a
18  balance sheet and Exhibit 6 is a P&L.  That's what I
19  wrote down here.  And Forza or LK, which is what you
20  told me.
21    Q.   So Exhibit 7 is a profit and loss
22  statement for Fitness Arts through 2012, right?
23    A.   Let me look.  Right.
24    Q.   Have you seen this document before?
25    A.   I don't think so.

DEPOSITION OF PAUL DUGGAN

1
2     Q.   Under "Merchandise Sales" there's a line
3  item for food and supplement sales, right?
4     A.   Under --
5     Q.   Under "Ordinary Income," about three
6  lines down, the next line is "Merchandise Sales" and
7  under that there's something that says "Food and
8  Supplement Sales"?
9     A.   Yes.
10    Q.   And that number is around $38,000,
11  right?
12    A.   That's correct.
13    Q.   Not the $520,000 that's indicated on --
14  in your Schedule 4 for 2012, right?
15    A.   Correct.
16    Q.   There's a discrepancy, isn't there?
17    A.   No.
18    Q.   Why not?
19    A.   Again, you're looking at two different
20  reports, cash basis.  If you would refer to -- I
21  made the same comment as to Exhibit 6.  If you
22  looked at cost to goods sold, 324,000, you could not
23  have 324,000 in costs for 36,000 in sales.  So I'm
24  looking at -- the total sales seem to be consistent
25  with the company sales between 650,000 and 750,000

DEPOSITION OF PAUL DUGGAN

1
2  over the period of time.  And the cost of goods sold
3  would be approximately 70 percent of a $500,000 in
4  sales, which is consistent with the 30 percent gross
5  margins you were showing me on another document.
6         So when I look at it, I don't find
7  it inconsistent with the company books and records
8  but again, it's cash basis.  Who inputted the sales
9  versus the sales here, I don't know.
10    Q.   So that's your explanation for the
11  discrepancies, right?
12    A.   Yes.  Clearly this document is
13  incorrect.  Clearly.
14         MR. SOLON:  Exhibit 7.
15  BY THE WITNESS:
16    A.   7.  Or sloppily prepared.  Maybe the net
17  is okay, but it's sloppily prepared because you
18  can't have 324,000 of cost to sell $36,000 worth of
19  product.
20  BY MS. ALIKHAN:
21    Q.   You weren't given this document to
22  review, were you?
23    A.   I was not.
24    Q.   You were just given this exhibit that we
25  spoke to in your Schedule 4 to determine the sales

### DEPOSITION OF PAUL DUGGAN

2    A.    No, I just said it wasn't.

3    Q.    **Oh, it wasn't?**

4    A.    It wasn't. I asked questions. His

5 deposition testimony wasn't one of the questions or

6 documents that I asked for.

7    Q.    **So I assume you didn't read Mia's dep**

8 **either?**

9    A.    That's correct.

10    Q.    **The parties in this case.**

11    A.    The parties are LK Nutrition.

12    Q.    **Comprised of Lee and Mia, right?**

13    A.    Those are investors in that company,

14 yes.

15    Q.    **They're members, aren't they?**

16    A.    They're members of the LLC.

17    Q.    **They're Forza, aren't they? They're the**

18 **members of Forza?**

19    A.    That's my understanding they are. Lee

20 and Mia.

21    Q.    **They're the ones that would be most**

22 **knowledgeable as to the business and the goings on**

23 **in Forza, right?**

24    A.    In most instances, absolutely.

25    Q.    **They're actually a party in this lawsuit**

### DEPOSITION OF PAUL DUGGAN

2 based on the caption, right?

3    A.    Yes.

4    Q.    **And you didn't find it prudent to read**

5 **their deposition testimony?**

6    A.    I'm calculating numbers, not their

7 opinions.

8    Q.    **Well --**

9    A.    I wanted the sales.

10    Q.    **Okay. What was the purpose of Forza?**

11 **What type of company was Forza?**

12    A.    Looking to sell wrestling-related

13 supplements into the wrestling community to take

14 advantage of the marketing power of Lee Kemp's name.

15    Q.    **What was the marketing power of**

16 **Mr. Kemp's name?**

17    A.    Noted to be one of the top 10 wrestlers

18 of all time, well-known in the wrestling community,

19 his work as a coach for the Olympic team,

20 internationally known and respected in the wrestling

21 community.

22    Q.    **Where do you get that information from?**

23    A.    You could literally Google it.

24    Q.    **Did you?**

25    A.    Yeah.

### DEPOSITION OF PAUL DUGGAN

2    Q.    **Did you --**

3    A.    I am a sports -- I used to be a walking

4 sports encyclopedia. Do you want to know who won

5 the 100 meter dash in the 1960 Rome Olympics?

6    Q.    **No. I'm actually just interested in Mr.**

7 **Kemp.**

8    A.    A German, and he upset the American.

9 I'll tell you who won the 200 meter race too, Livio

10 Berruti from Italy. I am a sports nut.

11    Famous wrestlers, he's in that

12 short list of top 10 wrestlers of all time.

13    Q.    **Did you Google that information in**

14 **preparation for your report?**

15    A.    I Googled -- yeah. In fact, I Googled

16 top 10 wrestlers and depending on whose -- the point

17 system used it would range Mr. Kemp, third, fourth,

18 fifth or sixth all time.

19    Q.    **What website did you see it on?**

20    A.    I couldn't tell you right now. If you

21 Googled it right now, do it at lunch, you'll see

22 most would rank Cael Sanderson, which I don't agree

23 with, Bruce Baumgartner, Rulon Gardner, Lee Kemp

24 ahead of Dan Gable, which I found surprising in

25 terms of notoriety, but he's listed.

### DEPOSITION OF PAUL DUGGAN

2    MS. ALIKHAN: It's 12:30. I am going to

3 take a break. I don't need long, but I don't know

4 if people want to eat or do something other -- or if

5 you want to press forward.

6    THE VIDEOGRAPHER: We are off the

7 record. The time is 12:37 p.m.

8    (Whereupon, there was a lunch

9 break.)

DEPOSITION OF PAUL DUGGAN

1 THE VIDEOGRAPHER: We're back on the
2 record. The time is 1:36 p.m.
3 EXAMINATION (continued)
4 BY MS. ALIKHAN:
5 Q. We just came back from a break,
6 Mr. Duggan. I would like to direct your attention
7 to Page 6 of your report. We'll start on Page 5.
8 And in Paragraph 15, you state it's your opinion
9 that "Ms. Scheid and Mr. Kemp had the ability to
10 expand an already existing successful business by
11 selling a proprietary line of nutritional
12 supplements to athletes if the products had been
13 supplied to them on a timely basis during the
14 Olympic year which were not mislabeled and tainted
15 by banned substances like DHEA."
16 What company are you referencing or
17 what successful business are you referencing?
18 A. Fitness Arts and LK/Forza.
19 Q. So the already existing business was
20 Fitness Arts?
21 A. LK Forza was basically a division of
22 Fitness Arts and -- which was selling 500,000 a year
23 in product. That's existing business.
24 Q. What forms your basis that LK Nutrition
25

DEPOSITION OF PAUL DUGGAN

1 was an extension of Fitness Arts?
2 A. Fitness Arts sold supplements, was
3 already in business. Lee Kemp and Mia Scheid worked
4 for Fitness Arts and were working for LK/Forza so
5 they're one in the same.
6 Q. Okay. How long did Mr. Kemp work for
7 Fitness Arts?
8 A. According to what he told me, he started
9 in 2008.
10 Q. How long did he work there for?
11 A. I don't know if he's still working
12 there. He's still in the business promoting
13 wrestling but I'm not sure if he's still at Fitness
14 Arts.
15 Q. You don't know how long Mr. Kemp worked
16 at Fitness Arts?
17 A. I'm saying he started in 2008. I don't
18 know if he's still there.
19 Q. So you don't know how long he worked
20 there?
21 A. Same answer.
22 Q. Is that a yes or a no?
23 A. That's a do I know how long he worked
24 there? No.
25

DEPOSITION OF PAUL DUGGAN

1 Q. No, you don't.
2 Are you aware of deposition
3 testimony by Mia Scheid stating that Mr. Kemp worked
4 at Fitness Arts on and off between -- for 2008?
5 A. I have not read her deposition.
6 Q. I'll submit to you that Lee Kemp worked
7 on and off for one year in 2008. Does that change
8 your opinion that forms the -- does that change the
9 basis of your opinion that Fitness Arts -- that
10 Forza was extension of Fitness Arts?
11 MR. SOLON: Object to foundation but
12 we'll treat it as hypothetical.
13 BY THE WITNESS:
14 A. I don't think that's consistent with the
15 facts in evidence so no, it doesn't.
16 BY MS. ALIKHAN:
17 Q. What are the objective facts that you
18 relied on that indicate that Forza was an extension
19 of Fitness Arts?
20 A. Start with Schedule 1. Lee Kemp worked
21 starting 2008, worked 9,000 hours.
22 Q. One second. Let me get there. Schedule
23 1 of your report?
24 A. Yes.
25

DEPOSITION OF PAUL DUGGAN

1 Q. Okay. Keep going.
2 A. I thought I answered your question.
3 Q. So your --
4 THE WITNESS: Do you want to reread the
5 question?
6 (Whereupon, the record was
7 read as requested.)
8 BY THE WITNESS:
9 A. Commonality of employees, meaning Mia
10 Lee; commonalty of product, meaning nutritional
11 product. So it's like adding a product line, that's
12 all. Just like we talked Nike was an existing
13 business and they came up with Air Jordan using
14 Michael Jordan's reputation. So Fitness Arts is a
15 business and they come up with an extension under
16 the LK name using Lee Kemp's reputation.
17 BY MS. ALIKHAN:
18 Q. Did you specifically see that
19 information anywhere in the record besides Schedule
20 1?
21 A. That's conversations with Mr. Kemp.
22 Q. When did you have those conversations?
23 A. The last two months, March and April of
24 2015.
25

28 (Pages 106 to 109)

DEPOSITION OF PAUL DUGGAN

1
2    Q.    You don't know what date?
3    A.    Correct.
4    Q.    Who was present?
5    A.    Probably on the phone with me and Lee.
6    Q.    It was you and Lee only on the phone?
7    A.    It could have been in a meeting with
8  Dylan and Ray Niro.
9    Q.    Did you cite any of these conversations
10  as the materials you relied upon in preparing the
11  opinions for your report today?
12    A.    My conversations with Lee Kemp. It's
13  Mr. Kemp's testimony, not mine, that I'm relying on.
14    Q.    His conversations, not testimony, right?
15    A.    I take that as evidence when he tells me
16  something.
17    Q.    But you never read his deposition to
18  confirm whether or not that's what he actually
19  testified to in this case, right?
20    A.    I've already answered that, right.
21    Q.    So that's no, right?
22    A.    I did not read his deposition. No, I
23  did not.
24    Q.    Schedule 1, at the top of that,
25  indicates that this is a lost hours recap for LK

DEPOSITION OF PAUL DUGGAN

1
2  Nutrition, right?
3    A.    Yes.
4    Q.    Do you see anywhere on this document
5  that indicates this is also for Fitness Arts?
6    A.    No.
7    Q.    Forza was actually incorporated in 2011,
8  right?
9    A.    That's my understanding.
10    Q.    And did you see any contracts between
11  Fitness Arts and Forza?
12    A.    No.
13    Q.    Did you see any agreement or licensing
14  agreement between Fitness Arts and Forza?
15    A.    No.
16    Q.    Who signed the agreement between
17  Passignano and Forza on behalf of Forza?
18    A.    I don't recall.
19    Q.    Was Fitness Arts a party to that
20  contract?
21    A.    I don't recall.
22    Q.    You were the 30(b)(6) for Passignano,
23  weren't you?
24    A.    I was.
25    Q.    And you don't recall who entered into

DEPOSITION OF PAUL DUGGAN

1
2  that agreement on behalf of Forza?
3    A.    I don't --
4        MR. SOLON:  Object to form. You asked
5  him if he recalled and he said he didn't recall and
6  you asked him again.
7        MS. ALIKHAN:  You don't have to continue
8  on. You can make the form and foundation objection.
9        MR. SOLON:  Don't ask the same questions
10  over and over again.
11        MS. ALIKHAN:  You made your objection.
12  Please don't tell me how to ask my questions.
13        MR. SOLON:  Someone should.
14        MS. ALIKHAN:  Thanks for your advice.
15  BY MS. ALIKHAN:
16    Q.    Did Passignano have any inclination LK
17  was an extension of Fitness Arts?
18    A.    I don't recall.
19    Q.    Wouldn't that have made the investment
20  by Passignano less risky into Forza?
21    A.    That would be speculation.
22    Q.    You don't know whether or not having an
23  established business record would make the
24  investment less risky than not?
25        MR. SOLON:  Object to form.

DEPOSITION OF PAUL DUGGAN

1
2  BY THE WITNESS:
3    A.    That's confusing. Is that a follow-on
4  question? You might have to go back four questions.
5  I am not sure where you are at here.
6  BY MS. ALIKHAN:
7    Q.    My question to you is would having an
8  established business record when considering
9  investing into a company, wouldn't that make the
10  investment less risky?
11        MR. SOLON:  Object to form.
12  BY MS. ALIKHAN:
13    Q.    Do you understand the question?
14    A.    I understand the question.
15    Q.    What is your answer?
16    A.    I think there is an established business
17  here, which is Fitness Arts, with the same people,
18  Mia and Lee, with funding from Passignano which
19  makes it less risky.
20    Q.    You didn't know whether or not
21  Passignano had that information when it decided to
22  invest in Forza, did you?
23    A.    I said I don't recall that. What I'm
24  saying is this isn't about Passignano, it's about
25  Fitness Arts and LK.

29  (Pages 110 to 113)

DEPOSITION OF PAUL DUGGAN

1
2   **Q.** And I'm asking you a question with
3 respect to whether or not the investor knew that
4 Fitness Arts was an extension of Forza at the time
5 it determined it was going to invest in Forza?
6   **A.** They didn't invest. Passignano is not
7 an investor, it's a lender.
8   **Q.** At the time it decided to lend money to
9 Forza.
10   **A.** Ask the question again because you just
11 switched it.
12   MS. ALIKHAN: Can you repeat the
13 question again for the witness.
14   (Whereupon, the record was
15 read as requested.)
16   MR. SOLON: Object to the foundation for
17 the question that was just read back.
18 BY MS. ALIKHAN:
19   **Q.** Go ahead and answer.
20   **A.** I answered that Passignano is not an
21 investor.
22   **Q.** At the time Passignano decided to loan
23 money to Forza, did it have knowledge that Fitness
24 Arts -- that Forza was an extension of Fitness Arts?
25   **A.** Yes.

DEPOSITION OF PAUL DUGGAN

1
2   **Q.** You gave a deposition in this case May
3 6, 2014 as a 30(b)(6) witness for Passignano,
4 correct?
5   **A.** Is that the right date? I don't have a
6 memory of the date.
7   **Q.** You gave a deposition, right?
8   **A.** I did give a deposition.
9   **Q.** And you gave an oath to tell the truth
10 in that deposition?
11   **A.** I did.
12   **Q.** And you did tell the truth in that
13 deposition, didn't you?
14   **A.** I assume I did.
15   **Q.** And you testified to some of the risks
16 that were calculated in deciding to lend Forza money
17 during that deposition.
18   Do you recall that?
19   **A.** I don't recall my testimony. You want
20 me to reread the deposition?
21   **Q.** No.
22   **A.** Okay. I don't recall.
23   **Q.** One of the risks that you testified to
24 in Passignano loaning money to Forza was that --
25 would be the performance of Premier to make the

DEPOSITION OF PAUL DUGGAN

1
2 product correctly.
3   Do you recall that?
4   **A.** I don't recall my deposition testimony.
5   **Q.** Do you recall stating that another risk
6 would be that Forza was a start-up company with no
7 track record?
8   **A.** I don't recall my testimony.
9   **Q.** Do you have any reason to doubt that
10 that's what you stated?
11   **A.** I have -- I don't recall my testimony.
12 If you want to give me the deposition, I'm happy to
13 read it.
14   **Q.** I'll hand you your deposition.
15   MR. SOLON: Let me see it.
16   (The document was tendered.)
17   MR. SOLON: Okay. Page please?
18   MS. ALIKHAN: 50. Line 5.
19 BY MS. ALIKHAN:
20   **Q.** Are you done reading it?
21   **A.** No.
22   **Q.** Did you say that, Mr. Duggan?
23   **A.** Did I say what?
24   **Q.** In response to my question:
25   "Would one of the risks be that

DEPOSITION OF PAUL DUGGAN

1
2 Forza was a start-up company with no track record?
3   "ANSWER: Forza is a risk, yes."
4   **A.** If that's my answer in the deposition,
5 that's fine.
6   **Q.** Which entity signed the agreement
7 between the USAW, Forza or Fitness Arts?
8   **A.** I don't recall.
9   **Q.** Which entity owned the patent
10 applications?
11   **A.** I don't recall.
12   **Q.** Did Fitness Arts' name or trademark
13 appear on any of the LK/Forza products or marketing
14 materials?
15   **A.** I don't know.
16   **Q.** Did you ask?
17   **A.** No.
18   **Q.** Did you ask who owned the patent
19 applications?
20   **A.** No.
21   **Q.** Did Forza -- did Fitness Arts sell Forza
22 products in its stores?
23   **A.** I don't recall.
24   **Q.** Did you ask?
25   **A.** No.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1 referenced a little bit ago?
2
3 A. Yes.
4 Q. On the phone or in person?
5 A. Yes.
6 Q. In March or April of this year?
7 A. Yes.
8 Q. You can't recall the dates?
9 A. I do not recall the dates.
10 Q. You don't know if it was on the phone or
11 if it was in person?
12 A. Or both.
13 Q. You don't know how many conversations
14 you had?
15 A. Correct.
16 Q. Is there any information on your
17 invoices or billings that would help to refresh your
18 recollection as to when these conversations took
19 place?
20 A. No idea.
21 Q. You don't know?
22 A. I don't know what my billings look like.
23 Q. Is it typical to have entries for phone
24 calls that you have with clients?
25 A. I've only done two of these cases in 15

DEPOSITION OF PAUL DUGGAN

1
2 years and there's nothing typical.
3 Q. You don't account for your time when
4 charging the client?
5 A. I don't know what the invoice looks
6 like, that's what you asked me. I don't know what
7 it looks like. It might just say eight hours times
8 $500, 4,000, services provided. It might. I don't
9 know.
10 Q. What's your basis for your fifth opinion
11 that states, "Mrs. Scheid and Mr. Kemp will help" --
12 "with help from Mrs. Scheid's mother, a physician
13 specializing in children's health, formulated a
14 proprietary line of supplements for amateur
15 wrestlers and even sought patent protection for its
16 formulas."
17 A. Conversations with counsel for LK and
18 with Mr. Kemp.
19 Q. So conversations that you had with
20 counsel helped form the basis of some of the
21 opinions that you have in your report?
22 A. No. Counsel was with Mr. Kemp. So when
23 I'm saying conversations, I'm speaking with Lee Kemp
24 and counsel was there.
25 Q. And you state that "The fact of

DEPOSITION OF PAUL DUGGAN

1
2 proprietary formulations covered by a patent gave
3 LK/Forza potentially exclusive position in this
4 space."
5 What forms the basis for that
6 opinion?
7 A. Well, a patent is meant to provide
8 exclusivity and keep other people out of the market.
9 That's the nature of a patent. So that's -- one
10 would infer that if I have a successful formulation
11 and it's patented, then people can't copy it.
12 Q. Do you know if these products were ever
13 patented?
14 A. I do not.
15 Q. Do you know the status of the patent for
16 the products?
17 A. I do not.
18 Q. Are you aware if they were issued?
19 A. I do not.
20 Q. Did you review the patent applications
21 filed by LK/Forza in connection with the products at
22 issue?
23 A. No.
24 Q. Do you know if the United States Patent
25 and Trademark Office had offered any opinion as to

DEPOSITION OF PAUL DUGGAN

1
2 the patentability of the products in the
3 application?
4 A. No.
5 Q. Without an issued patent, how could have
6 Forza prevented an established sports nutrition
7 company from selling an identical or near identical
8 product?
9 A. That's a legal question.
10 Q. It goes to your opinion that they had an
11 exclusive space, potentially exclusive position in
12 this space.
13 A. From a business standpoint, your patent
14 lawyer would inform the potential infringer that we
15 have a patent pending so they may or may not elect
16 to continue to sell the product. That's a business
17 or a legal business decision that Kemp, Forza and
18 counsel would make.
19 Q. What forms your basis that Ms. Scheid
20 helped to form -- formulate the products?
21 A. Conversations with Mr. Kemp.
22 Q. Sorry, Ms. Scheid's mother.
23 What forms your basis for the fact
24 or your opinion that Ms. Scheid's mother formulated
25 the products?

33  (Pages 126 to 129)

### DEPOSITION OF PAUL DUGGAN

1     A.   Same answer.
2     Q.   Did you review Ms. Scheid's mother's
3 deposition testimony in this case?
4     A.   I did not.
5     Q.   In her deposition she stated that she
6 didn't have any part in the formulation of these
7 products.
8         Does that change your opinion?
9     MR. SOLON: Object to foundation.
10 BY MS. ALIKHAN:
11     Q.   Would that change your opinion?
12     A.   No. That Scheid and Kemp formulated a
13 supplement.
14     Q.   With help from Ms. Scheid's mother, a
15 physician specializing in children's health.
16     A.   No.
17     Q.   Did you review any statistics on the
18 allowance on rate of patent applications relating to
19 dietary supplements or sports nutrition products?
20     A.   No.
21     Q.   Did you ask if any patentability
22 opinions existed with respect to these patent
23 applications?
24     A.   No.

### DEPOSITION OF PAUL DUGGAN

1     Q.   So you don't know whether or not these
2 patents could have been issued at any point?
3     A.   Could have been?
4     Q.   Yes.
5     A.   At the time the business was started,
6 they were potentially able to be issued, period.
7     Q.   Did you examine whether there were any
8 other sports nutritional products targeted to
9 amateur wrestlers?
10     A.   No.
11     Q.   In your sixth opinion you state that
12 "LK/Forza had the endorsement of USA Wrestling as
13 the only authorized source for approved nutritional
14 supplements for wrestlers."
15         What do you base that opinion on?
16     A.   Ripley deposition.
17     Q.   What page?
18     A.   You'd have to give me the deposition.
19     Q.   You don't know sitting here today?
20     A.   I don't have a perfect memory -- I've
21 got a Ripley document that I have, it was about four
22 inches. So I don't have total recall.
23     Q.   Assuming that statement is true, that
24 doesn't mean that other sports nutritional companies

### DEPOSITION OF PAUL DUGGAN

1 couldn't sell to Forza's intended customers, right?
2     A.   Ripley was not assuming that they
3 controlled the market a hundred percent. He was
4 assuming they would get a piece of it. It's a very
5 large market and they're looking at getting two,
6 then five then 10 million a year in sales, not the
7 entire market.
8     Q.   So other companies could sell products
9 to Forza's intended customers, correct?
10     A.   Correct. And that's considered and
11 calculated into the Ripley report.
12     Q.   We'll get to that report in a second.
13         Did you see the USAW contract that
14 Forza entered into?
15     A.   No.
16     Q.   Did you review it?
17     A.   No.
18     Q.   Do you have an understanding of the
19 terms that are contained in it?
20     A.   No.
21     Q.   So you got that information strictly
22 from Mr. Ripley, correct?
23     A.   Correct.
24     Q.   Do you know whether or not he reviewed

### DEPOSITION OF PAUL DUGGAN

1 the contract?
2     A.   I do not.
3     Q.   Do you know whether or not he had any
4 understanding of the agreement between Forza and
5 USAW?
6     A.   No.
7     Q.   You state that "No other company had the
8 endorsement or access" -- pardon me. "No other
9 company had that endorsement" of the USAW.
10         How do you know that?
11     A.   Ripley report.
12     Q.   You also stated that "USA Wrestling
13 permitted Forza/LK to use its extensive database."
14         What do you base that on?
15     A.   I am not sure if that's from Ripley or
16 Kemp.
17     Q.   The conversations with Mr. Kemp?
18     A.   Right. Or the Ripley report. I would
19 have to reread Ripley.
20     Q.   Before we take a break, you stated that
21 Mr. Kemp's marketing power was a draw for the
22 success of Forza, correct?
23     A.   Yes.
24     Q.   And in your report here you liken him to

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1 Michael Jordan as the Michael Jordan of amateur
2 wrestling, right?
3 A. Yes.
4 Q. What's your basis for that?
5 A. It's an analogy. Michael Jordan was, if
6 you looked at greatest basketball players, he'd be
7 listed as top 10. If you looked at greatest
8 wrestlers Lee Kemp's listed in the top 10.
9 Q. Would Michael Jordan be listed as top
10 three?
11 A. He might be listed as top 10. It
12 depends on your era, the greatest player. Could
13 have been Oscar Robinson, or Wilt Chamberlain who
14 scored up to 100 points a game. Jordan didn't break
15 Chamberlain's records. They still stand. So it's a
16 question of analyzing the eras they played in.
17 But in the -- Jordan clearly and
18 Wilt Chamberlain would each be included in top 10
19 like Lee Kemp along with others are included in top
20 10 in wrestling.
21 Q. What do you base that information on?
22 A. As I answered before, I Googled greatest
23 wrestlers and it includes Lee Kemp, John Smith, Cael
24 Sanderson and others.

DEPOSITION OF PAUL DUGGAN

1 Q. What websites did you get that
2 information from?
3 A. You already asked me that and I answered
4 I don't recall.
5 Q. Did you list those websites on your
6 Exhibit B of your report?
7 A. No.
8 Q. So sitting her today, you can't tell me
9 specifically where that information came from.
10 A. Google.
11 Q. Where on Google? Google is a big space.
12 A. I could probably pull it up at the break
13 if you'd like to see it. I'd be happy to do it.
14 Q. What's the basis of your statement if
15 Michael Jordan sold "supplements to amateur
16 basketball players, one could forecast a better than
17 average probability of success"?
18 A. It's my opinion name recognition, Jordan
19 to basketball players is like Kemp to wrestling.
20 Q. What research did you do to determine
21 that Jordan to basketball players is like Kemp to
22 wrestling?
23 A. What research did I do?
24 Q. Yes.

DEPOSITION OF PAUL DUGGAN

1 A. I draw the inference from being an
2 amateur basketball and wrestling enthusiast.
3 Q. Because you're a fan you're able to draw
4 that inference?
5 A. As to the Kemp side of things, I draw it
6 off the web in terms of all the ratings and systems.
7 Q. When you talk about ratings and systems,
8 can you explain to me what that is, what that means?
9 A. Well, one way they rate wrestlers is on
10 a point system. You get X number of points for
11 being in the Olympics, X number of points for
12 winning a silver or bronze or gold medal; X number
13 of points for participating in international
14 tournaments, for winning them; for competing at the
15 NCAA, the collegiate.
16 Cael Sanderson, who comes at the
17 top of some lists, and Cael is C-a-e-l. He comes to
18 the top of some lists, never lost a match in high
19 school or college. And yet some people don't
20 recognize him as the all-time wrestler although he
21 never lost a match because he doesn't have the
22 international points.
23 So there are different point
24 systems that would come up with different answers.

DEPOSITION OF PAUL DUGGAN

1 Some consider John Smith, and I don't disagree, is
2 the greatest. I think that's who Lee Kemp would
3 consider, John Smith is the greatest.
4 Q. Do any of these resources rank Mr. Kemp
5 as the greatest?
6 A. No. I would put him top five. Of his
7 era, I would say he came after Gable, beat Gable,
8 came before Cael Sanderson and before John Smith.
9 Q. What about Pat Smith?
10 A. Pat Smith?
11 Q. Have you heard of him?
12 A. No.
13 Q. So do you have any knowledge as to
14 whether or not Mr. Kemp has won any gold medals in
15 the Olympics?
16 A. His Olympic eligibility year, the U.S.
17 did not participate because of the Jimmy Carter
18 boycott.
19 Q. So he did not participate in the
20 Olympics?
21 A. Right, which knocks him down because he
22 didn't get points for having an Olympic gold medal
23 even though he didn't get the chance.
24 Q. Have you done any research with respect

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1  to athlete endorsements of products?
2
3     A.   No.
4     Q.   Have you done any research with respect
5  to the wrestling consumers?
6     A.   No.
7     Q.   In Paragraph 17 of your report, you
8  compare Nike and Michael Jordan to Fitness Arts and
9  the LK/Forza brand.
10         What research did you do to
11  determine the success of Michael Jordan with Nike?
12    A.   In the news last week they listed
13  Michael Jordan as the highest paid athlete in the
14  world last year based on a combination of salary and
15  endorsements. So that's only a recent anecdote, but
16  the Michael Jordan association to Nike in creating
17  the Air Jordan brand has been legendary and has put
18  Jordan as the highest paid athlete in sports in
19  calendar 2014.
20    Q.   So one of the bases is based on a news
21  report from last week?
22    A.   No. It only confirms my --
23    Q.   Your speculation?
24    A.   Not my speculation. The success of Nike
25  and its association with Tiger Woods and Michael

DEPOSITION OF PAUL DUGGAN

1
2  Jordan.
3     Q.   Based on what research?
4     A.   Over time I've owned the Nike stock,
5  analyzed their sales, their sales growth. It has
6  been a very powerful stock in the market. From time
7  to time I invest with Jackson in consumer brands so
8  I'm aware of it on a sometimes casual and sometimes
9  very intense basis, depending on where my
10  investments are made.
11    Q.   What were Nike's sales prior to its
12  enlisting of Michael Jordan?
13    A.   I don't have that information.
14    Q.   What were their sales after?
15    A.   Higher.
16    Q.   Based on what?
17    A.   Reality.
18    Q.   Do you have any knowledge of Michael
19  Jordan endorsing products directed to young people
20  today?
21    A.   Air Jordan brand, he's the No. 1 paid
22  celebrity today, 20 years after he stopped playing.
23    Q.   Anything else?
24    A.   He used to do Gatorade, but I don't know
25  if he still does. I don't think he does anymore.

DEPOSITION OF PAUL DUGGAN

1
2     Q.   Are Air Jordans targeted to particular
3  athletes?
4     A.   Basketball players.
5     Q.   Are those the only consumer that buys
6  Air Jordan.
7     A.   Sometimes they're more of a social brand
8  where people want to have the Air Jordan, but Nike
9  has its own logo with the swoosh and Air Jordan is
10  an extension of that.
11    Q.   Was LK Nutrition targeted to any type of
12  consumer?
13    A.   Was it?
14    Q.   Yes. Did it have a targeted market?
15    A.   Wrestling community: Local club, grade
16  school, high school, college.
17    Q.   In 8, the basis for your opinion located
18  in your report is that "LK/Forza secured sufficient
19  funding to purchase the initial round of proprietary
20  products from PRL," right? And you state that it
21  was enough to generate twice the --
22    A.   That's not what 18 says.
23    Q.   8.
24    A.   8. I thought you said 18.
25         Are you saying Page 8 or Paragraph

DEPOSITION OF PAUL DUGGAN

1
2  8? What are saying here?
3     Q.   I'm on Page 7.
4     A.   I can't understand you.
5     Q.   Page 7.
6         MR. BROWN: Item 8.
7         THE WITNESS: Item 8. Okay. I thought
8  she said 18.
9         MR. BROWN: Halfway down.
10  BY MS. ALIKHAN:
11    Q.   Here you state that "LK had secured
12  sufficient funding to purchase the initial round of
13  proprietary products from PRL." And you say, it was
14  "enough to generate twice the amount in cash to then
15  purchase second and third full cycles of products."
16         How do you form the basis or what
17  basis do you rely upon for that opinion?
18    A.   If you -- I believe that they had
19  550,000 in cash in the form of a loan. They spent
20  $365,000 in goods. If you turn the goods over with
21  the similar product margin you would have 550 to
22  $600,000 in sales. You repeat the process, repeat
23  the process, repeat the process.
24         So there was enough money to turn
25  the inventory over, they had enough money to make

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1            DEPOSITION OF PAUL DUGGAN
2 the purchase of the product.
3     **Q.   This came from Mr. Ripley's business**
4 **plan, right?**
5     A.   The funding came from -- the turnover
6 comes from Mr. Ripley's business plan, the physical
7 funding came from the information received either
8 through -- I state in here. Let me see, I state in
9 here --
10    **Q.   I'm just talking about the numbers where**
11 **you say they were funded adequately, enough to**
12 **generate twice the amount of cash.**
13            **Where does that assumption come**
14 **from?**
15     A.   They have $550,000 to purchase $365,000
16 worth of product. Okay? Clearly they had enough
17 money. Once that product sold and resold and
18 resold. Once you sell it, you get the cash back.
19 You sell it again, you get the cash back.
20    **Q.   How much do you have to sell it for?**
21 **What kind of profit margins do you have to make to**
22 **generate twice the amount of cash?**
23     A.   At two turns a year you would only have
24 to turn it two turns to generate that.
25    **Q.   To who?**

DEPOSITION OF PAUL DUGGAN

1            DEPOSITION OF PAUL DUGGAN
2     A.   Right now they're selling product with a
3 30 to 40 percent margin. I think on average, 35
4 percent.
5    **Q.   I'm talking about the basis for this**
6 **statement on Page 7, Section 8, Item 8.**
7     A.   Your question again is?
8    **Q.   What is your basis that LK had secured**
9 **sufficient funding to purchase the initial round and**
10 **generate twice the amount of cash?**
11    A.   I think I've answered that. What don't
12 you understand?
13    **Q.   I don't understand your answer. Go**
14 **ahead and answer it again.**
15     A.   They had $550,000 in a loan to secure a
16 $365,000 purchase from the supplier, from Premier.
17 So that gives them a $165,000 cushion. But once
18 that 365,000 is sold for over 500,000 in sales, the
19 500,000 is reinvested and would generate 700. The
20 700 is reinvested and would generate a million. So
21 it might have three or four or five X. That two X
22 is very conservative.
23    **Q.   Did this take into account any of the**
24 **expenses that LK would have to incur? Can you**
25 **remember?**

DEPOSITION OF PAUL DUGGAN

1          **DEPOSITION OF PAUL DUGGAN**
2     A.   There is 165 in excess cash to fund the
3 start-up, to fund the spinoff of LK. So there's
4 plenty of money. This is funded. The key in a new
5 business is even get a foothold. They've got the
6 money for an Olympic year for a distribution of
7 product.
8    **Q.   What is your basis for that, just simple**
9 **numbers? How do you come to that conclusion?**
10    A.   Well, if -- it's math. It's simple
11 numbers. What's a bigger number, counselor, 550,000
12 or 365,000?
13    **Q.   I don't know. I am the one asking you**
14 **questions.**
15    A.   Okay. So do you understand math?
16 What's a bigger number? 550,000 is bigger than 365.
17 There's enough money to do it.
18    **Q.   Did you see an operational plan?**
19    A.   It's in Mr. Ripley's.
20    **Q.   Did you know whether or not it was**
21 **feasible to make those numbers?**
22    A.   Mr. Ripley considers it feasible with
23 his analysis.
24    **Q.   Do you?**
25    A.   I am relying on Mr. Ripley. My opinion

DEPOSITION OF PAUL DUGGAN

1           DEPOSITION OF PAUL DUGGAN
2 here is there is significant cash.
3    **Q.   Based on Mr. Ripley's --**
4     A.   No. Simple math. 550,000 will clearly
5 buy 365,000 worth of merchandise unless it's
6 tainted.
7    **Q.   And what is your basis that $165,000 was**
8 **sufficient to cover any expenses that Forza would**
9 **have incurred? Is that simple math?**
10    A.   Yes, it is very simple. Is that your
11 question, is it simple math? Yes, it's simple.
12    **Q.   What is your basis?**
13    A.   If you take a look at Fitness Arts,
14 their cost of -- their expenses are 140,000 a year
15 for 700 million in sales, irrespective of salaries.
16    **Q.   Did Mr. Ripley compare Fitness Arts'**
17 **financials in coming up with Forza's?**
18    A.   He built a business model and --
19    **Q.   Did he rely upon Fitness Arts' numbers?**
20    A.   I don't recall.
21    **Q.   I'll mark this as Exhibit 8.**
22           (Whereupon, Duggan Exhibit 8
23           marked as requested.)
24           (Whereupon, the document was
25           tendered.)

**DEPOSITION OF PAUL DUGGAN**

1   BY MS. ALIKHAN:
2       Q.   This is a business plan that Mr. Ripley
3   created for Forza, right?
4       A.   Is this -- it is one. Is this his final
5   one?
6       Q.   Do you know when he -- what date he
7   created the final version?
8       A.   I'd have to -- you would have to show me
9   his deposition.
10      Q.   His deposition states that this was the
11  final business plan.
12      MR. SOLON: Object to foundation.
13  BY THE WITNESS:
14      A.   Your question is?
15  BY MS. ALIKHAN:
16      Q.   Is this the business plan that
17  Mr. Ripley created for Forza?
18      A.   You're telling me it is. I don't know.
19      Q.   I'm asking you, is it?
20      A.   You're telling me it is. I don't know.
21      Q.   I said is this the business plan?
22      A.   I would have to refer to -- I don't have
23  a document here. I didn't bring a document. There were


---


**DEPOSITION OF PAUL DUGGAN**

1   BY MS. ALIKHAN:
2       Q.   This is a business plan that Mr. Ripley
3   created for Forza, right?
4       A.   Is this -- it is one. Is this his final
5   one?
6       Q.   Do you know when he -- what date he
7   created the final version?
8       A.   I'd have to -- you would have to show me
9   his deposition.
10      Q.   His deposition states that this was the
11  final business plan.
12      MR. SOLON: Object to foundation.
13  BY THE WITNESS:
14      A.   Your question is?
15  BY MS. ALIKHAN:
16      Q.   Is this the business plan that
17  Mr. Ripley created for Forza?
18      A.   You're telling me it is. I don't know.
19      Q.   I'm asking you, is it?
20      A.   You're telling me it is. I don't know.
21      Q.   I said is this the business plan?
22      A.   I would have to refer to -- I don't have
23  a document here. I didn't bring a document. There were

**DEPOSITION OF PAUL DUGGAN**

1   interim drafts.
2       Q.   In Paragraph 18 of your report, you
3   state, "I think the single most important issue is
4   that LK/Forza was funded. They had $550,000 in
5   funding on hand. This was not a pipe dream."
6       I want to turn your attention to
7   Page 15 of the exhibit I just provided you. Sales
8   obviously played a factor in your opinion that Forza
9   was adequately funded, right?
10      A.   What played a factor?
11      Q.   Sales.
12      A.   Sales?
13      Q.   Sales.
14      A.   I stated that $550,000 was enough to
15  fund the opening purchase of inventory and get the
16  company started.
17      Q.   Well, that assumes there would have to
18  be sales of the product, right?
19      A.   No question.
20      Q.   And this is a part of the business model
21  that deals with the sales forecast, right?
22      A.   Page 15? The sales forecast is the
23  whole business plan here but this is a component,
24  yes.

**DEPOSITION OF PAUL DUGGAN**

1  BY MS. ALIKHAN:
2    Q.  This is a business plan that Mr. Ripley
3  created for Forza, right?
4    A.  Is this -- it is one. Is this his final
5  one?
6    Q.  Do you know when he -- what date he
7  created the final version?
8    A.  I'd have to -- you would have to show me
9  his deposition.
10    Q.  His deposition states that this was the
11  final business plan.
12    MR. SOLON: Object to foundation.
13  BY THE WITNESS:
14    A.  Your question is?
15  BY MS. ALIKHAN:
16    Q.  Is this the business plan that
17  Mr. Ripley created for Forza?
18    A.  You're telling me it is. I don't know.
19    Q.  I'm asking you, is it?
20    A.  You're telling me it is. I don't know.
21    Q.  I said is this the business plan?
22    A.  I would have to refer to -- I don't have
23  a document here. I didn't bring a document. There were

**DEPOSITION OF PAUL DUGGAN**

1  interim drafts.
2    Q.  In Paragraph 18 of your report, you
3  state, "I think the single most important issue is
4  that LK/Forza was funded. They had $550,000 in
5  funding on hand. This was not a pipe dream."
6    I want to turn your attention to
7  Page 15 of the exhibit I just provided you. Sales
8  obviously played a factor in your opinion that Forza
9  was adequately funded, right?
10    A.  What played a factor?
11    Q.  Sales.
12    A.  Sales?
13    Q.  Sales.
14    A.  I stated that $550,000 was enough to
15  fund the opening purchase of inventory and get the
16  company started.
17    Q.  Well, that assumes there would have to
18  be sales of the product, right?
19    A.  No question.
20    Q.  And this is a part of the business model
21  that deals with the sales forecast, right?
22    A.  Page 15? The sales forecast is the
23  whole business plan here but this is a component,
24  yes.

**DEPOSITION OF PAUL DUGGAN**

1    Q.  Section 5.43, your sales forecast?
2    A.  Yes.
3    Q.  And according to Mr. Ripley, in Year 1,
4  there would be almost $4 million in sales of the
5  product, right?
6    A.  Yes.
7    Q.  And that's assuming that 3.1 million of
8  that was sold to wrestling clubs, right?
9    A.  Yes.
10    Q.  And 525,000 of that was sold to high
11  school wrestling programs?
12    Q.  And $250,000 of that was sold at
13  wrestling events?
14    A.  Yes.
15    Q.  Online sales of $50,000, right?
16    A.  Yes.
17    Q.  Did you see any evidence that Forza had
18  attended events or had approached 300 clubs to make
19  that 3.15 million goal sales forecast?
20    A.  No.
21    Q.  Did you see any evidence that Forza
22  approached 35 wrestling programs to make that
23  $525,000 forecast?

**DEPOSITION OF PAUL DUGGAN**

1    A.  I didn't see any of that evidence, no.
2  And they might have approached 500 wrestling
3  programs to get 35.
4    Q.  Did you see that evidence?
5    A.  I did not.
6    Q.  Did you see any evidence that Forza
7  attended 50 wrestling events to make that $250,000?
8    A.  They didn't because they didn't receive
9  the product. And when they got it, it was tainted.
10  Why would you go sell a tainted product mislabeled
11  by a manufacturer? You can't do it. It was
12  destroyed by PR. I can't help that. Of course
13  you're not going to sell bad products to kids and
14  ruin their careers.
15    Q.  What's your basis that the product would
16  ruin these kids' careers?
17    A.  Well, if they take a tainted product and
18  it shows up in the --
19    Q.  What's your basis --
20    A.  -- DHEA --
21    Q.  What's your basis that it was tainted?
22    A.  I'm probably told that by Mr. Kemp,
23  that's why they couldn't sell it.
24    Q.  That's why they couldn't sell it?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1
2    A.   It's tainted. It's been ruined. It's
3  cited in here in the depositions. I am not a
4  tainted expert, tainted product expert. Are you
5  denying the product was tainted with DHEA?
6    Q.   **I'm not making any claims. This is what**
7  **you're saying. You're saying they couldn't sell the**
8  **product to wrestling clubs and high school programs**
9  **and wrestling events because it was tainted.**
10   A.   And it was never delivered. It was
11 ordered and paid for in November and they didn't get
12 it for a year. How are you going to sell something
13 you don't have? And then when you get it, it's
14 mislabeled and tainted. You can't sell something
15 that doesn't exist.
16   Q.   **What's your basis for the fact they**
17 **couldn't sell it because they got it quote, unquote,**
18 **late?**
19   A.   You know what? That's the most
20 commonsense in the whole world. If you don't have
21 it you can't sell it.
22   Q.   **So when you have it, why can't you sell**
23 **it?**
24   A.   Because when it was received it was
25 mislabeled and tainted.

DEPOSITION OF PAUL DUGGAN

1
2    Q.   **What's your basis for the fact that they**
3  **couldn't sell it because it was mislabeled and**
4  **tainted?**
5    A.   That's not part of my opinion.
6    Q.   **But you just testified to that. You**
7  **said they couldn't sell the product because it was**
8  **mislabeled and tainted and it wasn't delivered on**
9  **time.**
10   A.   You can't sell something you don't have.
11 You're not going to -- if you're going to have a
12 reputation, you're not going to try to ruin careers
13 by selling them tainted products so they're banned
14 from wrestling. That's just commonsense. You can't
15 sell garbage. You can't sell things that are
16 mislabeled. They have their money ripped off.
17       MR. SOLON: May I suggest that you don't
18 argue the merits underlying the case.
19       MS. ALIKHAN: I'm not arguing the
20 merits. He's the one that brought it up.
21 BY THE WITNESS:
22   A.   No, no, no. I said at Paragraph 18 I
23 said they're funded.
24 BY MS. ALIKHAN:
25   Q.   And I'm taking you through the business

DEPOSITION OF PAUL DUGGAN

1
2  plan to test that assumption.
3    A.   That's Mr. Ripley's business plan.
4    Q.   **Yeah. That you relied upon in forming**
5  **your opinions, right?**
6        MR. SOLON: Hang on. Let me object.
7  Don't argue with the witness. Slow down. Let's get
8  a question and answer, get back on track.
9  BY MS. ALIKHAN:
10   Q.   **Mr. Duggan, you relied upon Mr. Ripley's**
11 **business plan in determining whether or not Forza**
12 **incurred damages in this case, didn't you?**
13   A.   My report lists damages.
14   Q.   **Did you rely on the business plan --**
15   A.   Can I answer the question?
16   Q.   **I'm not asking about your report. I'm**
17 **asking about whether or not you relied on**
18 **Mr. Ripley's business plan in determining the**
19 **damages that Forza incurred.**
20   A.   My report does not speak to that. My
21 report lists direct losses of $2,759,000 not related
22 to the lost business expansion that Mr. Ripley
23 calculated, not me. So if you go to -- if you add
24 damages up, you have the Ripley damage in my report.
25   Q.   **Part of your report has to do with lost**

DEPOSITION OF PAUL DUGGAN

1
2  **profits, doesn't it?**
3    A.   My report deals with actual expenses
4  lost, the purchase of tainted product from PRL and
5  the development cost. It's not a lost profits
6  calculation, that's Mr. Ripley's report.
7    Q.   **In Section 20 of your report you state,**
8  **"I have reviewed the business plan prepared by**
9  **Michael Ripley. Mr. Ripley is a certified public**
10 **accountant. His business plan is thorough and**
11 **complete and predicts a very conservative market**
12 **penetration. Mr. Ripley forecast of $47 million in**
13 **sales and $11.3 million in profits for the three-**
14 **year period from 2012 and 2014. In my opinion,**
15 **profits of at least 10 million from the LK/Forza**
16 **business were both reasonable and achievable."**
17 **Did you rely upon Mr. Ripley's**
18 **report or business plan in making that -- in forming**
19 **that opinion?**
20   A.   The $10 million was less than the Ripley
21 plan; I reduced it, yes. So I took the Ripley plan,
22 he did the work, and I said even with a range of
23 error it would be $10 million.
24   Q.   **Did you do anything to test the**
25 **assumptions within Mr. Ripley's business plan?**

### DEPOSITION OF PAUL DUGGAN

2    A.   When I read the plan I thought they were
3 reasonable.
4    **Q.   Based on what?**
5    A.   Based on my knowledge, skills, training,
6 experience, working with businesses. It seemed to
7 be a comprehensive, well-thought out, well-prepared
8 report.
9    **Q.   Did you do anything to test whether or**
10 **not Forza would have been able to sell $3.1 million**
11 **to 300 wrestling clubs?**
12    A.   I did not.
13    **Q.   Did you do anything to test whether or**
14 **not Forza would have been capable of selling**
15 **$525,000 to 35 wrestling programs in Year 1?**
16    A.   I think I've answered this already.
17    **Q.   Did you do that?**
18    A.   Yes, I think so. I think I've answered
19 it more than once. I didn't test this.
20    **Q.   So what forms your basis that this was a**
21 **thorough and well and complete -- very conservative**
22 **market penetration -- which predicts a very**
23 **conservative market penetration?**
24    A.   That's what Mr. Ripley's job is, not
25 mine. He did it. He was paid to do it. He spent

### DEPOSITION OF PAUL DUGGAN

2 an extensive amount of time studying the market. So
3 I took his number and reduced it by a margin of
4 error and inserted it at Line 20. I didn't do this
5 business plan, he did. He's the subject of the
6 deposition, not me.
7    **Q.   Where did you see he did a thorough and**
8 **complete examination of the market?**
9    A.   I thought he did a reasonable -- I
10 thought the data he's relying on was reasonable, I
11 thought it was a reasonable approach. I've seen a
12 lot of business plans. That was his opinion. When
13 I looked at it, it was done in a normal, reasonable
14 method and way.
15    **Q.   Did you see in Mr. Ripley's deposition**
16 **that did he not do any research with respect to**
17 **these numbers? This all came from Lee and Mia?**
18    A.   I don't recall.
19    **Q.   Would that affect your opinion on -- as**
20 **to whether or not this was a thorough and complete**
21 **business plan?**
22    A.   No.
23    **Q.   Why not?**
24    A.   Because if someone would be aware of the
25 market, it would be Lee. Lee's in the market. So

### DEPOSITION OF PAUL DUGGAN

2 you would take that -- you have to start with some
3 baseline points and you have an idea of pricing and
4 you do the calculations and the forecasting.
5    **Q.   And would these numbers just come out of**
6 **thin air or would you have to do some sort of**
7 **research to determine whether or not these numbers**
8 **were feasible?**
9    A.   Mr. Ripley did it, I didn't.
10    **Q.   And you read in Mr. Ripley's deposition**
11 **that he did do that?**
12    A.   I didn't say that. He's done a
13 reasonable amount of work here. He's got a
14 reasonable basis for an opinion, a market exists and
15 its funded.
16    **Q.   I just want to confirm that you did read**
17 **Mr. Ripley's deposition, correct?**
18    A.   I've seen it. Yes, I read it. The file
19 I was given is about that thick and a lot of
20 schedules on Ripley.
21    **Q.   During the time of this -- of Forza's**
22 **launch in 2011, the U.S. was in a recession,**
23 **correct?**
24    A.   Would you define "recession"?
25    **Q.   Well, hasn't it been called the time**

### DEPOSITION OF PAUL DUGGAN

2 **period of the great recession? Have you ever heard**
3 **that?**
4    A.   That was 1928 to 1936.
5    **Q.   The great recession?**
6    A.   You're asking me? That was the great
7 recession. The market crashed October 29, 1929 and
8 we were in a recession for the next 10 to 15 years,
9 and it didn't pull out until Pearl Harbor.
10    **Q.   That was referred to as the great**
11 **recession, not the Great Depression?**
12    A.   A depression is a recession. So if
13 you're going to talk about historical issues, the
14 stock market was October 29, 1929. That was the
15 crash.
16    **Q.   So then you're unfamiliar with the**
17 **term -- of the term "great recession" used for the**
18 **period 2011?**
19    A.   That would not be -- in the business
20 that I exist in, that's not a term that would be
21 used, "the great recession."
22    **Q.   Was the economy in a recession in 2011?**
23    MR. SOLON: Object to foundation.
24 BY THE WITNESS:
25    A.   I would have to research the -- I think

40 (Pages 154 to 157)

DEPOSITION OF PAUL DUGGAN

1    I would have to research the timing. There's a
2    concept of recessions and what triggers them and
3    that's an economic model, and what I would say that
4    based on unemployment, that it was -- the recession
5    had ended in 2011.
6
7    BY MS. ALIKHAN:
8        Q.    What's your opinion of the economy in
9    2011?
10       MR. SOLON:  Objection.  It calls for a
11   narrative.
12   BY MS. ALIKHAN:
13       Q.    Go ahead and answer.
14       MR. SOLON:  It's vague.
15   BY MS. ALIKHAN:
16       Q.    What was the status of the economy in
17   2011?
18       A.    It was good.
19       Q.    It was good.
20       A.    Stock market had doubled from the
21   bottom, it bottomed in March of 2009.  Employment
22   was recovering, unemployment had dropped from double
23   digit rates.  Employment was getting better.
24   Payroll is getting better.  Interest rates were at
25   zero, which aided businesses.  Federal funds were at

DEPOSITION OF PAUL DUGGAN

1    zero.  Market was thriving, stock market, which is
2    an indication of the business market.
3        Q.    So, Mr. Ripley forecasted that Forza
4    would make around $47 million in sales, and in your
5    opinion, you said that the profits of at least $10
6    million were both reasonable and achievable.
7              What caused you to reduce the
8    amount that Mr. Ripley projected?
9        A.    Just even giving credit for margin of
10   error, if it got off slower than expected or if
11   collections were slower, just trying to be
12   conservative.  But that's Mr. Ripley's number, not
13   mine.
14       Q.    But your number is at least $10 million
15   in profits were both reasonable and achievable,
16   right?
17       A.    Yes.
18       Q.    And would Forza's -- the way Forza's
19   marketing is its product affect the profits that it
20   would make?
21       A.    Of course.
22       Q.    Would Forza attending certain events
23   affect the profits that it makes?
24       A.    Possibly.

DEPOSITION OF PAUL DUGGAN

1        Q.    You state that in 2012 and 2013 that
2    there were no direct competitors targeting amateur
3    wrestlers.
4              What's your basis for that
5    statement or that opinion?
6        A.    Conversations with Lee Kemp.
7        Q.    When did these conversations take place?
8        A.    March and April of 2015.
9        Q.    Where did they take place?
10       A.    On the phone and in the counsel's
11   office.
12       Q.    Did you do any research to independently
13   verify whether or not that was true?
14       A.    I did not.
15       Q.    Have you heard of a company called
16   Advocare?
17       A.    No.
18       Q.    Were you aware they were the company
19   that held the USAW exclusive contract before Forza
20   did?
21       A.    No.
22       Q.    Would that affect your opinion, knowing
23   that Advocare was still in business and still
24   selling to wrestlers during this time?

DEPOSITION OF PAUL DUGGAN

1        A.    No.
2        Q.    Why not?
3        A.    You're talking about very small --
4    you're talking about gradually taking business away.
5    You had the relationship with the Olympic Committee,
6    it's a Olympic year.  If you didn't have bad
7    product, maybe the profits would have been a whole
8    lot more than this.  But they were talking about a
9    gradual concentration increase, 35 wrestling
10   programs.  There's a hundred wrestling programs in
11   the Chicagoland area, they're only talking about 35
12   wrestling programs nationwide.  So it's a very small
13   percentage of a very large market.
14       Q.    How do you know that selling to 35
15   programs was easy?
16       A.    What I'm saying is that there's tens of
17   thousands of programs and so to think you'd only get
18   35 programs isn't claiming that you would own the
19   universe.  You're taking a small segment of a
20   business.  You're not looking for -- it's not an
21   outlandish claim.
22       Q.    That's not what I'm asking.  Based upon
23   what I just shared with you, your statement that
24   there were no direct competitors targeting amateur

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1 there's 140,000 of non-payroll expenses on Exhibit
2 4, and that would be for the course of a year when
3 in fact product sales would more than -- product
4 sales at gross margins in excess of 40 percent would
5 more than cover the difference of cash needed if, in
6 fact, there was any needed. Seems to me to be a
7 reasonable budget.
8     Q.    Assuming that those sales were made,
9 right?
10     A.    Right. Assuming they didn't get tainted
11 product that was mislabled, right.
12     Q.    There's no other reason they failed in
13 selling product?
14     A.    Again, we keep on going at this, how do
15 you sell something you don't have?
16     Q.    Well, when they did get it.
17     A.    They couldn't sell it.
18     Q.    Why?
19     A.    Because it was tainted and it was
20 mislabled.
21     Q.    I'm trying to understand your basis for
22 that.
23     A.    The basis -- you're asking me for the
24 basis for the lawsuit? I'm not here to --

DEPOSITION OF PAUL DUGGAN

1 somebody's going to testify if the product was
2 labeled correctly or not. I'm not. That will be a
3 fact in evidence or won't be in evidence before I
4 testify. I'm told it was mislabeled. Why are we
5 sitting here? It was mislabeled. It was tainted.
6     Q.    And there's no other reasons that Forza
7 could not sell their product?
8     A.    Other than the fact that they didn't
9 have any product? You can't sell things you don't
10 have. They don't have the product. How do you sell
11 something you don't have?
12     Q.    Do you understand they eventually did
13 receive product?
14     A.    It was tainted and mislabeled. Yes.
15     Q.    You assume that for the basis of the
16 opinions in your report, correct?
17     A.    I assumed what?
18     Q.    That they couldn't sell the product
19 because it was tainted, as you say, and it was
20 mislabeled, as you say.
21     A.    They actually did sell some product,
22 which I report in here. $20,000 in calendar year
23 2012.
24     Q.    So do you have any -- an understanding

DEPOSITION OF PAUL DUGGAN

1 as to how much Forza would have needed for expenses
2 in Year 1?
3     A.    My understanding is 165,000 was
4 sufficient. If the product was delivered on time in
5 an Olympic year, it was sufficient.
6     Q.    I would like you to -- I would like to
7 direct your attention to Duggan 8 which is the
8 business plan. Specifically, Page 14.
9     A.    What am I looking at?
10     Q.    Are you on Page 14?
11     A.    Of what?
12     Q.    Duggan 8, Mr. Ripley's business plan.
13     A.    Oh, Duggan 8. Okay. Page 14?
14     Q.    Yes.
15     A.    Okay.
16     Q.    Under "Marketing and Promotion," the
17 last sentence, "Year 1 costs for these consulting
18 promotion efforts will be $100,000."
19         Do you see that?
20     A.    Yes.
21     Q.    So that's $100,000 of $165,000.
22     A.    No, it's not.
23     Q.    I'll direct your attention to Page --
24     A.    Let me finish my answer. It's not.

DEPOSITION OF PAUL DUGGAN

1     Q.    That's not an expense?
2     A.    If you spend $100,000, that would be
3 $8,500 per month. And if you started selling
4 product in January, you'd have profits by March.
5     Q.    It was for Year 1 costs, wasn't it?
6     A.    But it's not spent up front and it's not
7 accounted for out of the 165. What you want to do
8 is take every expense and ignore the gross margin on
9 the product and that's not how it works. So you
10 can't pick that number out. It's meaningless.
11     Q.    I'll direct your attention to Page 19.
12 There's administrative costs of $125,000?
13     A.    You're asking or telling?
14     Q.    That says that there are --
15     A.    Is that a question?
16     Q.    -- $125,000 of administrative costs,
17 correct?
18     A.    That's what the line says, yes.
19     Q.    When Forza got the product, what did it
20 do to meet its Year 1 goals?
21     A.    Well, the -- they already missed Year 1
22 because the product came late and they missed the
23 Olympics.
24     Q.    What did they do to meet their quarterly

43  (Pages 166 to 169)

DEPOSITION OF PAUL DUGGAN

1
2  which they have now listed here.
3  BY MS. ALIKHAN:
4      Q.  Now your report you refer to Forza's
5  direct losses on Page 9.
6      A.  Page 9 of my report now?
7      Q.  Of your report.
8      A.  Okay.
9      Q.  You state that "Forza suffered direct
10  losses as a result following problems caused by PRL:
11  PRL failed to timely supply product in December 2011
12  for introduction to the 2012 Olympic year.  Many of
13  the PRL products that were supplied were mislabeled
14  and thus were not salable.  Some of the products
15  were tainted with a banned substance, DHEA, which
16  reflected poorly on LK/Forza's image and its source
17  of supply making it virtually impossible for them to
18  sell products to amateur athletes."
19          What is the basis for your
20  conclusion that those issues caused Forza direct
21  losses?
22      A.  I footnote it as Gibson deposition.
23      Q.  What else?
24      A.  Other than what I say the footnote is?
25      Q.  Yes.

DEPOSITION OF PAUL DUGGAN

1
2      A.  There's e-mails between -- I think
3  included in the depositions of Gibson and Weesner --
4  Weesner is at the Iowa State.  I think he's the
5  assistant athletic trainer -- indicating if there's
6  DHEA, it's dead money and stay away from it.  And
7  that's the correspondence between Gibson and
8  Weesner.  So the tainted product threw them out.
9      Q.  So your testimony is that Mr. Weesner
10  and Ms. Gibson had e-mail correspondence with one
11  another regarding the products provided by PRL to
12  Forza?
13      A.  Yes.
14      Q.  What's your basis for the fact that the
15  products were mislabeled and not salable?  First,
16  what does not salable mean?
17      A.  Well, Webster would probably say it's
18  not capable of being sold.
19      Q.  Are you aware that -- of any remedy that
20  could have been taken to fix the mislabeling?
21          MR. SOLON:  Well, object to the scope of
22  his reason for being here.
23          MS. ALIKHAN:  It's mitigation.
24          MR. SOLON:  I'll object to the
25  foundation for your question.

DEPOSITION OF PAUL DUGGAN

1
2  BY MS. ALIKHAN:
3      Q.  Go ahead and answer if you can.
4          MR. SOLON:  The question may well be
5  relevant; it's not relevant for this witness given
6  the scope of why he's here as expert.
7          MS. ALIKHAN:  It's a basis for which he
8  calculates the damages.
9  BY MS. ALIKHAN:
10      Q.  And so my question is, if the products'
11  labeling could have been easily remedied, would that
12  have any bearing on your opinion that the products
13  were not salable?
14      A.  The products that existed were not
15  salable.  So when you talk about mitigation, they
16  did mitigate, they sold some of this through their
17  system and those sales are listed.
18          But how do you -- if it's not
19  salable, it's not salable.  You would have to go
20  back to the source, PRL, who gave them the tainted
21  and mislabeled product.  And I guess that's why
22  we're here in litigation because the parties didn't
23  agree.
24      Q.  Didn't the fact that they did sell
25  products indicate that their products were salable?

DEPOSITION OF PAUL DUGGAN

1
2      A.  $20,000 versus the business plan of
3  three to five million?  No.  I would tell you it was
4  a dismal failure.  When you take $550,000 and
5  generate 20,000 in products, it's a disaster caused
6  by the tainted products.
7      Q.  The business plan that you didn't
8  create?
9      A.  Pardon me?
10      Q.  A business plan that you didn't create
11  based upon the numbers you that never tested?
12          MR. SOLON:  Let me object to form.  And
13  please, just don't argue with the witness.
14          MS. ALIKHAN:  I'm not arguing.
15          MR. SOLON:  Yes, you are.
16  BY THE WITNESS:
17      A.  Your question's ridiculous.  They bought
18  $365,000 worth of product, they paid cash for it.
19  It was tainted, it was mislabeled, it was not
20  salable.  They were able to sell $20,000.  So let's
21  just talk until 10 o'clock at night.  They sold
22  20,000 because that's all they could sell because it
23  wasn't the proper product.
24          Why do you go like this?
25  BY MS. ALIKHAN:

DEPOSITION OF PAUL DUGGAN

2  Q.  Because I'm confused as to what you're
3  basing that on. I ask you and you get upset.
4  A.  No. No. Because you ask the same
5  question I get upset. They sold $20,000, Miss.
6  They sold 20,000, not 3 million. You can't sell
7  something you don't have. It wasn't delivered.
8  When they got it, it wasn't labeled, it was tainted.
9  You can't sell something that doesn't exist.
10  Q.  How do you know that 3 million was an
11  achievable number?
12  A.  That's Mr. Ripley's number. He's going
13  to testify to his business plan. I don't think in
14  light of the success at Fitness Arts and the -- and
15  Mr. Kemp's name and stature and the fact that you
16  had recapitalized money to do this, I don't think
17  it's unreasonable to sell that product in through
18  what I would call three or four turns in the course
19  of a year at high margins. That's the Ripley
20  business plan, that's why they went into it. They
21  weren't planning on having bad product from a bad
22  supplier.
23  Q.  What is the basis for your opinion that
24  Forza could not sell the product because it
25  contained DHEA, trace amounts of DHEA, as opposed to

DEPOSITION OF PAUL DUGGAN

2  the fact that they chose to disclose this fact in
3  their marketing?
4  MR. SOLON: Object to the form.
5  BY MS. ALIKHAN:
6  Q.  Can you say with a reasonable degree of
7  certainty that it was the very fact that the DHEA
8  was in the product or the marketing that Forza did
9  with respect to its product that caused its losses?
10  A.  You've been asking that question for a
11  few minutes. What you're saying is if they failed
12  to disclose to the high school and collegiate
13  wrestler that they're going to give them a tainted
14  product and perhaps act in an immoral way might they
15  have sold more product?
16  Q.  No, that wasn't my --
17  A.  If we don't warn the person that it's
18  tainted and mislabeled and it might subject them to
19  disqualification, then you might sell more product
20  but you would be acting immorally and maybe ruining
21  careers. Is that what you're recommending as a
22  business plan, immorality and destruction of the
23  youths' careers?
24  Q.  Those words never came out of my mouth.
25  A.  We talked about the -- had they hadn't

DEPOSITION OF PAUL DUGGAN

2  bothered to disclose, they might have sold more
3  tainted product if they didn't tell people it was
4  bad product.
5  Q.  What is your basis that the trace
6  amounts of DHEA would have an effect on high school
7  athletes?
8  MR. SOLON: Object to the foundation.
9  BY MS. ALIKHAN:
10  Q.  What is your basis on the record for
11  that?
12  MR. SOLON: For what?
13  BY MS. ALIKHAN:
14  Q.  That the trace amounts of DHEA would
15  have an effect on high school wrestlers.
16  MR. SOLON: Where is that?
17  MS. ALIKHAN: That comes from his
18  testimony that says the products were tainted and
19  couldn't be sold.
20  BY MS. ALIKHAN:
21  Q.  So what is your basis for the fact that
22  the trace amounts of DHEA would have a negative
23  effect on high school wrestlers?
24  MR. SOLON: Object to foundation.
25

DEPOSITION OF PAUL DUGGAN

2  BY MS. ALIKHAN:
3  Q.  What is your basis?
4  A.  Mr. Weesner was cautioned or warned by
5  Jennifer Gibson that being involved with a company
6  like that would be bad form and not to buy it. So
7  if you now wanted to take an immoral approach and go
8  out and sell product that would disqualify Olympic
9  or college wrestlers that were subject to a drug
10  test and sell it to high school kids, then you're
11  saying go ahead and act in an immoral way and hurt
12  people.
13  So maybe Kemp said I am a wrestler
14  and I have a clean reputation. I'm not going to
15  sell tainted product and hurt reputations and
16  careers.
17  Q.  Are high school wrestlers subject to
18  drug testing?
19  A.  I don't know.
20  MR. SOLON: Let me object to the
21  foundation. These are not the subject of his expert
22  testimony in this case. Don't you have 12 other
23  witnesses to ask these questions to that you already
24  have probably ad infinitum on other days? Enough.
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1 BY MS. ALIKHAN:
2 Q. Can you not make speaking objections and
3 please stop telling me who to question and what to
4 question them on?
5 MR. SOLON: Fine. Let's just stop this
6 deposition.
7 MS. ALIKHAN: For what?
8 MR. SOLON: We'll file a protective
9 order to shut down the nonsense. He's a damages
10 expert. You're asking him about tainted DHEA.
11 MS. ALIKHAN: Sir, these are opinions
12 that are in his report that I am reading straight
13 from. If he can opine on these, I can ask him
14 questions and probe into the reliability of his
15 research and understanding. That's the point of
16 this questioning.
17 MR. SOLON: There are many things in
18 this report.
19 MS. ALIKHAN: And I can delve into all
20 of them. So your nonsense about filing a protective
21 order is unfounded.
22 MR. SOLON: Let's do it. I'm leaving.
23 You can't read a report and tell what opinion.
24 MR. KRIT: Counsel, is it your opinion

DEPOSITION OF PAUL DUGGAN

1 that mitigation of damages is irrelevant to his
2 report?
3 MS. ALIKHAN: We're not off the record
4 actually.
5 MR. SOLON: We're on the record and I'm
6 not talking to you.
7 MS. ALIKHAN: We'll seek sanctions for
8 this.
9 MR. SOLON: Your party has a counsel who
10 is taking this deposition. She can speak.
11 MS. ALIKHAN: Is it your position that
12 mitigation is not relevant to this case?
13 MR. SOLON: This is what I want to do,
14 we're going to take a break.
15 MS. ALIKHAN: We're not taking a break.
16 Can you answer the question, please? We're on the
17 record. We've asked you a question three times that
18 you've refused to answer.
19 MR. SOLON: Here's what I'm going to do,
20 I'm going to take a break. I'm not going to answer
21 his question.
22 MS. ALIKHAN: I posed the question.
23 MR. SOLON: I'm not going to answer your
24 question either. Now you know. I'm going to take a

DEPOSITION OF PAUL DUGGAN

1 break, we're going to calm this down, we're going to
2 make a decision. Let's go off the record. You
3 ready?
4 MR. KRIT: I can't speak.
5 MS. ALIKHAN: Let's go off the record
6 for you.
7 THE VIDEOGRAPHER: We're off the record.
8 The time is 3:34 p.m.
9 (Whereupon, there was an
10 intermission.)
11 THE VIDEOGRAPHER: We're back on the
12 record. The time is 3:43 p.m.
13 MR. SOLON: In interest in getting this
14 done, you may proceed.
15 BY MS. ALIKHAN:
16 Q. Forza represented that its products were
17 WADA safe. Do you understand what WADA means?
18 A. WADA? WADA?
19 Q. Yes.
20 A. I've seen it but I couldn't recite what
21 it means. I've seen that at the same time.
22 Q. I'll represent to you that's the World
23 Anti-Doping Association.
24 If Forza represented that its

DEPOSITION OF PAUL DUGGAN

1 products were WADA safe and it would not cause
2 failure of a drug test, would that change your
3 opinion as to whether or not Forza incurred losses
4 because the product contained trace amounts of DHEA?
5 MR. SOLON: Objection to form.
6 BY MS. ALIKHAN:
7 Q. Do you understand the question?
8 THE WITNESS: Read it back.
9 (Whereupon, the record was
10 read as requested.)
11 BY THE WITNESS:
12 A. No.
13 BY MS. ALIKHAN:
14 Q. Why not?
15 A. The existence of DHEA, which was the
16 subject of an e-mail exchange between Weesner and
17 Gibson, Gibson indicated "I'd stay away from that
18 company." That alone is an indication that the
19 presence of DHEA affects the sales.
20 Q. Do you have an understanding as to
21 whether or not Jennifer Gibson was a potential
22 customer of Forza? Do you?
23 A. Yes.
24 Q. What's your understanding?

DEPOSITION OF PAUL DUGGAN

1
2  that correct?
3      A.   I believe that's my number.
4      Q.   Can you describe how you arrived at that
5  number?
6          MR. SOLON: Object. Calls for a
7  narrative.
8  BY MS. ALIKHAN:
9      Q.   Go ahead and answer.
10     A.   The number I believe is 2,759,000, not 3
11 million.  And then I list it at Page 10 with six
12 bullets and then I explain those bullets.
13     Q.   Let's talk about the $365,000.  Is that
14 from the purchase of the products from PRL?
15     A.   Yes.
16     Q.   And in your review of the documentation
17 in this case, do you know whether or not Forza had a
18 contingency supplier on hand for these products?
19     A.   I don't know.
20     Q.   Would that have an effect on damages or
21 any of your opinions in this matter?
22     A.   No.
23     Q.   Do you hold any opinions with respect
24 mitigation of damages?
25     A.   Yes.

DEPOSITION OF PAUL DUGGAN

1
2      Q.   What are they?
3      A.   The company was able to sell about
4  $128,000 worth of product.  They've tried to get a
5  refund from the -- from Premier to have a do-over
6  which has never happened to them.  They haven't
7  refunded the money.  And they have attempted, which
8  is part of the financial statements, they have
9  attempted to sell the product unsuccessfully.  They
10 can't even scrap it for $5,000 in a mitigation
11 effort.  So it's carried on their books at zero
12 value because it's worthless in the marketplace.
13     Q.   Where is that in your report?
14     A.   The balance sheet of -- let's see.  It's
15 Schedule 6.  The balance sheet carries no PRL
16 inventory because it's worthless and yet it wasn't
17 sold.
18     Q.   Where are your opinions with respect to
19 mitigation of damages in your report?
20     A.   I don't use the word "mitigation."
21     Q.   Where is it?
22     A.   I just said I don't -- where is it?
23     Q.   Do you understand what mitigation means?
24     A.   Mitigation means that you make an effort
25 to reduce your losses in kind of a layman's sense.

DEPOSITION OF PAUL DUGGAN

1
2  If I -- if I can sell it -- I break my iPhone and I
3  can go ahead and fix the screen and I might be able
4  to resell it for 150 bucks.  That would be
5  mitigation.
6          In this case, they sold, which I
7  list -- we don't call it mitigation, we call it
8  sales.  They sold $128,000 worth of product.  The
9  rest has been written off because it has no value.
10 And they've attempted to sell it.  And the books of
11 the company, as done by an outside CPA, not by me,
12 reflect zero inventory because that's its value.
13 And they're unable to sell it despite their efforts.
14     Q.   Where did you get the information that
15 they are unable to sell the product?
16     A.   Mr. Kemp.
17     Q.   When?
18     A.   March and April, 2015.  I inquired why
19 there's no more inventory and he said it's written
20 off because, which is the financial statement, it
21 shows it's zero as produced by a third party CPA.
22          And I said, "Why is it written
23 off?"
24          He said, "We tried to sell it and
25 we wrote it off to zero."

DEPOSITION OF PAUL DUGGAN

1
2      Q.   Did he say how long they tried to sell
3  the product for?
4      A.   I'm going to say it went to a scrap
5  dealer last October.
6      Q.   Did he say how much he sold it for?
7      A.   Zero.  It's unsalable.  Zero bid.  And
8  that's why it's carried at zero.
9      Q.   Why is it unsalable?
10     A.   Because it's tainted and mislabeled.
11     Q.   Did you see the product listing for the
12 inventory?
13     A.   I don't know what you mean by that.
14     Q.   You said that they were unable to sell
15 it, zero bids.
16     A.   Correct.
17     Q.   Was it on a website for sale?
18     A.   They went to a scrap dealer.
19     Q.   Did you see the listing for the --
20     A.   I did not.  It's not salable.
21     Q.   And where did you get that information
22 from?
23     A.   Mr. Kemp.  I inquired why there's no
24 inventory on their books and why the losses are so
25 large.  And he said, "We spent $365,050 in

49  (Pages 190 to 193)

DEPOSITION OF PAUL DUGGAN

1   inventory. We sold what we could. We tried to
2   scrap what we could. We offered the rest back to PR
3   Labs. They refused to repurchase it. And they're
4   required under the law not to file improper, phony
5   financial statements so they write it off. That's
6   the requirement. That's the legal requirement.
7   **Q.  Did you see any documents substantiating**
8   **what Mr. Kemp stated to you?**
9   A.  Yeah. I have the financial statements
10  of the company which carries it at zero. That's a
11  document prepared by a CPA out of Arlington Heights.
12  **Q.  Other than the financial documents, did**
13  **you see any other document that substantiated what**
14  **Mr. Kemp said to you with respect to --**
15  A.  Other than their books and records of
16  the company, no.
17  **Q.  -- where it specifically shows their**
18  **attempts to sell their product?**
19  A.  Well, if the products have value, then
20  your accusing Mr. Kemp of tax fraud and financial
21  fraud and you're accusing the CPA of being
22  complaisant. So I take the CPA's statement as an
23  indication of value. I'm not a certified fraud
24  examiner. It's worthless. They can't get any

---

DEPOSITION OF PAUL DUGGAN

1   money. If PR wants to purchase it at cost, let
2   them have it. They can't get a bid so they're
3   required by the law to write it off. Otherwise,
4   they'd be filing false financial statements.
5   **Q.  So based on the fact that you don't**
6   **believe their CPA would file false financial**
7   **statements, you have no other objective evidence to**
8   **detail their efforts in selling the product?**
9   A.  The efforts of selling the product are
10  explicit here. They're shown as sales as poor as
11  they are of 20,000 in 2012 and 29,000 in 2014.
12  That's all they're able to sell. Those are the
13  records of sales. Those are the public documents
14  that exist for the company.
15      That being said, in addition, the
16  conversation between management and the CPA
17  indicates that the inventory's written off and
18  expensed because that's the law. That's what
19  they're required to do so they don't commit fraud.
20  **Q.  So the whole amount is written off,**
21  **correct?**
22  A.  Correct. They have no bid. They've
23  been unable to secure a single bid for the product.
24  **Q.  Even though they had $20,000 of sales in**

---

DEPOSITION OF PAUL DUGGAN

1   **the year 2012, right?**
2   A.  No, no, no, no. They had -- right. And
3  then they expensed the product sold. The unsold
4  inventory is written to zero. Not the sold
5  inventory. The sold inventory goes to cost of goods
6  sold. The unsold inventory is expensed out because
7  it's worthless.
8   **Q.  In the next line you have that Lee and**
9  **Mia garnered around 1.7, $1,8 million in lost time**
10  **for Forza.**
11  A.  Let me finish my answer from before.
12  Because if this is included in the report at
13  Schedule 7, Page 2 of Schedule 7, which is indicated
14  as Page 1, it's showing damaged inventory of 290,000
15  being written off. So that's a document file.
16  **Q.  This is Schedule 7?**
17  A.  Schedule 7. Page 1 is the lead sheet.
18  Page 2 is comparative income statement. And Page 3,
19  in the bottom right, is labeled "Draft."
20      Page 1, about four lines from the
21  top shows the damaged inventory write-off of
22  290,000. And it also indicates the sales, which I
23  reflect on the sales recap on Page 12 of my report,
24  of 29,000. The remaining inventory is worthless so

---

DEPOSITION OF PAUL DUGGAN

1   they're required by law to write it off; otherwise,
2  they'd be filing fraudulent statements.
3   **Q.  Other than these financials, did you see**
4   **any documents that evidenced that Forza was actively**
5   **attempting to sell these products?**
6   A.  These -- this financial statement
7  doesn't indicate their efforts. It indicates the
8  net result of zero. That's what it indicates.
9  They're worthless. They're written off. That's
10  what they indicate.
11  **Q.  In the next section you indicate that**
12  **Lee and Mia spent approximately $1.8 million in lost**
13  **time for Forza.**
14      **How do you come to that number?**
15  A.  You're starting at the bottom of Page 10
16  of my report?
17  **Q.  No. I'm second bullet of Paragraph 23.**
18  A.  Okay. And then if the first bullet is
19  covered below under "Goods Purchased," the second
20  bullet, "Lost Time," is covered on the bottom of
21  Page 10 and the top of Page 11. And it's Schedule 2
22  to my report.
23  **Q.  Where did you get those numbers?**
24  A.  From Mr. Kemp and I believe the hours

DEPOSITION OF PAUL DUGGAN

1 came from the company, I'm not sure, given to me by
2 counsel.
3 Q. Did you create this document?
4 A. Yes. I put this on an Excel
5 spreadsheet, yes.
6 Q. Where did you get the numbers from?
7 A. Management.
8 Q. Who in management?
9 A. Lee and Mia.
10 Q. And what format did they provide you
11 with those numbers?
12 A. Week-by-week listing of hours spent.
13 Q. Did they provide you with any invoices?
14 A. No.
15 Q. Any timesheets?
16 A. No.
17 Q. Any payroll records?
18 A. They weren't paid. They spent the time.
19 Q. Any calendars?
20 A. No.
21 Q. Anything to verify whether or not this
22 time was actually spent?
23 A. Their statements.
24 Q. I want --

DEPOSITION OF PAUL DUGGAN

1 A. I actually reduced it from what they
2 gave me.
3 Q. What did they give you?
4 A. They gave me more hours and I reduced
5 it.
6 Q. How much of the total?
7 A. How much is what total?
8 Q. The hours they gave you?
9 A. If you look at Schedule 1, 2,000 hours
10 for year 2009, he gave me 2080 in all those years.
11 I reduced it by two weeks.
12 Q. Why did you reduce it?
13 A. It's not practical assuming one wouldn't
14 take a vacation.
15 Q. Is it practical to not have invoices or
16 timesheets reflecting time spent on a project you're
17 seeking recovery for?
18 A. Yes. You don't know in 2008 that you're
19 going to have -- you're going to get tainted,
20 mislabeled product from a supplier. You wouldn't
21 know that four years in advance that you're going to
22 get shafted out of your money.
23 Q. Businesses typically keep some sort of
24 record of time spent in some form, right?

DEPOSITION OF PAUL DUGGAN

1 A. No.
2 Q. Via payroll records or invoices?
3 A. No.
4 Q. Timesheets?
5 A. No.
6 Q. Calendars?
7 A. No.
8 Q. I want to go back to the goods
9 purchased. Under that heading you state that "Forza
10 requested a refund from PRL Labs, and PRL refused to
11 buy back its own product or refund an overpayment of
12 $6,347."
13 What's your basis for that
14 statement?
15 A. There's been -- I've seen dialogue with
16 the request.
17 Q. Where?
18 A. From management in this case about the
19 refund of 6,000. What are you talking about
20 specifically?
21 Q. Where do you get the basis that PRL, A,
22 refused to refund Forza?
23 A. Mr. Kemp.
24 Q. When?

DEPOSITION OF PAUL DUGGAN

1 A. In the last two months. I'm trying to
2 find out what happened to the product, what did we
3 pay for it, that's covered in the 150 to 215, and
4 what's remaining and what's written off, which is
5 what's written off the exhibit we just went through,
6 Schedule 7.
7 Q. Did you see any documents where -- that
8 illustrated Forza requesting a refund from PRL?
9 A. Yes, I've seen some correspondence.
10 Q. What documents?
11 A. I believe an e-mail exchange. They were
12 looking for a refund. That's what this whole
13 lawsuit is about.
14 Q. Where do you see that PRL refused? What
15 do you base that on?
16 A. Lee Kemp. Why are we sitting here?
17 We're sitting here because there's litigation over
18 tainted product which you don't want to concede.
19 I'm just giving this as a fact.
20 Q. Mr. Duggan, I'm not the one being
21 deposed. I don't appreciate this.
22 A. We're in a litigation here. You're
23 trying to take my testimony far outside of my expert
24 report.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

**226**

DEPOSITION OF PAUL DUGGAN

1
2    Q.   What is your basis for the inclusion of
3  Olympic development in the damages calculation?
4      A.   The -- Forza intended to make a big
5  splash at the Olympics, be a sponsor, market their
6  product. They made a movie about Lee Kemp and his
7  life and his ups and downs. And they incurred costs
8  towards the movie, in the movie development, and it
9  was going to be part of their marketing.
10           When the product wasn't available
11  for sale at the Olympics the costs were lost, sunk.
12     Q.   What is the connection between the
13  products being available at the Olympics and a
14  documentary about Lee Kemp?
15     A.   Well, the e-mail attached as -- to
16  Schedule 3 from Mia Scheid outlines from Mia why it
17  was a documentary, it was set to premier. She's
18  also telling Mr. Niro to get Lee's expenses from
19  Lee, lists her expenses. So it tells what they did,
20  why they did it. So it comes from Mia Scheid.
21     Q.   So where does it say that the production
22  of this documentary was contingent upon the products
23  provided by PRL?
24     A.   It doesn't, if you read it literally. I
25  would have to reread it. But I would have to --

**227**

DEPOSITION OF PAUL DUGGAN

1
2  they were going to present -- the movie was going to
3  premier. When the product didn't show up and when
4  it did show up it was mislabeled and tainted, they
5  couldn't go through with it.
6      Q.   Do you have an understanding that Forza
7  actually did attend the U.S. Olympics with product
8  in hand?
9      A.   I don't know.
10     Q.   And they provided samples to Olympians
11  at the Olympics?
12     A.   I don't know.
13     Q.   Does that change your opinion as to
14  whether or not this was a direct loss to Forza as a
15  result?
16     A.   Samples had nothing to do with Olympic
17  costs or the movie development. No, it wouldn't
18  change my opinion. The movie didn't premier, the
19  costs were incurred.
20     Q.   And it's your opinion that the movie
21  didn't premier because of something that PRL did?
22     A.   With the tainted product they weren't
23  able to sell the product and have the Olympic
24  sponsorship and all the benefits they were going to
25  enjoy from the connection so the money was wasted.

**228**

DEPOSITION OF PAUL DUGGAN

1
2      Q.   Did you see a contract between Forza and
3  the producer of this documentary?
4      A.   No.
5      Q.   Do you have an understanding of the
6  terms of that -- of any agreement between Forza and
7  the producer of this documentary?
8      A.   No.
9      Q.   So you relied upon Forza's assertions
10  for that opinion?
11     A.   I'm basing it on this e-mail here which
12  I attached as Schedule 3, or to Schedule 3.
13     Q.   I'm going to hand you Duggan Exhibit 13.
14           (Whereupon, Duggan Exhibit 13
15           marked as requested.)
16           (Whereupon, the document was
17           tendered.)
18  BY MS. ALIKHAN:
19     Q.   This is the income tax return for Forza
20  Technologies for year 2012, correct?
21     A.   It appears to be.
22     Q.   Did you review this document in
23  ascertaining your damages calculation?
24     A.   No, I did not.
25     Q.   Did you ask to review any tax returns in

**229**

DEPOSITION OF PAUL DUGGAN

1
2  ascertaining your damages calculation for Forza?
3      A.   I was using financial statements which
4  were accrual basis, not tax returns which are cash
5  basis so I would -- I could relate the two together.
6  But for accounting purposes you would use accrual
7  basis financial statements versus cash basis tax
8  returns.
9      Q.   Did you ask to see the document?
10     A.   No.
11     Q.   On the last page you'll see -- first,
12  can you determine whether or not this is a complete
13  tax return?
14     A.   It may be.
15     Q.   You can't tell for sure?
16     A.   I didn't prepare it. You'd have to ask
17  Manella if there could be some other document
18  attached. But it may be the complete tax return.
19     Q.   Have you ever completed a tax return for
20  an S-corporation?
21     A.   Probably 400 of them.
22     Q.   But you can't tell whether or not this
23  is --
24     A.   Rules have changed. I probably have
25  signed 10,000 tax returns. Rules have changed.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

1  Sometimes there's requirements based on the volume
2  of the business that certain schedules aren't
3  required to be attached. So that would allow for a
4  tax return like this which is strictly a cover page.
5  Some size partnerships and S-corps don't require
6  balance sheets anymore.
7      Q. Did you -- can you turn to the last page
8  of that document? Is there any reason why
9  deductions would be blocked out?
10     MR. SOLON: Object to foundation.
11 BY MS. ALIKHAN:
12     Q. You can answer.
13     A. Would there be any reason?
14     Q. Yes. What sort of things would be
15 listed in deductions that would be required to be
16 left out?
17     MR. SOLON: Object to foundation.
18 You're asking for complete speculation.
19     MS. ALIKHAN: He's prepared these types
20 of documents before. I'm just asking.
21     MR. SOLON: He has no personal knowledge
22 of this.
23 BY THE WITNESS:
24     A. I've never seen a document like this

DEPOSITION OF PAUL DUGGAN

1  with this blocked out. I don't know if it's done by
2  the computer program. It doesn't look like it's
3  done manually.
4  BY MS. ALIKHAN:
5      Q. So this is not how it would appear
6  regularly?
7      A. Pardon me?
8      Q. This is not how it would appear
9  regularly?
10     A. I don't know that. I've never seen
11 anything like this. That's not to say that it's
12 right, wrong or anything. I've never seen anything
13 like it. I'm trying to compare it to the financial
14 statement to see if it rings true.
15     Q. I don't really need it. I'm just trying
16 to figure out why that area is blacked out.
17     A. Well, again, I would say that it's cash
18 basis in the financial statement you rely on or I
19 relied on is in my right hand which --
20     Q. That's not my question.
21     A. I understand it's not your question.
22 I'm trying to give some clarity that people don't
23 rely on 1120-S tax return prepared on a cash basis
24 when you have a better document.

DEPOSITION OF PAUL DUGGAN

1      Q. The plaintiff's attorney is going to be
2  able to ask you some questions later on when I'm
3  finished so he could ask all the clarification
4  questions you need. But my question didn't pertain
5  to what you just testified to.
6      A. I'm trying to help you if you don't
7  understand it. I'm trying to help explain why you
8  wouldn't even look at this.
9          Go ahead and reask the question.
10     MR. SOLON: And for the record, the tax
11 returns are not relevant evidence in a case like
12 this, which is not a tax case. And there's law on
13 that which you can look up before coming to a
14 deposition and asking hours of questions about tax
15 returns.
16     MS. ALIKHAN: Thanks, again, for your
17 advice.
18 BY MS. ALIKHAN:
19     Q. You also show that Mia Scheid incurred
20 $65,000 in travel expenses.
21         What is your basis for that?
22     A. It's footnoted as Schedule 3, which is
23 the e-mail from Mia. It indicates she probably
24 spent more than 65, I only put down the minimum of

DEPOSITION OF PAUL DUGGAN

1  65.
2      Q. Did she provide you with any receipts
3  for these?
4      A. She did not.
5      Q. Did you see any invoices for this
6  travel?
7      A. No.
8      Q. Any credit card statements?
9      A. No.
10     Q. You indicate in your report that Forza
11 experienced employment costs as part of its damages
12 in this case.
13         How many employees were employed at
14 Forza?
15     A. I don't know.
16     Q. Do you know the names of the employees?
17     A. No. I have a list of the employment
18 costs which I scheduled at Schedule 5, and it lists
19 employees there.
20     Q. Who gave you this document?
21     A. (No response.)
22     Q. Did you prepare this document?
23     A. I did not. It came from Forza.
24 Actually, it came from Fitness Arts.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

DEPOSITION OF PAUL DUGGAN

Q. How do you know that?

A. Because it's their document.

Q. How can you tell?

A. Not Forza document. It's just -- it's Fitness Arts' employees and the percentage of time they spent on Forza.

Q. And how could you tell these are Fitness Arts' employees?

A. I know from Laura Mann that I've spoken to because she was the coordinator to get me the documents. I would request documents from Laura. She was authorized to speak to me by Lee and then she would send those to counsel and they would provide them to me.

Q. How do you know that Keith Bardin is an employee of Fitness Arts?

A. It was indicated to me by whoever sent the schedule. But I didn't independently verify that he worked or works there. It looks like he no longer -- he may still work there but didn't spend time on Forza.

Q. Did you independently verify whether Cheyenne Johnson worked at Forza during these times?

A. No.

DEPOSITION OF PAUL DUGGAN

Q. What about Elizabeth Miner?

A. No.

Q. Do you have an understanding as to what positions they held at Fitness Arts?

A. No.

Q. Do you have an understanding as to whether or not they were full-time or part-time employees?

A. No.

Q. Were you ever given any billing with respect to these numbers?

A. No.

Q. Any invoices?

A. No.

Q. Did you independently verify whether or not these wages came from Fitness Arts or Forza?

A. No.

Q. Did you see any W2s with respect to these numbers?

A. No.

Q. Did you ask for W2s?

A. No.

Q. Did you ask for invoices?

A. No.

DEPOSITION OF PAUL DUGGAN

Q. Did you ask for anything to substantiate the numbers on these documents?

A. When you're saying "invoices," I don't think invoices would pertain here so there's nothing to ask for.

Q. Billings?

A. No. There wouldn't be billings as far as what's indicated. They spent some time on Forza.

Q. In your sales recap you indicate that Forza had 77,000, about, approximately, dollars in sales.

Do you know how much of that was PRL product?

A. No. Not offhand from memory. Let me see.

Q. Where did you get that number from?

A. It seems to be a couple hundred dollars different from this financial statement which shows 76, not 77.

Q. Which financial statement are you referring to?

A. Exhibit 11.

Q. The P&L statement for 2013?

A. Yes.

DEPOSITION OF PAUL DUGGAN

Q. Did you review that document in preparation for your report?

A. You know, actually, this document that you provided me is only 11 months. It won't tie to the information because it's missing the 12th month.

Q. I'm asking you where you got your information with respect to the sales?

A. I must have received a 12-month financial statement and copied the wrong item because that doesn't tie out here. But it's very consistent with this document but it's -- this is 11 months, Exhibit 11. So it would have come from Forza.

Q. Is there anything on Exhibit B that would refresh your recollection as to where you got that information from?

A. Exhibit B?

Q. Duggan Exhibit 3.

A. Again, I think we've been through this. But at Schedule 7, I recap the income statements for 2011 through 2014. I thought I had attached the financial statements and it looks like I Xeroxed them incorrectly.

Q. So you have the 2013 financial

98:24 99:11
99:22,23,24
100:8,10
101:19
102:22
106:11,18
106:20,24
107:4,13
109:14,16
112:23
113:8,16
118:10,18
119:9,15,23
129:13,16
129:17
131:6 142:3
142:6 144:5
145:18
146:3,12,17
146:22
147:21,24
151:25
152:3,11,14
152:18,22
153:8,10,16
153:18,25
155:5,12,21
157:19
159:3
160:24
161:5,21
162:5
165:17
168:9,13
170:13,17
177:2,7,10
178:13,20
179:22
205:15
215:3 219:9
223:3 230:3
240:12,16
241:21
251:2
253:25
**businesses**
36:10 154:6
158:25

199:24
**business's**
81:8
**buy** 64:10
145:5 181:6
186:6
200:12
**buys** 140:5

**C**

C 259:4
**Cael** 104:22
134:24
136:17,18
137:9
**calculate**
49:16,22
189:25
253:8
**calculated**
30:24,24
49:17
115:16
132:12
152:23
219:10
**calculates**
176:8
**calculating**
52:15 103:6
**calculation**
31:23 153:6
203:19
204:24
205:5,6,11
226:3
228:23
229:2
**calculations**
44:12 156:4
205:15,23
**calendar**
62:23
138:19
167:23
250:18
**calendars**
198:20

200:7
**call** 121:12
121:13,19
125:12
171:16,20
178:18
192:7,7
**called** 2:2
13:19 16:15
16:21 19:11
19:20 27:12
51:7 77:17
156:25
160:16
**calling** 96:5
**calls** 31:15
121:21
125:14
126:24
158:10
190:6 242:4
**calm** 184:2
244:3,12
**campaign**
163:18
**campaigns**
163:4,11
**cancerous**
25:16
**capable**
154:14
175:18
251:3
**capacity**
11:23 55:7
55:13
**Capital** 16:12
19:21,22
20:13 21:12
21:13,17
22:5
**caption** 103:2
**car** 62:16
**card** 13:21
218:14
233:9
**career** 29:3
30:10,11

**careers**
149:15,17
151:12
179:21,23
181:16
**carefully**
261:3
**carried**
191:11
193:8
**carries**
191:15
194:11
**cars** 99:3,10
99:13
**Carter**
137:18
**case** 6:9 7:18
9:11 33:9
33:19 34:8
37:7,8,10
37:12,18,20
38:2 41:3
41:15 51:23
79:20 99:17
101:3
102:10
110:19
115:2 130:4
151:18
152:12
181:22
183:13
190:17
192:6
200:19
206:18
214:12,14
232:12,13
233:13
239:17,25
241:25
242:17
**cases** 30:17
31:6,7,14
31:22 32:3
32:4,6,8
33:3,7,11

34:2 35:20
35:25 38:18
38:21
124:15
126:25
210:22
**cash** 77:11,21
80:19 87:12
87:14 92:20
93:8 98:17
141:14,19
142:12,18
142:19,22
143:10
144:2 145:2
165:17
166:6
177:18
210:5
214:21
215:11
229:4,7
231:18,24
**casual** 139:8
**categories**
27:10
**category**
30:19
**cause** 185:2
**caused** 159:8
174:10,20
177:5 179:9
**cautioned**
181:4
**cease** 19:14
**Celebrex**
24:24
**celebrity**
139:22
**cell** 23:22
24:2 28:24
41:25
**cellular** 28:19
28:20
**certain** 27:9
27:13
119:22
159:23

173:9 230:3
**certainty**
79:19 179:7
**certificate**
260:6
**certified** 2:8
2:10 6:12
12:25 52:10
52:19 153:9
194:24
259:6,8
260:7
**certify** 78:9
248:7,17,20
258:10
259:8,18
260:2,6
**cetera** 75:22
**chain** 173:17
**Chamberlain**
134:14,19
**Chamberla...**
134:16
**chance**
137:24
**change** 9:12
15:7 17:4
21:8 74:9
74:13,23
108:8,9
130:9,12
185:3
204:18,19
204:22
219:18
227:13,18
255:6 262:9
262:11,13
262:15,17
262:19
**changed** 19:3
21:5 229:24
229:25
**changes**
203:22
261:9 262:5
**chaotic**
224:17

characteriz...
45:19
charging
127:4
charter 23:12
chartered
23:13,13,14
check 58:7
82:24 83:3
165:10
checklist 44:8
Cheyenne
234:24
Chicago 1:15
2:11 3:7 4:6
6:6 14:21
Chicagoland
53:14
161:12
children
25:17 36:21
children's
127:13
130:16
China 36:9
38:16
choose 99:25
chose 75:3,3
179:2
chronology
17:15
cite 110:9
cited 150:3
cites 254:24
Civil 1:6 2:4
247:11
claim 161:22
204:24
219:21
240:4
241:19,20
claimed
223:20
240:8
claiming
161:19
claims 150:6
239:17,25

240:15,20
240:20
241:12,15
clarification
9:7 232:4
clarify 256:5
clarity
231:23
clean 7:24
8:8 11:4
48:14
181:14
cleaned 43:13
51:8
clear 255:10
clearly 93:12
93:13
134:18
142:16
145:4 209:8
209:9 239:3
Clesceri
16:17,17,19
17:7,14,21
18:11 33:10
client 36:11
38:22 127:4
clients 19:5
126:24
clock 28:5
closely 74:24
CLR 1:21
260:16
club 140:15
clubs 148:9
148:20
150:8
154:11
170:14
clues 45:16
coach 103:19
162:18
Coast 26:2
code 2:4 79:7
250:11
coffee 50:5
51:2,6,11
collect 66:5

collections
159:12
college 12:6
22:9,12
60:3 136:20
140:16
181:9 204:4
collegiate
136:16
179:12
189:4
colon 25:15
color 35:7
column 253:2
253:4
combination
28:24
138:14
combined
250:25
Comcast
26:24
come 25:16
60:21 71:14
99:21
109:16
120:4
136:25
142:13
144:9 156:5
197:15
206:14
207:3,7
215:3
237:13
239:8
242:16,21
comes 136:17
136:18
142:6
180:17
225:5
226:20
coming
145:17
232:14
command
173:17

commence...
259:9
comment
45:12 92:21
commit
195:20
Committee
161:6
170:22
171:3 187:2
commonalty
109:10,11
commonse...
150:20
151:14
communica...
187:11
communica...
187:11
communica...
27:11,18
186:9
247:21,24
community
103:13,18
103:21
140:15
companies
22:25 25:22
28:25 29:8
29:11 33:20
41:22 42:2
42:8,11
131:25
132:9
company
14:9 19:8
20:25 21:19
21:23 23:6
24:4,6
25:22,24
26:10,12
27:11 29:15
32:22 33:12
33:14,16
34:11 53:14
53:24 54:7
74:19 83:23

92:25 93:7
97:2,4,24
102:13
103:11
106:17
113:9 116:6
117:2
118:14,16
118:17,21
118:24
119:4,7,11
129:7 133:8
133:10
147:17
160:16,19
172:17
181:5
185:19
187:8 189:3
191:3
192:11
194:11,17
195:15
198:2
215:25
225:6
249:16
251:10
company's
76:21 77:4
98:10 209:6
comparative
196:19
205:25
206:11
compare
138:8
145:16
162:24
221:20
231:14
comparing
222:6
comparison
119:6
Compass
26:7,12,13
27:8,12,12

27:16,20
41:25
compassion...
25:19
compete
28:24
competing
136:15
competition
162:15
competitors
160:3
161:25
162:23
compilation
80:18
compiled
77:10
complaisant
194:23
complete
30:2 49:21
74:2 76:18
153:11
154:21
155:8,20
210:15,20
212:22
229:12,18
230:19
259:15
completed
229:19
completely
86:18 202:5
completion
40:3
component
28:23
147:24
components
28:5 99:21
Compound
249:18
comprehen...
154:7
comprise
205:21

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LK NUTRITION, LLC,

        Plaintiff,

v.

PREMIER RESEARCH LABS, LP,

        Defendant and Counterclaimant,

v.

LK NUTRITION, LLC,
LEE KEMP and MIA SCHEID,

        Counterclaim-Defendants,

---

MIA SCHEID,

        Counterclaimant,

v.

PREMIER RESEARCH LABS, LP,

        Counterclaim-Defendant,

and

ROBERT J. MARSHALL,

        Third-party Defendant.

Civil Action No. 12-cv-07905

Honorable Joan B. Gottschall

Magistrate Judge Young B. Kim

# EXPERT REPORT OF PAUL J. DUGGAN
# PURSUANT TO FED.R.CIV.P. 26(a)(2)(B)

# March 20, 2015

Confidential -- Attorneys' Eyes Only
Subject to Protective Order

## I. INTRODUCTION

1.     My name is Paul J. Duggan and I have been retained by LK Nutrition LLC (formerly known as Forza Technologies) ("LK" or "LK/Forza") to act as an expert in the calculation of damages. In this report, I am providing my opinions as to damages due LK in this case as a result of the breach of contract and fraud claims made against Premier Research Labs, LP and Robert J. Marshall. (collectively, "Premier"). My opinions are based on the assumption that there is liability.

2.     I have prepared various schedules and calculations that are attached to this report. I may in fact utilize this information as well as additional visual presentation materials that have not yet been prepared at trial. I will provide those materials through counsel for LK to Premier at an appropriate time. Those materials may include charts, tables, and any other forms of exhibits necessary to illustrate my opinions at trial.

## II. QUALIFICATIONS AND BACKGROUND

3.     I am the President of Jackson Capital Management, LLC, founded in 1993, which specializes in hedge fund management, investment analysis and business valuations and small business accounting. I had previously founded and managed the accounting firm of Duggan, Kenning & Gemini, LLC, from 1988 to 2000, which provided litigation support and technology transfer consulting. From 1976 to 1988, I founded the accounting firm Duggan & Clesceri, Ltd., specializing in a certified public accounting practices. My work experience has included preparing company financial statements, performing financial audits, preparing individual and business income tax returns, performing business valuations, and providing consulting and expert testimony in the area of licensing and damages calculations.

4.     My expertise is in accounting, generally, and financial assessment of business value, business and intellectual property valuation and licensing and damage analyses for litigation. I have been providing such consulting services since as early as 1976. I have previously been engaged as a consultant and as a testifying expert in at least 40 legal proceedings involving the calculation of damages. I have testified at trial or by deposition in at least 30 of those legal proceedings. I have given trial testimony in federal courts in the states of Virginia, Illinois, Connecticut, Wisconsin, Iowa, California, New York, Washington, Michigan, Massachusetts, Oregon, Pennsylvania, Texas, and Utah. This testimony included the calculations of damages related to lost profits, reasonable royalty, price erosion, trade secret misappropriation and breach of contract.

5.     I have served on the Boards of Directors for publicly-held companies PS Financial, Damen National Bank and Cell Pathways, Inc. and on privately-held companies Marinette Marine Corporation, TV Compass, Inc., Evolve Solutions, Inc. and Epay Systems, Inc. I have also served as Chairman on the charitable Boards of Erin's Handicapped Children's Fund and Brother Rice High School Capital Campaign, sat on the Board of Directors for Chinese Orphan Relief Fund Board out of Beijing China and as Chairman Emeritus for Love Without Boundaries.

6.     I am a Certified Public Accountant licensed or registered in the State of Illinois since 1974. I obtained a Bachelor's Degree in Business, with a major in accounting, from Loyola University in 1974. I have attended throughout my career various educational seminars and conferences that have related to the areas of audit, accounting, taxes, business valuations, litigation services and damages calculations.

7.     I have participated in courses on patent damages methodology for the Practicing Law Institute, an organization comprised generally of lawyers.

8.     A listing of my qualifications, including a list of deposition and/or trial testimony I have given within the last four years, is attached as Exhibit A.[1]  The nature of my work experience and academic credentials are also included in my curriculum vitae.[2]

9.     I am being compensated based on the number of hours I, and those assisting me, perform multiplied by our hourly rates. My current hourly billing rate is $500 per hour.

## III.     LK AND FITNESS ARTS

10.     LK/Forza was founded by Mia Scheid and Lee Kemp.  Ms. Scheid is an entrepreneur who founded and operates a successful company known as Fitness Arts in Palatine, Illinois.   Mr. Kemp is a former three-time NCAA and three-time world amateur wrestling champion and an Olympic coach.  His skills and achievements as an amateur wrestler are legendary and they make him a highly sought-after spokesman and commentator in amateur wrestling events like the NCAA and Olympic wrestling championships.

11.     Fitness Arts has operated a business in which it purchases nutritional supplements from Premier and others and resells them to address the nutritional needs of customers and to improve their health, fitness and athletic performance.  Fitness Arts customers include high school and college athletes and, on occasion, even professional athletes.

---

[1] Exhibit A
[2] Exhibit C

- 4 -

**12.**     Fitness Arts' business began operating in 1999 with no annual nutritional supplement sales and progressed in 2001-2002 from $10,000 per year in supplement sales to $500,000 per year in sales by 2011-2012.  By then, Fitness Arts had become a highly successful and profitable business and Fitness Arts actually supplied nutritional supplements to wrestlers from youth, high school and college levels before the formation of Forza in 2011. Fitness Arts explosive sales growth include an increase from $131,393 in sales for 2006 to $405,595 in sales for the calendar year of 2007. Sales information appears in **Section V Direct Losses**

13.     Mr. Kemp, in turn, is in a unique position to promote the sale of nutritional supplements to high school and college wrestlers, many of whom belong to wrestling clubs.  Mr. Kemp is known and respected by most coaches and has an easy entry to most wrestling clubs and high school and collegiate programs.

14.     Lee Kemp was actually an employee of Fitness Arts during which time he brought in high school and college wrestlers into Fitness Arts facilities to personally train them and attempt to sell fitness supplements to them.  Lee Kemp was able to bring many wrestlers into Fitness Arts because of his name recognition.  This established business showed sufficient potential that Lee Kemp and Mia Scheid used this same model to form Forza.  Forza's business was aimed at this exact market -- selling fitness supplements, using Lee Kemp's name recognition to high school, college and other amateur wrestlers.

15.     In my opinion, Ms. Scheid and Mr. Kemp together had the ability to expand an already existing successful business by selling a proprietary line of nutritional supplements to athletes if the products had been supplied to them on a timely basis

- 5 -

during the Olympic year, were not mislabeled and were not tainted by banned substances like DHEA.

## IV.    LOST PROFITS

16.    I do not believe it is speculative but, rather, believe it is reasonably certain that Mr. Scheid and Mr. Kemp could have extended the existing business of Fitness Arts to add a line of specifically formulated nutritional supplements aimed at amateur wrestlers.  First, the LK/Forza business was simply an expansion of the existing Fitness Arts business, which was already selling as much as $500,000 per year in nutritional supplements made by the same company, PRL.[3]  Second, Fitness Arts, through Mr. Kemp, had already begun selling PRL-made nutritional supplements to amateur wrestlers who would come to Fitness Arts' facilities, worked with Mr. Kemp and were being counselled and trained by him on fitness, nutrition and the benefits of supplements.  The LK/Forza business was not similar, it was the same as what was already started at Fitness Arts.  Third, the whole idea for LK/Forza originated from the success Fitness Arts was having selling nutritional supplements to people interested in health and fitness.  This was, in effect, the mere extension of an existing business, not the establishment of a new business.  Fourth, Fitness Arts (with Mr. Kemp helping to promote and sell PRL supplements to amateur wrestlers) was already in business at the time LK (then Forza Technologies) was formed in 2011. Fifth, Ms. Scheid and Mr. Kemp (with help from Ms. Scheid's mother, a physician specializing in children's health) formulated a proprietary line of supplements for amateur wrestlers and even sought patent protection for its formulations.  The fact of proprietary formulations covered by a

---

[3] See Schedule Four

patent gave LK/Forza a potentially exclusive position in its space. Sixth, LK/Forza had the endorsement of USA Wrestling as the only authorized source for approved nutritional supplements for wrestlers.[4] No other company had that endorsement or access to the proprietary products.[5] USA Wrestling is a national organization that reaches 180,000 members, consisting of wrestlers, coaches, officials, state federations and others interested in the sport.[6] USA Wrestling permitted Forza/LK to use its extensive database. Seventh, Mr. Kemp is a well-known, nearly legendary figure in amateur wrestling. He is like the Michael Jordan of amateur wrestling. If Michael Jordan formed a company to sell supplements to amateur basketball players, one could forecast a better-than-average probability of success. Eighth, LK/Forza had secured sufficient funding (see Goods Purchased) to purchase the initial round of proprietary products from PRL (enough to generate twice the amount in cash to then purchase second and third full cycles of products). The supplier of the products was established; it had years of successful operations in making and selling nutritional supplements to a wide spectrum of customers. Ninth, the proprietary products were being introduced during the Olympic year where there was special attention on all Olympic sports, including wrestling. Tenth, Olympic wrestlers (maybe the most famous current Olympic champion, Jordan Burroughs, had used and endorsed the LK/Forza products. Burroughs actually won an Olympic gold medal in 2012. Eleventh, Lee Kemp's name and image was associated with the LK/Forza products much like Michael Jordan is associated with Nike shoes. Twelfth, LK/Forza had a detailed business and marketing

---

[4] Exhibit B Item 3
[5] Exhibit B Item 3
[6] Exhibit B Item 3

plan done by a highly-skilled professional, so the forecast of sales and profits was not speculative.

17.     When Nike signed on Michael Jordan, they created the Air Jordan line.  It was a special line of gym shoes for basketball players.  In the instant case, Fitness Arts created the LK/Forza brand to market just the product to wrestlers.  Air Jordan was not a new business, but an extension of the Nike Brand. LK was not a new business but a way to market the LK/Forza (Lee Kemp) brand to athletes.  The formation of LK/Forza brand was for marketing.  In a similar fashion, Toyota created the Lexus Brand and Honda created the Acura brand. Air Jordan, Lexus and Acura are not new companies, but separate franchises for marketing with ownership common to Nike, Toyota and Honda.

18.     I think the single most important issue is that LK / Forza was funded. They had  $550,000 in funding  on hand. This was not a pipe dream. They were funded with a source of product.   They had an existing $500,000 sales base along with an established world class reputation in the wrestling and athletic community.

19.     In short, it is my opinion that the projected profitability of LK's business is not based upon the prior success of a similar business; it is based upon the actual operation and success of an existing business at Fitness Arts. This was apparently, known to Mr. Marshall who owned and operated PRL and he expressed an interest in himself owning a portion of LK/Forza.

20.     I have reviewed the Business Plan prepared by Michael Ripley attached as  Exhibit B.[7]  Mr. Ripley is a Certified Public Accountant.  His Business Plan is thorough and complete and predicts a very conservative market penetration.  Mr. Ripley

---

[7] Exhibit B Item 3

- 8 -

forecast of $47 million in sales and $11.3 million in profits for the three-year period from 2012 through 2014[8]. In my opinion, profits of at least $10 million from the LK/Forza business were both reasonable and achievable.

21. In the 2012-2013 timeframe, there were no direct competitors targeting amateur wrestlers. Nevertheless, the products required and marketing approaches for sales to persons interested in fitness and those engaged in competitive athletics would be substantially the same. There have since been entities who now sell nutritional supplements to wrestlers who previously sold more general purpose supplements and they have had success.

## V.  DIRECT LOSSES

22. Forza suffered direct losses as follows from these problems caused by PRL: (1) PRL failed to timely supply product in December 2011 for introduction to the 2012 Olympic year;[9] (2) many of the PRL products that were supplied were mislabeled and, thus, was not saleable;[10] (3) some of the products were tainted with a banned substance, DHEA,[11] which reflected poorly on LK/Forza's image and its source of supply, making it virtually impossible for them to sell products to amateur athletes. A consultant contacted by Iowa State University after Mr. Kemp had a commitment from Iowa State's coach to purchase Forza's supplements said this after learning of the DHEA contamination: "I would say this might be a good company to stay away from if they have had a positive testing for contamination, even though it says it was at a low level; it seems it would be a red flag" (Exhibit 2 to Timothy Weesner Deposition).

---

[8] Exhibit B Item 3
[9] Exhibit B Item 1
[10] Exhibit B Item 1
[11] Exhibit B Item 1

23. The direct losses are at least $2,759,928.70 calculated as follows:

- $365,050.00 purchase of product from PRL; [12]

- $1,794,375.00 in lost time by Lee Kemp and Mia Scheid; [13]

- $ 310,916.59 in operating losses at LK Nutrition, not counting the unsalable inventory. [14]

- $38,257.70 in Lee Kemp Development Expenses. [15]

- $165,000.00 Olympic costs and movie development. [16]

- $86,329.41 Fitness Arts employment costs spent on LK/Forza. [17]

## GOODS PURCHASED

LK/Forza purchased product from PR Labs. They made two payments as follows: $150,000 on November 22, 2011 and a wire transfer for $215,050 on April 17, 2012. They used some product for samples, sold $20,820 worth of product in 2012 and wrote off the remaining product with a write down or loss on the ending inventory of $290,619.94. Forza requested a refund from PR Labs and PRL refused to buy back its own product or refund an overpayment of $6,347.00.

## LOST TIME

Lee Kemp began working on the project in 2008. He worked between 22.5 and 40 hours per week through December 31, 2012. LK/Forza sold his time at a daily rate of $1500 or a weekly rate of $6,000 per week. Mia Scheid worked on the project for 22.5 hours per week from January, 2011 through December, 2012. Ms. Scheid bills at the hourly rate of $150 per hour.

---

[12] Schedule One
[13] Schedule One
[14] Schedule Seven
[15] Schedule Two
[16] Schedule Three
[17] Schedule Five

Mr. Kemp worked many hours from 2008 through 2012 on the product, its marketing and development. Mr. Kemp has invested $1,456,875 in his time in the five-year period from January, 2008 through December, 2012. Ms. Scheid has invested $337,500 of her time during the period from January, 2011 and December 2012. The combined investment of time is equal to $1,794,375. This is recapped on Schedule One and is based on conversations with Lee Kemp.

## OPERATING LOSSES

LK Nutrition had operating losses for 2012, 2013 and 2014 totaling $595,216.47, plus additional losses of $80,750.12 from 2011 for total losses of $675,966.59. These losses include the write off of the unsold product received from Premier. The goods cost $365,050. Operating losses net of unsalable inventory were $310,916.59.[18]

## LEE KEMP EXPENSES

Lee Kemp has spent $38,257.70 on travel and related tournament expenses. This includes attending wrestling events, world championships, seminars, conferences and presentation around the world since 2006 in the development and promotion of his nutritional product line.[19]

## OLYMPIC DEVELOPMENT

Olympic development costs and Lee Kemp documentary development are broken down as follows:

LK/Forza developed a documentary surrounding Mr. Kemp and his career. It was to premier at the 2012 Olympics in London. When the product was delivered late, mislabelled and found to be tainted, the documentary was not completed. Costs

---

[18] Schedule Seven
[19] Schedule Two

incurred were around $100,000. In addition, Ms. Scheid incurred $65,000 in travel expenses related to the product and the London Olympics.

## EMPLOYMENT COSTS

Four employees of Fitness Arts spent time on the expansion of LK/Forza. The employees names and percentage of time spent on LK/Forza are attached and total $86,329.41[20]

## SALES RECAP

Fitness Arts had substantial sales of nutritional supplements. These sales provided the basis for the expansion into LK/Forza wrestling products. Sales from various years were taken from the company books and records and are as follows:[21]

| | |
|---|---|
| 2003 | $28,244 |
| 2006 | $131,393 |
| 2007 | $405,595 |
| 2008 | $507,526.00 |
| 2010 | $447,493.54 |
| 2011 | $503,113.26 |
| 2012 | $501,542.38 |
| 2013 | $408,929.37 |
| 2014 | $362,010.52 |

In addition, LK Nutrition LLC (F/K/A Forza) had sales as follows:

| | |
|---|---|
| 2012 | $20,820.68 |
| 2013 | $77,201.3 |
| 2014 | $29,162.22 |

---

[20] Schedule Five
[21] Schedule Four

## BALANCE SHEET

Balance sheet as of December 31, 2014 - See Schedule Six

## COMPARATIVE INCOME STATEMENTS

Comparative income statements 2011 to 2014 - See Schedule Seven

Dated: March 20, 2015

Paul J. Duggan

**Exhibit A**

PAUL J. DUGGAN

QUALIFICATIONS & DEPOSITION TESTIMONY

2011 - 2014

1. Forza Technologies, LLC, Plaintiff, v. Premier Research Labs, LP, Defendant and Counterclaimant, v. Forza Technologies, LLC, Lee Kemp and Mia Scheid, Counterclaim-Defendants. Deposition testimony.

**Exhibit B**

ANALYZED DOCUMENTS

1.  Deposition of Jennifer Gibson dated May 1, 2014  Pages 86-121

2.  Deposition of Timothy David Weesner dated March 26, 2014

3.  Deposition of Michael Earl Ripley dated March 20, 2014 and Related Documents

    including business plan.

**Exhibit C**

PAUL J. DUGGAN
CIRRICULUM VITAE

1. President of Jackson Capital Management, LLC – Evergreen Park, IL
   Founded in 1993

   a. Hedge Fund Management
   b. Investment Analysis and Valuations
   c. Small Business Accounting

2. Graduate - Loyola University of Chicago

   - BBA in Accounting
   - CPA – State of Illinois

3. Board of Directors

   a. Public Companies
      - PS Financial Inc. (PSFI)  3-year term (2000-2003) - Bank Sold
      - Damen National Bank (DFIN) – sold to Mid City National Bank (1998)
      - Cell Pathways, Inc ( CLPA) 2001- 2003- sold to OSI Pharmaceuticals.

   b. Private Companies
      - Marinette Marine Corporation – sold to The Manitowoc Company (1993-2000)
      - T V Compass, Inc. London, England   2003 to sale
      - Evolve Solutions, Inc. Irvine, California   2003 to sale
      - Epay Systems, Inc. Chicago, Illinois  2008 to present

4. Charitable Boards

   a. Erin's Handicapped Children's Fund – Chairman
   b. Brother Rice High School Capital Campaign – Chairman
   c. Chinese Orphan Relief Fund Board- Beijing China
   d. Love Without Boundaries – Chairman Emeritus

5. Prior activities

   a. Founder and Managing Partner Duggan and Associates, LLC  1988 to 2000
      Litigation Support and Technology Transfer Consulting
   b. Founder and General Partner Duggan & Clesceri, Ltd., CPA's  1976-1988

# Schedule One

**LK Nutrition**
**Lost Hours Recap**

| Employee | Year | | Hours | Value | |
|---|---|---|---|---|---|
| LK | | 2008 | 1,712.50 | $ | 256,875.00 |
| LK | | 2009 | 2,000.00 | $ | 300,000.00 |
| LK | | 2010 | 2,000.00 | $ | 300,000.00 |
| LK | | 2011 | 2,000.00 | $ | 300,000.00 |
| | | 2012 | 2,000.00 | $ | 300,000.00 |
| LK | | totals | 9,712.50 | $ | 1,456,875.00 |
| | | | Hours | Value | |
| Mia S | 2008 | | 0.00 | $ | - |
| Mia S | 2009 | | 0.00 | $ | - |
| Mia S | 2010 | | 0.00 | $ | - |
| Mia S | 2011 | | 1125.00 | $ | 168,750.00 |
| Mia S | 2012 | | 1125.00 | $ | 168,750.00 |
| | | totals | 2250.00 | $ | 337,500.00 |
| Combined | | | 11,962.50 | $ | 1,794,375.00 |

**LK Nutrition**
**Cost of PR Labs Product**

| Date | Check # | Amount | |
|---|---|---|---|
| 11/22/2011 | 1005 | $ | 150,000.00 |
| 4/17/2012 | Wire Trans | $ | 215,050.00 |
| Total | | $ | 365,050.00 |

**Schedule Two**

**Lee Kemp**
**Forza Expenses**
**2008 to 2015**

Lee Kemp FORZA Expenses 2008 - 2015

| | Date | Travel | Hotel | Meals | Entertainment | Shipping | TOTAL |
|---|---|---|---|---|---|---|---|
| **2006** | | | | | | | |
| World Team Trials-Las Vegas, NV | Jun-06 | 400 | 190 | 120 | | | |
| 1st Wisconsin Wrestling Alumni Reunion-Madison, WI | Sep-06 | 146.05 | 190 | 60 | | | |
| World Championships-Guangzhou China | Sep-06 | | | | | | |
| **2007** | | | | | | | |
| World Team Trials-Las Vegas, NV | Jun-07 | 400 | 190 | 120 | | | |
| Junior World Championships-Beijing, China | Aug-07 | | | | | | |
| 1st Wisconsin Wrestling Alumni Reunion-Madison, WI | Sep-07 | 143.75 | 285 | 60 | | | |
| **2008** | | | | | | | |
| Illinois State Tournament-Champaign | Feb-08 | 187.45 | | 40 | | | |
| NCAA Wrestling Championships-St Louis, MO | Mar-08 | 389.85 | 285 | 120 | | | |
| World Team Trials-Council Bluffs, Iowa. | May-08 | 529 | 190 | 120 | | | |
| Olympic Games-Beijing China | Jul-08 | | | | | | |
| **2009** | | | | | | | |
| Illinois State Tournament | Feb-09 | 187.45 | | 40 | | | |
| NCAA Wrestling Championships-St Louis, MO | Mar-09 | 389.85 | 285 | 120 | | | |
| World Team Trials-Council Bluffs, Iowa. | Jun-09 | 529 | 190 | 120 | | | |
| **2010** | | | | | | | |
| Freestyle/Greco US Team Training Camp-Colorado Spring, CO | Jan-10 | 400 | 380 | 120 | | | |
| Illinois State Tournament | Feb-10 | 187.45 | | 40 | | | |
| Expo West (Health Conference)-Anaheim Ca | Mar-10 | 400 | 95 | 30 | | | |
| NCAA Wrestling Championships-Omaha, NE | Mar-10 | 400 | 285 | 120 | | | |
| Wrestlers in Business-Cleveland, OH | Dec-10 | 300 | | 30 | | | |
| **2011** | | | | | | | |
| Illinois State Tournament | Feb-11 | 187.45 | | 40 | | | |
| NCAA Wrestling Championships-Philly, PA | Mar-11 | 400 | 285 | 120 | | | |
| Met with Potential Investor Dan McCabe-New Jersey | May-11 | 400 | 95 | 30 | | | |
| World Team Trials-Oklahoma City, OK | Jun-11 | 400 | 190 | 60 | | | |
| Dan McCabe came to Chicago to meet-Chicago (came w/2 other People) | Jun-11 | | | 150 | | | |
| MMA World Expo (Exhibitor and speaker)-New York, NY | Dec-11 | 400 | 190 | 60 | | | |
| **2012** | | | | | | | |
| Supplement 411 Conference-Colorado Springs, CO | Feb-12 | 400 | 190 | 60 | | | |
| Illinois State Tournament | Feb-12 | 187.45 | | 40 | | | |
| NCAA Wrestling Championships-St Louis, MO | Mar-12 | 389.85 | 285 | 120 | | | |
| NCAA D3 Wrestling Championships-Stevens Point, WI | Mar-12 | 257.6 | | 30 | | | |
| Olympic US Wrestling Trials-Iowa City, IA | Apr-12 | 276 | 190 | 60 | 150 | 400 | |
| Fox Morning Show Shoot with Scott Cutaneo-New York, NY | May-12 | 400 | | 60 | | | |
| Biotic Researcg Corporation, Rosenberg, TX | Jul-12 | 400 | 190 | 60 | | | |
| Junior Nationals - Fargo, ND | Jul-12 | 709.55 | 285 | 120 | | 400 | |
| Olympic Games-London England | Jul-12 | | | | | | |
| New Orleans - State Assn Meeting/Clinic-New Orleans, LA | Oct-12 | 400 | 190 | 60 | | | |
| Ohio State Coaches Clinic-Columbus, OH | Oct-12 | 445.05 | | 30 | | | |
| Northwest Wrestling Coaches Conference Clinic- Pasco, WA | Oct-12 | 400 | 190 | 60 | | 400 | |
| WWCA Clinic-Green Bay, Wi | Nov-12 | 211.6 | 190 | 60 | | | |
| Shooting Foxcatcher Movie-Pittsburg, PA | Dec-12 | 400 | 190 | 60 | | | |
| **2013** | | | | | | | |
| NE Nartionals & Cornel vs Harvard Wrestling Dual & Clinic | Jan-13 | 400 | 190 | 60 | | | |
| MMA World Expo (Exibitor and Speaker)-New York, NY | Feb-13 | 400 | 190 | 60 | | 800 | |
| Illinois State Tournament | Feb-13 | 187.45 | | 40 | | | |
| Damion Logan Event for Autism and Clinic-East Orange, NJ | Mar-13 | 400 | 190 | 60 | | | |
| NCAA Wrestling Championships-Des Moines, IA | Mar-13 | 384.1 | 285 | 120 | | | |
| USAW/CLIFF KEEN FOLKSTYLE NATIONALS-Cedar Fall, IA | Apr-13 | 289.8 | 190 | 60 | | | |
| York College Clinic (Ramon Diaz), York, NE | Apr-13 | 300 | | 30 | | | |
| SouthWest Regionals-Dallas, TX | Apr-13 | 400 | 190 | 60 | | | |
| World University Games Trials-Akron, OH | May-13 | 456.55 | 190 | 60 | | | |
| NWHOF Induction - Presenter for John Bardis-Stillwater, OK | Jun-13 | 400 | 190 | 60 | | | |
| School Boy National Duals-Indianapolis, IN | Jun-13 | 246.1 | 190 | 60 | | | |
| Ohio All_Star Wrestling Team-Middletown, OH | Jun-13 | 250 | 190 | 60 | | | |
| US World Team Trials (Present at Silver College)-Stillwater, OK | Jun-13 | 400 | 190 | 60 | | 200 | |
| FORZA Product Shoot | Jul-13 | | | | | | |
| RALLY4WRESTLING (Met Andy Barth)-Atlanta, GA | Aug-13 | 400 | 190 | 60 | | | |
| Freak Show Wrestling Tournament (John Azevedo)-Los Angeles, CA | Oct-13 | 400 | 190 | 60 | | | |
| USAW Fall Coaches Clinic, Colorado Springs, CO | Oct-13 | 400 | 190 | 60 | | | |
| FILA International Clinic-Las Vegas, NV | Nov-13 | 400 | 190 | 60 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| NE Washington Coaches Clinic. Craig Hansen-Pasco, WA | Nov-13 | 400 | 190 | 60 | | |
| AGON II Wrestling Event-Flint, MI | Dec-13 | 349.6 | 190 | 60 | | |
| IRON MAN -Cuyahoga Falls, OH | Dec-13 | 447.35 | 190 | 60 | | |
| **2014** | | | | | | |
| Liberty Nationals-St Joseph, MO | Feb-14 | 300 | 190 | 60 | | |
| Dave Schultz Tournament (Indian Wrestlers)-Colorado Springs, CO | Feb-14 | 400 | 190 | 60 | | |
| Illinois State Tournament | Feb-14 | 187.45 | | 40 | | |
| NCAA Wrestling Championships-Oklahoma City, OK | Mar-14 | 400 | 285 | 120 | | |
| World Team Trials-Madison, WI | May-14 | 142.6 | 190 | 60 | | |
| Will Johnson Clinic-Miami, FL | Jun-14 | 400 | 285 | 120 | | |
| **2015** | | | | | | |
| Illinois State Tournament | Feb-15 | 187.45 | | 40 | | |
| NCAA Wrestling Championships-St Louis, MO (Upcoming) | Mar-15 | 389.85 | 285 | 120 | | |
| **TOTALS** | | 21,372.70 | 10,165.00 | 4,370.00 | 150.00 | 2,200.00 | 38,257.70 |

| 0.575 | Standard business milage rate |
|---|---|

http://www.irs.gov/uac/Newsroom/New-Standard-Mileage-Rates-Now-Available,-Business-Rate-to-Rise-in-2015

**Schedule Three**

**Mia Scheid**
**Email Dated 3/11/15**
**Olympic Costs and**
**Movie Development**

From: Mia Scheid <miascheid@me.com>
Date: March 11, 2015 at 4:00:53 AM CDT
To: Raymond Niro <rpniro@aol.com>, Lee Kemp <lk@leekemp.com>, Fitness Arts
<info@fitnessarts.org>, "Wartman, Donna L" <wartman@nshn.com>
Subject: Re: Nutritional Supplement Sales

The documentary was around $100,000. This was set to premier at the USA House in
London 2012 Olympic Games.

Lee should provide you with his travel dates to various venues from 2009-2012.

I spent at least $50k in travel expenses and additional $15k to London between 2009-2012.

I spent minimum of 4-5 hours a day m-f (2011-2012) and traveled on many weekends to the
OTC, NCAA, Olympic Trials, national meets, dozens of pre Olympic events, WGB events to
name a few. Lee should have a better list.

My time is billed out at $150 per hour minimum. As reflected by drop in sales 2011-2012.

Lee and I started to plan and met with Bob Marshall as early as 2008 to discuss.

Lee spent all of his time on Forza. We spent countless ours on developing PowerPoint
presentations for both live and webinar presentations.

I am waiting for wifi as the satellite doesn't work when it's cloudy.

Please let me know if I'm heading in the right direction.

Mia


Sent from my iPhone

On Mar 11, 2015, at 10:54 AM, Raymond Niro <rpniro@aol.com> wrote:

Actually supplement sales were higher: $447,493 in 2010; $503,113 in 2011 &
$303,292 & $362,010 respectively in 2013 & 2014. I still need 2012.

Sent from my iPad

On Mar 10, 2015, at 12:48 PM, Wartman, Donna L <wartman@nshn.com> wrote:

Laura:

     Thanks for everything. Ray is still looking for
nutritional supplement sales from 2010 through 2013. Mia told
him she had as much as $750,000/year. Is that true? He only sees
$181,000.

Raymond P. Niro
(Transmitted by Donna L. Wartman)

Dictated but not reviewed

**Schedule Four**

**Fitness Arts**
**Product Sales Recap**
**Various Years**
**2003 through 2014**

# Fitness Arts Academy
## Product Sales / Sales Tax
### January through December 2003

|  | Amount |
|---|---|
| **Total Product Sales** |  |
| Supplements, Gen'l | 28,244.48 |
| Fitness Equip., Aids | 314.37 |
| Videos,CD's,Manuals | 639.78 |
| **TOTAL PRODUCT SALES** | 29,198.63 |
|  |  |
| Sales Tax | 8.25% |
|  |  |
| **Total Sales Tax Calculated** | 2,408.89 |
|  |  |
| **Sales Tax Payments** |  |
| 1st Q 2003 |  |
| Payment | 814.00 |
| Merchant Fee | 14.00 |
|  |  |
| 2nd Q 2003 |  |
| Payment | 488.00 |
| Merchant Fee | 9.00 |
|  |  |
| 3rd Q 2003 |  |
| Payment | 537.00 |
| Merchant Fee | 10.00 |
|  |  |
| 4th Q 2003 (payable) |  |
| Payment | 531.00 |
| Merchant Fee | 9.00 |
|  |  |
| **Total Sales Tax Payments** | 2,412.00 |
|  |  |
| **Difference** | -3.11 |

# Sales Tax Liability
## January through December 2006

| | Total Sales | Non-Taxable Sales | Taxable Sales | Tax Rate | Tax Collected | Sales Tax Payable As of Dec 31, 06 |
|---|---|---|---|---|---|---|
| Illinois Department of Revenue | | | | | | |
| Sales Tax | 401,101.94 | 269,708.85 | 131,393.09 | | 11,497.64 | 987.14 |
| Illinois Department of Revenue - Other | 0.00 | 0.00 | 0.00 | | 0.00 | 33.20 |
| Total Illinois Department of Revenue | 401,101.94 | 269,708.85 | 131,393.09 | 2.25% | 11,497.64 | 1,020.34 |
| Misc | | | | | | |
| Misc - Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Misc | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| No tax vendor | | | | | | |
| Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total (no tax vendor) | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| TOTAL | 401,101.94 | 269,708.85 | 131,393.09 | | 11,497.64 | 1,020.34 |

## Sales Tax Liability
### January through December 2007

| | Total Sales | Non-Taxable Sales | Taxable Sales | Tax Rate | Tax Collected | Sales Tax Payable As of Dec 31, 07 |
|---|---|---|---|---|---|---|
| Illinois Department of Revenue | | | | | | |
| Sales Tax | 712,462.63 | 306,866.85 | 405,595.78 | 2.25% | 35,490.30 | 3,529.47 |
| Illinois Department of Revenue – Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Illinois Department of Revenue | 712,462.63 | 306,866.85 | 405,595.78 | | 35,490.30 | 3,529.47 |
| Misc | | | | | | |
| Misc – Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Misc | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| No tax vendor | | | | | | |
| Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total (no tax vendor) | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| TOTAL | 712,462.63 | 306,866.85 | 405,595.78 | | 35,490.30 | 3,529.47 |

## Sales Tax Liability
### January through December 2008

| | Total Sales | Non-Taxable Sales | Taxable Sales | Tax Rate | Tax Collected | Sales Tax Payable As of Dec 31, 08 |
|---|---|---|---|---|---|---|
| Illinois Department of Revenue | | | | | | |
| Sales Tax | 759,654.67 | 252,128.11 | 507,526.56 | 2.25% | 47,578.75 | 39,126.74 |
| Illinois Department of Revenue - Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Illinois Department of Revenue | 759,654.67 | 252,128.11 | 507,526.56 | | 47,578.75 | 39,126.74 |
| Misc | | | | | | |
| Misc - Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Misc | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| No tax vendor | | | | | | |
| Other | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total (no tax vendor) | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| TOTAL | 759,654.67 | 252,128.11 | 507,526.56 | | 47,578.75 | 39,126.74 |

# Fitness Arts
## Department Sales Summary

Date: 3/1/2010 12:00:00 AM to 12/31/2010 11:59:59 PM

| Dept Name | Qty Sold | Ext Price | Ext Cost | Margin % | |
|---|---|---|---|---|---|
| PRLabs | 20,433 | 447,493.54 | 272,739.09 | 39.05 | |
| Fitness Arts | 847 | 31,383.93 | 16,945.92 | 46 | |
| System | 673 | 5,281.45 | 4,387.20 | 16.93 | |
| QuickBooks Financial Software | 205 | 11,668.44 | 2,581.19 | 77.88 | This is the separate report submitted |
| SacroWedgy | 4 | 119.8 | 48 | 59.93 | |
| Service | 1,044 | 111,986.48 | 7.1 | 99.99 | |
| | 23,206 | 607,933.65 | 296,708.50 | 51.19 | |

# Fitness Arts
## Department Sales Summary

Date: 1/1/2011 12:00:00 AM to 12/31/2011 11:59:59 PM

| Dept Name | Qty Sold | Ext Price | Ext Cost | Margin % |
|---|---|---|---|---|
| PRLabs | 26,473 | 503,113.26 | 345,470.55 | 31.33 |
| Fitness Arts | 1,829.75 | 59,348.19 | 13,125.08 | 77.88 |
| System | 766 | 7,199.40 | 3,224.09 | 55.22 |
| Service | 945.25 | 100,584.68 | 79.96 | 99.92 |
| SacroWedgy | 4 | 119.8 | 68.88 | 42.5 |
| | 30,018 | 670,365.34 | 361,968.56 | 46 |

| | Category | Subtotal | Tax | Total |
|---|---|---|---|---|
| Jan-12 | Food | $42,352.67 | $914.65 | $43,267.32 |
| | Non-Food | $1,570.87 | $149.34 | $1,720.21 |
| Feb-12 | Food | $43,553.83 | $977.02 | $44,530.85 |
| | Non-Food | $1,500.45 | $137.80 | $1,638.25 |
| Mar-12 | Food | $41,238.50 | $901.72 | $42,140.22 |
| | Non-Food | $1,778.61 | $150.21 | $1,928.82 |
| Apr-12 | Food | $43,075.34 | $956.59 | $44,031.93 |
| | Non-Food | $1,406.41 | $128.68 | $1,535.09 |
| May-12 | Food | $43,169.28 | $963.96 | $44,133.24 |
| | Non-Food | $1,463.43 | $131.84 | $1,595.27 |
| Jun-12 | Food | $46,164.30 | $1,029.85 | $47,194.15 |
| | Non-Food | $2,749.40 | $251.51 | $3,000.91 |
| Jul-12 | Food | $36,194.16 | $794.98 | $36,989.14 |
| | Non-Food | $1,359.97 | $124.38 | $1,484.35 |
| Aug. 2012 | Food | $42,229.34 | $959.55 | $43,188.89 |
| | Non-Food | $2,055.39 | $188.71 | $2,244.10 |
| Sept. 2012 | Food | $39,491.65 | $877.36 | $40,369.01 |
| | Non-Food | $1,260.59 | $111.10 | $1,371.69 |
| Oct. 2012 | Food | $40,937.87 | $910.54 | $41,848.41 |
| | Non-Food | $980.78 | $86.46 | $1,067.24 |
| Nov. 2012 | Food | $36,764.42 | $827.79 | $37,592.21 |
| | Non-Food | $973.04 | $88.59 | $1,061.63 |
| Dec. 2012 | Food | $35,453.09 | $803.92 | $36,257.01 |
| | Non-Food | $691.59 | $59.06 | $750.65 |

**$520,940.59**

*Food - Supplement
*Non-Food - Product sold - Non Digestable.

| Jan-13 | Category | Subtotal | Tax | Total |
|--------|----------|----------|-----|-------|
|        | Food     | $39,563.10 | $868.42 | $40,431.52 |
|        | Non-Food | $988.08 | $87.80 | $1,075.88 |
| Feb-13 | Food     | $28,679.82 | $650.60 | $29,330.42 |
|        | Non-Food | $730.88 | $65.16 | $796.04 |
| Mar-13 | Food     | $34,992.78 | $782.24 | $35,775.02 |
|        | Non-Food | $699.11 | $60.33 | $759.44 |

$108,168.32

**Fitness Arts**

**Department Sales Summary**

Product Sales April 2013-December 2013

Date: 4/1/2013 12:00:00 AM to 12/31/2013 11:59:59 PM

| Department | Qty Sold | Ext Price | Ext Cost |
|------------|----------|-----------|----------|
| Food | 13,805 | 303,392.41 | 192,711.99 |
| Non-Food | 524 | 10,029.38 | 6,633.89 |
| | 14,329 | 313,421.79 | 199,345.88 |

# Fitness Arts
## Department Sales Summary

Date: 1/1/2014 12:00:00 AM to 12/31/2014 11:59:59 PM

| Department | Qty Sold | Ext Price | Ext Cost | Margin % |
|---|---|---|---|---|
| Food | 15,314 | 362,010.52 | 223,065.26 | 38.38 |
| Non-Food | 727 | 16,380.07 | 12,959.70 | 20.88 |
| Rental | 89 | 3,560.00 | 0 | 100 |
| Service | 1,430 | 131,353.50 | 0 | 100 |
| Shipping | 299 | 3,256.07 | 0 | 100 |
| | 17,859 | 516,560.16 | 236,024.96 | 54.31 |

**Schedule Five**

**Fitness Arts**
**Employment Costs**
**spent on LK / Forza**
**2011-2014**

| 2011 | | | | % of time -Forza | Total $ - Forza |
|---|---|---|---|---|---|
| | Keith Bardin | | 1,811.00 | 90 | 1,629.90 |
| | Cheyenne Johnson | | - | | |
| | Laura Manna | | 20,387.91 | | |
| | Elizabeth Miner | | 25,986.96 | | |
| | | | | | |
| 2012 | | | | | |
| | Keith Bardin | | 21,600.06 | 90 | 19,440.54 |
| | Cheyenne Johnson | | 10,775.00 | 90 | 9,697.50 |
| | Laura Manna | | 29,411.25 | 40 | 11,764.50 |
| | Elizabeth Miner | | 19,608.60 | 30 | 5,882.40 |
| | | | | | |
| 2013 | | | | | |
| | Keith Bardin | | | | |
| | Cheyenne Johnson | | | | |
| | Laura Manna | | 40,216.25 | 40 | 16,086.50 |
| | Elizabeth Miner | | 35,022.72 | 30 | 10,506.81 |
| | | | | | |
| 2014 | | | | | |
| | Keith Bardin | | | | |
| | Cheyenne Johnson | | | | |
| | Laura Manna | | 44,484.53 | 20 | 8,896.91 |
| | Elizabeth Miner | | 24,243.45 | 10 | 2,424.35 |

SCHEDULE SIX

BALANCE SHEET
December 31, 2014

# FORZA TECHNOLOGIES LLC
## Balance Sheet
### As of December 31, 2014

Accrual Basis

|  | Dec 31, 14 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1010 · Cornerstone NB & T 0116 | 6,325 |
| 1015 · Northern Trust Checking | 13,806 |
| **Total Checking/Savings** | 20,131 |
| **Other Current Assets** | |
| 1115 · Payroll Exchange Account | 0 |
| 1300 · Inventory | |
| 1302 · Product Inventory - Biotics | 6,042 |
| 1303 · Inventory Storage & Logistics | 15,414 |
| 1304 · Fulfillment Expenses | 6,913 |
| 1305 · Other Inventory Costs | 932 |
| **Total 1300 · Inventory** | 29,301 |
| **Total Other Current Assets** | 29,301 |
| **Total Current Assets** | 49,433 |
| **Fixed Assets** | |
| 1600 · Fixed Assets | |
| 1670 · Computer Equipment | 189 |
| 1680 · Computer Software | 357 |
| Total 1600 · Fixed Assets | 546 |
| 1661 · Accumulated Depreciation | (128) |
| **Total Fixed Assets** | 418 |
| **Other Assets** | |
| 1700 · Intangible Assets | |
| 1701 · Organization Costs | 780 |
| 1702 · Start Up Expenses | 64,149 |
| 1703 · Loan Fees | 500 |
| **Total 1700 · Intangible Assets** | 65,429 |
| 1771 · Accumulated Amortization | (8,700) |
| **Total Other Assets** | 56,729 |
| **TOTAL ASSETS** | 106,580 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 2,526 |
| **Total Accounts Payable** | 2,526 |
| **Credit Cards** | |
| 2020 · Amex Credit Card | 63 |
| **Total Credit Cards** | 63 |
| **Other Current Liabilities** | |
| 2100 · Accrued Payroll Taxes | 39 |
| 2205 · Reimbursement Payable - Scheid | 26,688 |
| 2206 · Due to Fitness Arts | 26,325 |
| 2301 · Loan Payable - Passignano | 550,000 |
| 2302 · Line of credit - Northern Trust | 100,000 |
| **Total Other Current Liabilities** | 703,053 |
| **Total Current Liabilities** | 705,641 |
| **Total Liabilities** | 705,641 |
| **Equity** | |
| 30700 · Owners Distributions | |
| Mia Scheid | (8,567) |



# FORZA TECHNOLOGIES LLC
## Balance Sheet
### As of December 31, 2014

|  | Dec 31, 14 |
|---|---|
| Total 30700 · Owners Distributions | (8,587) |
| **3100 · Owners Capital** |  |
| Lee Kemp | (8,587) |
| Mia Scheid | 13,329 |
| Total 3100 · Owners Capital | 4,742 |
| 3200 · Owners Equity | (293,498) |
| Net Income | (301,718) |
| **Total Equity** | (599,061) |
| **TOTAL LIABILITIES & EQUITY** | 106,580 |



**SCHEDULE SEVEN**

**COMPARATIVE INCOME STATEMENTS**
**2011 TO 2014**

## LK Nutrition LLC (f/k/a Forza Technologies LLC)
## Comparative Income Statements
## 2011 to 2014

| | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|
| Total Income | | $ 21,468.62 | $ 87,478.84 | $ 29,090.00 | $ 138,037.46 |
| Cost of Goods Sold | | 22,535.39 | 61,384.05 | 309,616.00 | 393,535.44 |
| Gross Profit | | (1,066.77) | 26,094.79 | (280,526.00) | (255,497.98) |
| Total Expenses | 80,750.12 | 186,594.77 | 131,931.72 | 21,192.00 | 420,468.61 |
| Net Losses | (80,750.12) | (187,661.54) | (105,836.93) | (301,718.00) | (675,966.59) |
| | | | | | |
| Net Losses from Purchased Inventory | | | | | $ (365,050.00) |
| Net Losses from Operations | | | | | $ (310,916.59) |
| Total Net Losses | | | | | $ (675,966.59) |

# FORZA TECHNOLOGIES LLC
## Profit & Loss

### January through December 2014

| | Jan - Dec 14 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4000 · Ordinary Income | |
| 4100 · Merchandise Sales | 29,166 |
| 4110 · Misc. Income | (76) |
| **Total 4000 · Ordinary Income** | 29,090 |
| **Total Income** | 29,090 |
| **Cost of Goods Sold** | |
| 6000 · Cost of Goods Sold | |
| 6100 · COGS-P/R Labs - damaged inv. | 290,620 |
| 6110 · COGS - Biotics | 17,110 |
| 6300 · COGS-Shipping | 1,887 |
| **Total 6000 · Cost of Goods Sold** | 309,616 |
| **Total COGS** | 309,616 |
| **Gross Profit** | (280,526) |
| **Expense** | |
| 7200 · Payroll Expenses | |
| 7201 · Officer's Wages | 6,550 |
| 7230 · Payroll Taxes | 726 |
| **Total 7200 · Payroll Expenses** | 7,276 |
| 7500 · Professional Fees | |
| 7520 · Accounting Fees | 2,159 |
| **Total 7500 · Professional Fees** | 2,159 |
| 8100 · Operational Expenses | |
| 8105 · Advertising and Promotion | 874 |
| 8110 · Automobile Expense | 75 |
| 8115 · Bank and Credit Card Fees | 316 |
| 8116 · Credit Card Processing Fees | 1,464 |
| 8150 · Gifts | 97 |
| 8160 · Interest | 3,565 |
| 8170 · Office Supplies | 26 |
| 8180 · Rent Expense | 3,772 |
| 8193 · Telephone Expense | 582 |
| 8194 · Internet Expense | 160 |
| **Total 8100 · Operational Expenses** | 10,931 |
| 8300 · Travel and Meeting Expenses | |
| 8321 · Parking and Tolls | 76 |
| **Total 8300 · Travel and Meeting Expenses** | 76 |
| 8500 · Business Expenses | |
| 8585 · Taxes and Licenses | 250 |
| 8590 · Other Expense | 500 |
| **Total 8500 · Business Expenses** | 750 |
| **Total Expense** | 21,192 |
| **Net Ordinary Income** | (301,718) |
| **Net Income** | (301,718) |



Accrual Basis

| | Jan - Dec 12 | Jan - Dec 13 |
|---|---|---|
| **Ordinary Income/Expense** | | |
| **Income** | | |
| **4000 · Ordinary Income** | | |
| 4100 · Merchandise Sales | 20,820.68 | 77,201.30 |
| 4101 · Merchandise Sales - Suplay | 584.78 | 788.42 |
| 4105 · Shipping Income | 0.00 | 642.12 |
| 4110 · Misc. Income | 63.16 | 2,500.00 |
| **Total 4000 · Ordinary Income** | 21,468.62 | 81,131.84 |
| **Total Income** | 21,468.62 | 81,131.84 |
| **Cost of Goods Sold** | | |
| **5000 · Cost of Goods Sold** | | |
| 6100 · COGS-P/R Labs | 20,219.00 | 30,342.37 |
| 6150 · COGS - Biotics | 0.00 | 24,231.70 |
| 6200 · COGS-Other | 1,337.90 | 2,480.72 |
| 6300 · COGS-Shipping | 978.49 | 4,329.26 |
| **Total 6000 · Cost of Goods Sold** | 22,535.39 | 61,384.05 |
| **Total COGS** | 22,535.39 | 61,384.05 |
| **Gross Profit** | -1,066.77 | 19,747.79 |
| **Expense** | | |
| 500 · Suspense | 664.74 | 0.00 |
| **7200 · Payroll Expenses** | | |
| 7201 · Officer's Wages | 52,000.00 | 45,159.60 |
| 7210 · Wages | 0.00 | 18,750.02 |
| 7230 · Payroll Taxes | 4,066.00 | 6,475.71 |
| **Total 7200 · Payroll Expenses** | 56,066.00 | 70,385.33 |
| **7500 · Professional Fees** | | |
| 7510 · Consulting Fees | 3,572.60 | 63.95 |
| 7520 · Accounting Fees | 3,250.00 | 6,820.00 |
| 7530 · Legal Fees | 4,687.75 | 62.56 |
| **Total 7500 · Professional Fees** | 11,510.35 | 6,946.51 |
| **8100 · Operational Expenses** | | |
| 8103 · Amortization | 4,329.00 | 4,371.25 |
| 8105 · Advertising and Promotion | 37,330.89 | 4,361.50 |
| **8110 · Automobile Expense** | | |
| 8110.1 · Parking and Tolls | 0.00 | 100.71 |
| 8110 · Automobile Expense - Other | 2,294.37 | 272.44 |
| **Total 8110 · Automobile Expense** | 2,294.37 | 373.15 |
| 8114 · Reconciliation Discrepancies | 0.00 | -800.00 |
| 8115 · Bank and Credit Card Fees | 230.90 | 226.39 |
| 8116 · Credit Card Processing Fees | 1,643.22 | 2,454.98 |

MANAGEMENT PURPOSES ONLY

Accrual Basis

| | Jan - Dec 12 | Jan - Dec 13 |
|---|---|---|
| 8125 · Commissions | 391.47 | 0.00 |
| 8130 · Computer Supplies/Support | 4,473.80 | 0.00 |
| 8140 · Donation | 1,250.00 | 0.00 |
| 8150 · Gifts | 1,500.00 | 0.00 |
| 8152 · Depreciation | 98.00 | 90.00 |
| 8160 · Interest | 0.00 | 1,098.79 |
| 8165 · Miscellaneous | 439.69 | 488.61 |
| 8170 · Office Supplies | 167.62 | 195.54 |
| 8175 · Postage | 187.68 | 68.37 |
| 8176 · Printing and Copying | 762.34 | 1,098.48 |
| 8177 · Printing and Packaging | 0.00 | 0.00 |
| 8180 · Rent Expense | 0.00 | 3,805.00 |
| 8190 · Sponsorship | 37,500.00 | 25,000.00 |
| 8193 · Telephone Expense | 937.99 | 508.31 |
| 8194 · Internet Expense | 152.62 | 466.22 |
| Total 8100 · Operational Expenses | 53,568.45 | 47,907.00 |
| | | |
| 8200 · Travel and Meeting Expenses | | |
| 8210 · Conference, Convention, Class | 530.00 | 0.00 |
| 8215 · Hotel & Lodging | 0.00 | 220.95 |
| 8220 · Airfare & Transportation | 6,512.91 | 3,727.33 |
| 8221 · Parking and Tolls | 320.25 | 184.00 |
| 8330 · Meals & Entertainment | 3,299.18 | 258.50 |
| 8300 · Travel and Meeting Expenses - Other | 13,624.99 | 1,480.07 |
| Total 8300 · Travel and Meeting Expenses | 24,331.23 | 5,910.36 |
| | | |
| 8500 · Business Expenses | | |
| 8510 · Insurance - Liability | 284.00 | 346.00 |
| 8585 · Taxes and Licenses | 150.00 | 536.00 |
| 8590 · Other Expense | 0.00 | 0.00 |
| Total 8500 · Business Expenses | 434.00 | 882.00 |
| | | |
| Total Expense | 186,594.77 | 131,931.72 |
| | | |
| Net Ordinary Income | -187,651.54 | -112,183.93 |
| | | |
| Other Income/Expense | | |
| Other Income | | |
| 9003 · Legal Settlement | 0.00 | 6,347.00 |
| Total Other Income | 0.00 | 6,347.00 |
| | | |
| Other Expense | | |
| 9200 · Documentary Project Expenses | -615.20 | 0.00 |
| 9201 · Ghost and Goblins start up | 615.20 | 0.00 |
| Total Other Expense | 0.00 | 0.00 |
| | | |
| Net Other Income | 0.00 | 6,347.00 |

MANAGEMENT PURPOSES ONLY

Accrual Basis

**LK Nutrition LLC (f/k/a Forza)**
**Historical P&L**
January 2012 through December 2014

|  | Jan - Dec 12 | Jan - Dec 13 |
|---|---|---|
| Net Income | -187,661.54 | -105,836.93 |

MANAGEMENT PURPOSES ONLY

# FORZA TECHNOLOGIES LLC
## Journal
### December 31, 2011

| Date | Num | Name | Memo | Account | Debit | Credit |
|------|-----|------|------|---------|-------|--------|
| 12/31/2011 | XFER | | Fitness Arts Transfer | Mia Scheid | | 1,000.00 |
| | | | Fitness Arts Transfer | 7520 · Accounting Fees | 208.75 | |
| | | | Fitness Arts Transfer | 1701 · Organization Costs | 779.81 | |
| | | | Fitness Arts Transfer | 8170 · Office Supplies | 1,249.40 | |
| | | | Fitness Arts Transfer | 8130 · Computer Supplies/Support | 318.44 | |
| | | | Fitness Arts Transfer | 8176 · Printing and Copying | 983.01 | |
| | | | Fitness Arts Transfer | 6182 · Security | 212.30 | |
| | | | Fitness Arts Transfer | 8180 · Rent Expense | 3,909.86 | |
| | | | Fitness Arts Transfer | 8181 · Repairs and Maintenance | 414.63 | |
| | | | Fitness Arts Transfer | 8120 · Cleaning Expense | 584.92 | |
| | | | Fitness Arts Transfer | 8320 · Airfare & Transportation | 7,939.60 | |
| | | | Fitness Arts Transfer | 2205 · Reimbursement Payable - Scheid | | 15,600.72 |
| | | | | | 16,600.72 | 16,600.72 |
| 12/31/2011 | AJE 1 JM | | To record 2011 start up costs | 1702 · Start Up Expenses | 64,149.40 | |
| | | | To record 2011 start up costs | 8510 · Insurance - Liability | | 401.00 |
| | | | To record 2011 start up costs | 7300 · Independent Contractors | | 13,000.00 |
| | | | To record 2011 start up costs | 8105 · Advertising and Promotion | | 5,046.70 |
| | | | To record 2011 start up costs | 8120 · Cleaning Expense | | 584.92 |
| | | | To record 2011 start up costs | 8130 · Computer Supplies/Support | | 318.44 |
| | | | To record 2011 start up costs | 8150 · Gifts | | 357.99 |
| | | | To record 2011 start up costs | 8170 · Office Supplies | | 1,477.51 |
| | | | To record 2011 start up costs | 8176 · Printing and Copying | | 983.01 |
| | | | To record 2011 start up costs | 8180 · Rent Expense | | 3,909.86 |
| | | | To record 2011 start up costs | 8181 · Repairs and Maintenance | | 414.63 |
| | | | To record 2011 start up costs | 8182 · Security | | 212.30 |
| | | | To record 2011 start up costs | 8190 · Sponsorship | | 25,000.00 |
| | | | To record 2011 start up costs | 7520 · Accounting Fees | | 208.75 |
| | | | To record 2011 start up costs | 7510 · Consulting Fees | | 1,600.00 |
| | | | To record 2011 start up costs | 6330 · Meals & Entertainment | | 177.66 |
| | | | To record 2011 start up costs | 6320 · Airfare & Transportation | | 10,456.63 |
| | | | | | 64,149.40 | 64,149.40 |
| TOTAL | | | | | 80,750.12 | 80,750.12 |

# EXHIBIT C

# In The Matter Of:

*Forza Technologies v*
*Premier Research Labs*

---

*Michael Earl Ripley - CONFIDENTIAL*
*March 20, 2014*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File mr032014.TXT

Min-U-Script® with Word Index

Page 65

1]     synopsis, correct?
2]     A.   Correct.
3]     Q.   And the message is, "Mia, we should talk before
4]     you present to your investor"?
5]     A.   Yes.
6]     Q.   And this document was for purposes of
7]     presenting to an investor, correct?
8]     A.   If this was with this, yes.
9]     Q.   At this point, did FORZA have any investors --
10]    A.   I don't --
11]    Q.   -- in their business?
12]    A.   I don't know.
13]    Q.   And when you wrote to Mia, "Mia, we should talk
14]    before you present to your investor," were you talking
15]    about a specific person?
16]    A.   No.
17]    Q.   This was in general?
18]    A.   I didn't know who she was talking to.
19]    Q.   Was this in preparation for a meeting that Mia
20]    was going to?
21]    A.   Yes.
22]    Q.   So she was going to meet with an investor, and
23]    this was in preparation --
24]         MR. NIRO:  Objection; leading.
25]         THE WITNESS:  I don't know if she was going to

Page 66

1]     be -- she asked:  I need to have this document for an
2]     investor.
3]         I sent her a document and said, we should talk
4]     before you present to the investor.
5]         I don't know if the meeting was imminent or
6]     not.
7]     Q.   BY MS. ALIKHAN:  And you don't know who she met
8]     with, correct?
9]     A.   No.
10]    Q.   If you go to the second page, 009790 --
11]    A.   Yes.
12]    Q.   -- the top, this is the FORZA Business Plan
13]    Synopsis, correct?
14]    A.   Is it the complete synopsis?  I don't know.
15]    Q.   At the top of the document it says, "Business
16]    Plan Synopsis," correct?
17]    A.   It says page 1.
18]    Q.   At the top of the document?
19]    A.   It says -- yes, it's a -- it's page 1 of a
20]    Business Plan Synopsis.
21]    Q.   Correct.  And it says, "Draft - Confidential,"
22]    correct?
23]    A.   Yes.
24]    Q.   Can you walk me through this document and tell
25]    me about the different sections?

Page 67

1]     A.   These are referring to the sections of a
2]     business plan that I referred to earlier where you
3]     usually state things like the goal, the market, the
4]     products, the market strategy, and the competition.
5]     Q.   In the initial market, there is a number of
6]     "180,000 wrestlers, coaches & wrestling parents
7]     registered as members of the United States American
8]     Wrestling Association."
9]         Did I read that correctly?
10]    A.   Yes.
11]    Q.   Does that presume every member of the USAWA?
12]    A.   I don't know.  That was what was in their
13]    database.
14]    Q.   I'm sorry?
15]    A.   That was their database of people.
16]    Q.   One hundred and eighty --
17]    A.   Yes.
18]    Q.   -- thousand?
19]         Where did you get that number from?
20]    A.   I got that number from Lee Kemp.
21]    Q.   Did you ever do any research into determining
22]    if that number was accurate?
23]    A.   Yes.  I got the -- I got a summary of the
24]    database at some point during this engagement.
25]    Q.   What do you mean by "summary"?

Page 68

1]     A.   Well, they tell you how many wrestlers they --
2]     they have at each club and where they're located, things
3]     like that, and totals.  We used those totals as part of
4]     the numbers of this document.
5]     Q.   Were you ever given specific names and
6]     locations of individuals?
7]     A.   Yes, only to the extent I think coaches were
8]     listed, coaches' names were listed.  Individual
9]     wrestlers I think are in that database, but I didn't
10]    look at them.  They may have been in that database.  I
11]    didn't look at them.
12]    Q.   And under the Product section --
13]    A.   Yes.
14]    Q.   -- it looks like there's five different
15]    products that FORZA was intending to roll out, correct?
16]    A.   Yes.
17]    Q.   At this point, there was no product made,
18]    correct?
19]    A.   No finished product, correct.  I don't know if
20]    they had samples or nonpackaged product.  I really don't
21]    know.
22]    Q.   Were you aware of any beta testing of their
23]    product or trial testing?
24]    A.   No, only anecdotally that the products were
25]    good for wrestlers.

Page 73

1]  what the second sentence says:  They guaranteed sole
2]  access and sponsorship to FORZA in the area of nutrition
3]  and wellness.  So they did not have a competitor in
4]  nutritional supplements that was going to be able to
5]  access the wrestling community using USA's sponsorship.
6]  In the general marketplace, they have competitors.
7]  Q.  And where did that information come from as to
8]  who their competitors were in the general marketplace?
9]  A.  That came from -- that came from Lee Kemp and
10]  Mia and our own knowledge of -- of -- as consumers of
11]  potential competitors.  It was not a -- we did not do a
12]  competitor research in the general market because that
13]  wasn't the focus of the company.
14]  Q.  Did you do any research with respect to the
15]  nutritional supplement market with respect to
16]  competitors?
17]  A.  No, we did not -- I did not, no.  I don't know
18]  if they did or not.
19]  Q.  Did -- so you don't have any recollection as to
20]  whether or not they did, correct?
21]  A.  I don't know, no.
22]  Q.  You don't know.
23]  And they obviously didn't provide you any
24]  documentation --
25]  A.  No.

Page 74

1]  Q.  -- to that effect?
2]  A.  No.
3]  Q.  Are you familiar with NCIS codes or SIC codes?
4]  A.  Yes.
5]  Q.  What is your understanding of those?
6]  A.  Those are business codes that help identify
7]  what businesses these companies are in.  I don't know
8]  about NCIS.  I don't recall that, but S -- S codes are.
9]  Q.  And did you use the SIC codes in comparing any
10]  competitors with respect to --
11]  A.  No.
12]  Q.  You can go to page 2, please, of that same
13]  document.
14]  A.  I'm sorry.  I only have one page.  That's why I
15]  was asking that question before.
16]  MS. ALIKHAN:  Let's go off the record real
17]  quick.
18]  (Discussion off the record.)
19]  Q.  BY MS. ALIKHAN:  We're back on.
20]  The second page, which is FORZA 009791 --
21]  A.  Correct.
22]  Q.  -- can you talk to me about the margin section
23]  of this document?
24]  A.  For the company to be profitable, the margins
25]  generally have to be -- of distribution companies need

Page 75

1]  to be somewhere in that range, and they can be less, but
2]  due to, as I said, in -- or they said in the document,
3]  the wrestling community is a closed community, so you
4]  should be able to charge them more for your products.
5]  Q.  And in this section you believed or you
6]  recommended that the margins --
7]  A.  That was what was estimated.  We used that as
8]  a -- for estimating -- for my estimating criteria within
9]  the rest of the document.  We were just pulling that
10]  number out.
11]  Q.  75 to 100 percent per sale?
12]  A.  Percent per sale, uh-huh.
13]  Q.  And was any research conducted with respect to
14]  those margins in other distribution companies?
15]  A.  Independent research, I don't know.  We -- when
16]  we talked to some of the focus groups, we did test
17]  whether or not the sales of a product would be too
18]  expensive for them, and they indicated that they didn't
19]  think it would be too expensive.
20]  Q.  What price point were you presenting to them?
21]  A.  I don't recall.  It would have been some part
22]  of that 75 to 100 percent above what the cost of the
23]  product was going to be.
24]  Q.  And this was based on the two focus groups that
25]  were conducted?

Page 76

1]  A.  Yes, and might have been through some of Lee's
2]  research as well.  I don't ...
3]  Q.  But you specifically didn't do any research
4]  with respect to the profit margins or the gross margins
5]  in this section?
6]  A.  No.
7]  Q.  Where did the information for the sales
8]  strategy come from?
9]  A.  That was -- that came through discussions
10]  between myself and the -- and the two participants, Mia
11]  Scheid and Lee Kemp.
12]  Q.  Did you consult with respect to the sales
13]  strategy as well?
14]  A.  As it relates to this document, I did, yes.
15]  Q.  In preparing these -- these documents, these
16]  business plan prospectives, is it, in your experience,
17]  your expectation that a company utilize the sale
18]  strategy that you recommend or that you write for them?
19]  MR. NIRO:  Objection; calls for speculation;
20]  compound; uses the word "or."
21]  Which question are you asking?
22]  Q.  BY MS. ALIKHAN:  Do you understand the
23]  question?
24]  A.  You need to rephrase that question.
25]  Q.  In your experience, do you have any expectation

1]     that the company will utilize the sale strategy that you
2] write for them?
3]   A.  No.
4]   Q.  Why is that?
5]   A.  Because unless they ask us to help implement
6] that, the company can use whatever strategy they choose
7] to use.
8]   Q.  So explain to me what the purpose of this
9] section is in the business plan prospectus.
10]   A.  As the whole document is set up, it's -- it's
11] designed to give a potential investor some indication of
12] what the company's thoughts are relative to its business
13] operation.  It's not a -- not meant to be anything more
14] than that.
15]     The sales strategy is just that; it's a
16] strategy.  It's not necessarily an operational plan.
17]   Q.  So in your experience, the sales strategy can
18] change --
19]   A.  Yes.
20]   Q.  -- with respect to the implementation?
21]   A.  Sorry.  Yes.
22]   Q.  And in your experience, is that commonplace?
23]   A.  Yes, it is -- but -- but it can also not be.  I
24] mean, it can be both.  They can use parts of it.  They
25] can go their own way or they cannot use any of it.

1]     MR. NIRO: Objection; speculation;
2] hypothetical.
3]   Q.  BY MS. ALIKHAN: Let's talk about the sales
4] forecast.  Can you talk to me about how you were able to
5] arrive at these numbers for each of the three sections
6] in year one?  So we have sales to wrestling clubs, 8 to
7] 14.  Can you --
8]   A.  I can only speak to the process.  I don't
9] recall any specifics about this other than what I'm
10] reading, correct?  Right now I can speculate -- or not
11] speculate.  I can say that the process we used was to
12] use a -- a conservative number of clubs and multiply it
13] times a certain number of members per club and calculate
14] what the dollars might be generated from that sale.
15]   Q.  So the number assumes that each person within
16] that club is purchasing at a particular rate, correct?
17]   A.  Yes.  And that's in the other document that you
18] don't have in front of me.
19]   Q.  Well, let's just stick to this one.
20]   A.  In this one it isn't listed but, yes, that's
21] what -- there are a number of people per club, number of
22] people that might buy from that club, and a monthly
23] sales amount to that particular wrestler, I think are
24] the three major multipliers.
25]   Q.  Does it account for any type of return or

1] refund?
2]   A.  Of what?
3]   Q.  The product.
4]   A.  Return or refund of the product?  I don't think
5] the sales do, no.
6]   Q.  Was any research done to test the numbers with
7] respect to these sales forecasts?
8]   A.  No.
9]   Q.  No comparing of ratios with other distributing
10] companies?
11]   A.  No.
12]   Q.  Any research into the sales of other
13] distributing companies and what their sales numbers
14] were?
15]   A.  There are all sorts of different distributing
16] companies.  It would not be a fair comparison.
17]   Q.  Sports nutrition distributing company?
18]   A.  No.
19]   Q.  There was none done?
20]   A.  No.
21]   Q.  What was considered year one?
22]   A.  Year one was 12 months after the startup of a
23] company.
24]   Q.  When was that?
25]   A.  I don't know.  At the time it would -- it was

1] anticipated from when the business plan would start to
2] be executed.  I don't know -- you know, there was no
3] timetable for starting.
4]   Q.  And was the same process used in calculating
5] the numbers for year two?
6]   A.  Yes.
7]   Q.  And I'm just going to assume for efficiency
8] sake that the same -- no research was done with respect
9] to these numbers in comparing -- pardon me -- comparing
10] other distribution companies' sports nutrition?
11]   A.  Correct.
12]   Q.  Same goes for year three, same process?
13]   A.  Yes, correct.
14]   Q.  Same answer with respect to the research?
15]   A.  Yes.
16]   Q.  If we can turn to the next page, FORZA009792
17] and the Expense Forecast, how were you able to calculate
18] the product costs or where did you get that information?
19]   A.  It's in the other document, but it's based on
20] the costs -- the estimated cost of producing the product
21] times the number of sales units sold.
22]   Q.  Where were you able to get the production
23] costs --
24]   A.  I was --
25]   Q.  -- of the product?

Page 97

1] business plan prospectus and business plan synopsis this
2] is?
3] A. No, I cannot. It's not the final product, I
4] can say that.
5] Q. Okay. I'd like to direct your attention to
6] FORZA009844.
7] A. Okay.
8] Q. It's the second page.
9] A. Uh-huh.
10] Q. At the top it has a date of September 1st,
11] 2011.
12] A. Yes.
13] Q. Does that give you any indication as to when
14] this was drafted?
15] A. I would say it was sometime within that week.
16] Q. So would it be safe to say that -- can we call
17] this a September 1st, 2011 version? Is that fair?
18] A. If you wish.
19] Q. I'm just trying to get a handle as to how many
20] versions there are --
21] A. I don't know how many versions there are.
22] Q. -- and which one is the final.
23] A. Final, correct. What I sent you is my
24] considered final. That's the one I had on my system.
25] Q. We'll get to your documents in a second, but

Page 98

1] there was more than two versions from what I saw in the
2] documentation.
3] A. I believe there were, yes.
4] Q. So that's why I have to question you as to
5] which one is the final.
6] A. Well, I sent you the -- I did send you the
7] final.
8] Q. Okay. Well, maybe throughout --
9] A. Okay.
10] Q. -- these documents, maybe I'll show you a
11] version --
12] A. Okay.
13] Q. -- that is the final.
14] A. Okay.
15] Q. Now, a lot of what we just discussed is
16] obviously in this document, correct?
17] A. Correct.
18] Q. And with respect to FORZA009856, page 13 --
19] A. Okay.
20] Q. -- these are the same numbers that we just
21] discussed in Defendant's Exhibit 8; is that correct?
22] A. I'll have to compare them.
23] Q. Go ahead.
24] A. Okay. Correct.
25] Q. And so all your answers with respect to how you

Page 99

1] came to these -- or these numbers and the process would
2] be the same?
3] A. Correct.
4] Q. And the same goes for any type of research you
5] did with respect to these numbers, correct?
6] A. Correct.
7] Q. I'd like to direct you to FORZA009857. It's
8] page 14 of that document. The next page.
9] A. Okay.
10] Q. It says "Sales Team."
11] A. Uh-huh.
12] Q. And under it you have listed Lee Kemp, correct?
13] A. Correct.
14] Q. And contract sales reps?
15] A. Correct.
16] Q. Do you know if at any point FORZA contracted
17] sales reps for --
18] A. I do not know.
19] Q. Okay. But as part of your business plan, that
20] was something you suggested, correct?
21] A. As part -- I don't know if the suggestion came
22] from me, from them, but yes, it's what we agreed to put
23] in here.
24] Q. You don't recall where that information came
25] from with respect to the contract sales reps will be

Page 100

1] used to target high-volume wrestlers?
2] A. I certainly might have suggested it. I'm
3] not -- as I said, this is two and a half years ago.
4] Q. Sure.
5] A. I don't remember exactly. But yes, I may well
6] have suggested it.
7] Q. Okay. And don't worry. I'm not here to, like,
8] trip you up.
9] A. Okay. I understand. I just want to make sure
10] I'm clear.
11] Q. Yeah, that's fine.
12] A. I don't want you to ...
13] Q. And I'd like to direct your attention to
14] FORZA009863. It's page 3 of the business plan synopsis.
15] A. Okay.
16] Q. Are those the same numbers we saw in the
17] Defendant's Exhibit 8 as the year expense -- three-year
18] expense forecast?
19] A. Can you give me a second?
20] Q. Yes, sure. Take your time.
21] A. What would that number have been?
22] Q. Defendant's Exhibit 8. That page is 009792.
23] A. I'm sorry.
24] Q. That's okay. Do you mind if I help you?
25] A. Yeah, could you help me? I have the one page

Page 101

1] of it because, remember, I got it in pieces, so now I
2] think I've -- 97 what?
3] Q. 92.
4] A. Okay. Thank you.
5] Q. Sure.
6] A. Okay. Correct.
7] Q. All the answers are the same for --
8] A. Yes, yes. They're identical documents, yes.
9]    MS. ALIKHAN: Okay. I'd like to mark
10] Defendant's Exhibit 10. This is FORZA -- pardon me,
11] FORZA009912 through FORZA009936.
12]    (Defendant's Exhibit No. 10 was marked for
13] identification.)
14] Q. BY MS. ALIKHAN: Take a look at that and let me
15] know when you've finished.
16] A. Okay. I've read it.
17] Q. Can you tell what version this -- or let me
18] back up for a second.
19]    This first page indicates that this is an
20] e-mail from you to Mia Scheid and Lee Kemp and the
21] subject line is "Latest draft." It's dated Thursday,
22] September 8th, 2011, at 4:41 p.m.
23] A. Okay.
24] Q. And the attachment to the e-mail is business
25] plan prospectus, correct?

Page 102

1] A. Correct.
2] Q. In the e-mail you indicate that "Attached is
3] complete business plan (to this point)"?
4] A. Correct.
5] Q. Is it safe to assume this was a business plan
6] as of September 8th, 2011, at 4:41 p.m.?
7] A. Correct.
8] Q. You go on and you indicate that there were two
9] significant changes in the business plan?
10] A. Correct.
11] Q. Can you talk to me about what those changes
12] were and what they -- what impact they had on the plan?
13] A. Let's see. They would have -- and I'm basing
14] this on this document, but they would have reduced the
15] cost of the product. I believe at this point they
16] were -- we were worried that the cost of the product was
17] too high.
18] Q. And based on what?
19] A. Based on the fact that we thought that the
20] sales prices to the wrestlers were going to be too high
21] per unit, so we put -- if I recall, we lowered the
22] estimate of what we were going to sell to them and that
23] brought the cost estimates down. That brought the cost
24] estimates down, as it says here. Made the total cost
25] equal 45 percent, not 50 percent, because we needed to

Page 103

1] make a larger margin.
2] Q. What information did you base your belief that
3] the cost of the product was too high?
4] A. That was information feedback from Mia Scheid
5] and Lee Kemp.
6] Q. Do you know how they obtained that information?
7] A. I don't -- I don't know how they obtained it.
8] They just simply said they thought the amounts were
9] going to be too high for wrestlers to buy.
10] Q. Did they provide you with any data with respect
11] to that -- those thoughts?
12] A. Not regarding that -- no, not regarding that,
13] no.
14] Q. Did you do any independent research --
15] A. No.
16] Q. -- to test that -- no?
17] A. No.
18] Q. So those changes were now incorporated into the
19] business plan as of September 8th, 2011, at 4:41?
20] A. Yes.
21] Q. Can you tell if there were any other changes
22] made to the business plan at this point?
23] A. Well, as I said at the bottom of this e-mail,
24] we downgraded our estimated number of individual sales
25] per club to 15 full wrestling packages and sales

Page 104

1] per high school program to 13 full wrestler packages.
2] And as I said, it reflected the higher cost of
3] the product, not as many will buy. I assume people will
4] buy only specific products and wanted to keep the sales
5] dollars roughly the same to be realistic. So that's the
6] other change.
7] And we also downgraded the number of
8] high school programs by about a third. That was done
9] because we were going to focus on the clubs first.
10] Q. And that was a strategic decision by Mia and
11] Lee?
12] A. That was a -- a -- that was an assumption
13] change in the document. I don't believe it was a
14] strategic decision at that point. We were just trying
15] to create a document. So it was an assumption change in
16] the document itself.
17] Q. And at the bottom you ask, there's "Really only
18] one question left to ask. Are these prices doable?"
19] Did you -- what was the basis of your question?
20] A. It was a -- this would be a confirmation with
21] the client that the prices that are reflected in the
22] business plan pass -- do they pass their belief that
23] that would be able to be a price that the wrestler would
24] buy? So it was a confirmation and a testing of that
25] assumption for the document.

Page 105

1] Q. Did you ask that question with respect to the
2] prices prior to that?
3] A. I would say I probably asked it every -- every
4] iteration of this process, yes.
5] Q. And did you receive verbal affirmations or
6] affirmations in writing or any affirmation?
7] A. I would say it would all be verbal
8] affirmations. I don't think they were in writing, but
9] they would have said, yes, they'll be able to afford
10] that amount.
11] Q. Based on your practice, do you typically seek
12] confirmation when you make any changes to a business
13] plan and prospectus by the client?
14] A. Yes, all the time.
15] Q. Do you keep records of those approvals or
16] whatnot?
17] A. No, I do not.
18] Q. Would you act if --
19] A. I mean, this would be one, I guess, but I
20] didn't keep a record of it, as you can tell, since I
21] didn't send it to you. So ...
22] Q. Would you -- based on your habit and routine,
23] would you act -- would you make a change without any
24] approval to a business plan or prospectus?
25] A. Could you rephrase that again? I'm sorry.

Page 106

1] Q. Sure. Based on your practice --
2] A. Uh-huh.
3] Q. -- would it be in your practice to make a
4] change without approval by the client?
5] A. Not without -- not without ultimate approval,
6] no. I may have -- I may put a new number in on my own,
7] but then I would always run that by the client.
8] Q. So is it fair to assume that the final product
9] would have been approved by the client?
10] A. Absolutely.
11] MS. ALIKHAN: I'm going to mark Exhibit 11.
12] This is FORZA010009 through FORZA 1 -- pardon me --
13] FORZA010033.
14] (Defendant's Exhibit No. 11 was marked for
15] identification.)
16] Q. BY MS. ALIKHAN: Take a look at that and let me
17] know when you've finished.
18] A. Okay.
19] Q. Page 1 of that document indicates that it's an
20] e-mail from you to Mia and Lee Kemp regarding this
21] sales -- a sales change, correct?
22] A. Regarding an estimate assumption change for the
23] documents.
24] Q. And it was sent on September 9th, 2011?
25] A. Correct.

Page 107

1] Q. And the attachment to it is a business plan
2] prospectus half sale doc?
3] A. Correct.
4] Q. In the text you say, "I changed page 11 to a
5] 15-day supply."
6] That's your only change to the document, right?
7] A. That's what I say, yes.
8] Q. Okay. So on the next page, page 1 of the
9] business plan, FORZA010010, it indicates that this is
10] FORZA Technologies Business Plan, September 9th, 2011.
11] A. Correct.
12] Q. Is this the final business plan?
13] A. I don't know because I know what I sent you and
14] it might be. Okay.
15] Q. You changed page 11 to a 15-day supply --
16] A. Yes.
17] Q. -- in this document. Why is that?
18] A. I think that was at the request of Mia and Lee,
19] Mia Scheid and Lee Kemp, because they felt it would be
20] easier to sell in smaller increments; rather than 30-day
21] supplies to sell in 15-day supplies to the wrestler.
22] Q. And do you know what the basis of that was?
23] A. They believed that the sales price would be
24] more -- it would be more easily accepted by a wrestler.
25] That's why if you double it and send them 30 days, it

Page 108

1] would double the sales price, and that number might
2] create sticker shock for a wrestler or a family,
3] whatever.
4] Q. So in the previous versions we were working
5] with 30-day supplies?
6] A. Most of the time, yes. I believe that's true.
7] I'd have to go back, but I think so, yes.
8] Q. Okay. Did they provide you with any
9] substantiation for that belief?
10] A. No. Just their -- that's just their belief,
11] yes.
12] Q. Did you do any research into that assumption?
13] A. No.
14] MS. ALIKHAN: I'm going to mark this
15] Defendant's 12.
16] THE WITNESS: Are we done with this?
17] (Defendant's Exhibit No. 12 was marked for
18] identification.)
19] Q. BY MS. ALIKHAN: Take a look at that and let me
20] know when you've finished, please.
21] A. What am I supposed to read?
22] Q. Well, this is a group exhibit.
23] A. Okay.
24] Q. And it contains a subpoena to produce documents
25] that was sent to Profit Link --

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


FORZA TECHNOLOGIES, LLC,    )

              Plaintiffs,  )

      vs.              )  Civil No. 12-cv-07905

PREMIER RESEARCH LABS, LP   )

and ROBERT J. MARSHALL,    )

individually,            )

            Defendants.  )

THE DEPOSITION OF MIA SCHEID

July 16, 2014

Chicago, Illinois

9:24 a.m.


Reported By:
Cynthia J. Conforti, CSR, RPR, CRR
Job No. 35096

DEPOSITION OF MIA SCHEID

1
2  Q.  Was there anybody else that was
3  involved in creating the company besides you and Lee
4  Kemp?
5  A.  No.
6      MS. LUK:  Objection, vague.
7  A.  Sorry.
8  BY MR. KAISER:
9  Q.  Can you tell me what Fitness Arts is?
10  A.  It is a wellness center.
11  Q.  What kinds of things does Fitness Arts
12  do?
13  A.  Quite a lot actually, but exercise,
14  corrective exercise, nutrition, wellness,
15  consultation.
16  Q.  Does Fitness Arts sell dietary
17  supplements?
18  A.  Yes.
19  Q.  Are you the owner of Fitness Arts?
20  A.  Yes.
21  Q.  Are there any other owners of Fitness
22  Arts?
23  A.  No.
24  Q.  So you are the sole owner of Fitness
25  Arts.

DEPOSITION OF MIA SCHEID

1
2  A.  No.
3  Q.  You don't have any boss at Fitness
4  Arts?
5  A.  No.
6  Q.  Okay.  How many employees are at
7  Fitness Arts?
8  A.  Currently?
9  Q.  Yes, let's start there.
10  A.  Five including me.
11  Q.  Who are they?
12  A.  Laura Manna, Elizabeth Minor, Karen
13  Selleck and Nizam Kaiser.
14  Q.  Is Lee Kemp no longer employed at
15  Fitness Arts?
16  A.  No.
17  Q.  Who was employed at Fitness Arts
18  during 2013?
19  A.  Same.
20  Q.  Was Lee Kemp employed at Fitness Arts?
21  A.  No.
22  Q.  Does Lee Kemp provide any services at
23  Fitness Arts?
24  A.  No.
25  Q.  You're aware that Lee Kemp is listed

DEPOSITION OF MIA SCHEID

1
2  on your Fitness Arts website, fitnessarts.org?
3  A.  Maybe.  I don't know.
4  Q.  You have no knowledge sitting here
5  today that Lee Kemp --
6  A.  No, I do not.  I have not looked at
7  that site.  I don't know.  I have an IT girl, and
8  there's probably a lot of people listed on there
9  that prob-- that doesn't work there, so there's
10  some transient or I don't know what you call that,
11  you know, people go in and out, yeah.
12      MS. LUK:  Mia, slow down, let him
13  finish his questions and give me time to object to
14  his questions before you answer.
15      THE WITNESS:  Okay.  Sorry.
16  BY MR. KAISER:
17  Q.  So when did Lee Kemp work at Fitness
18  Arts?
19      MS. LUK:  Objection, asked and
20  answered.
21  BY MR. KAISER:
22  Q.  You can answer.
23  A.  I'm thinking.
24      Well, that's a...
25      I don't know that he really worked for

DEPOSITION OF MIA SCHEID

1
2  Fitness Arts.  We -- he taught wrestling at Fitness
3  Arts, and so that would be 2008.  Yeah, 2008, the
4  Olympic year.
5  Q.  So other than wrestling, other than
6  teaching wrestling in 2008, Lee Kemp has not
7  provided any services at Fitness Arts?
8  A.  No.
9  Q.  Ms. Scheid, you've alleged in claims
10  against Premier Research Laboratories, I'll refer to
11  them as PRL during this deposition just for brevity,
12  but you've alleged in cross-claims against PRL and
13  Dr. Marshall to have lost substantial business
14  opportunities with Fitness Arts, your existing
15  customers and potential new customers as a result of
16  Dr. Marshall's actions; is that right?
17  A.  The --
18      MS. LUK:  Objection, form.
19      Can you read that back?
20      THE REPORTER:  Yes.
21  BY MR. KAISER:
22  Q.  You've alleged in cross-claims against
23  PRL and Dr. Marshall to have lost substantial
24  business opportunities with Fitness Arts, your
25  existing customers and potential new customers as a

4  (Pages 10 to 13)

DEPOSITION OF MIA SCHEID

1
2      about it. Because, again, we had a -- a change of
3      CPAs that year and that the books were pretty messed
4      up. Couldn't -- not quite sure of all of the
5      problems, nor did I really want to know, but that it
6      was rectified, and I believe this is the correct
7      one, and we may have left something out --
8          Q.    When you -- I'm sorry. You have to
9      tell us what -- you're pointing to a document saying
10     this --
11         A.    Oh, Exhibit 33.
12         Q.    So Exhibit 33 you believe is correct.
13         A.    This is the one I believe that was --
14     was done by my CPA, yeah.
15         Q.    When did you change CPAs again? What
16     year was that?
17         A.    It was between the two here. So I
18     think the 2011 was still by Tony, and then 2012, but
19     it wasn't -- maybe I should go back and explain.
20         I think the year before this, I had an
21     employee who embezzled, and she was managing the
22     business. And she really messed up the entire
23     QuickBooks system, and we had to have it
24     forensically done, and so there was confusion.
25         Q.    Okay.

DEPOSITION OF MIA SCHEID

1
2          A.    And --
3          Q.    You said a year before this you had an
4      employee who embezzled. Let's break it down. What
5      year --
6          A.    Yeah, umm --
7          Q.    -- was this? What year did the
8      employee embezzle?
9          A.    She was with me three years.
10         Q.    What year did she embezzle?
11         A.    All of them.
12         Q.    Okay. When did you catch her?
13         A.    I caught her, I believe it was 2010
14     now that I think about it, so I know this seems like
15     why -- why is it carrying on so long, but we tried
16     to get it rectified, and the CPA that we had brought
17     in said that -- I wanted it to start over and, you
18     know, start -- and they said no, that it has to be
19     -- everything has to match in QuickBooks, and it
20     just took time, that we couldn't just start a new
21     company. We couldn't start a new company. That we
22     would have to take all of the past, so forensically
23     make it right so that we could move forward.
24         Q.    But didn't Forza start in 2011?
25         A.    Yeah.

DEPOSITION OF MIA SCHEID

1
2          Q.    And this was after the embezzlement
3      stopped in 2010?
4          A.    Fitness Arts.
5          Q.    Okay. So how was -- how was the
6      embezzlement as to Fitness Arts affecting the
7      financial statements for Forza Technologies?
8          A.    It affected it because there was I
9      think chaos. I need to talk to my CPA to find out
10     exactly what happened between the two, but I can't
11     tell you specifically right at this moment, but
12     there was confusion.
13         Q.    Okay. So until sometime in 2012,
14     there was chaos and confusion in your financial
15     records at Forza Technologies. Sometime during 2012
16     that chaos and confusion was rectified when you
17     hired a new CPA, and you believe that Exhibit 33,
18     which is a balance sheet as of December 31st, 2012,
19     is accurate.
20         A.    Yes.
21         MS. LUK: Objection, form, compound.
22     BY MR. KAISER:
23         Q.    Okay. And so the implication here is
24     that the balance sheet for 2011 may not be accurate;
25     is that right?

DEPOSITION OF MIA SCHEID

1
2          A.    I don't know.
3          Q.    Okay. I'm going to just ask
4      questions, and -- and if you don't know --
5          A.    I don't know, I don't know.
6          Q.    Yeah, okay.
7          Well, you'll see on Exhibit 33 under
8      Liabilities and Equity, you'll see line 2205, and it
9      says: Due to Fitness Arts, $17,929. Can you
10     explain that?
11         A.    That was all for use -- I mean their
12     offices are at Fitness Arts. Forza did not pay rent
13     or its share of any of the expenses. It used the,
14     you know, we shared office staff as well as the
15     offices physically, and that was what we came up
16     with.
17         Q.    Okay. This is an arbitrary number
18     that you -- that Fitness Arts said --
19         A.    No, the CPA figured out a percentage
20     for it, and that's what he came up with, but that --
21     it really was about shared expense.
22         Q.    Okay. And you'll see back up at the
23     top of Exhibit 33 under Assets, you see Product
24     Inventory, $324,612 of product inventory.
25         A.    Um-hmm.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


FORZA TECHNOLOGIES, LLC,      )

            Plaintiffs,   )

      vs.                     )   Civil No. 12-cv-07905

PREMIER RESEARCH LABS, LP    )

and ROBERT J. MARSHALL,      )

individually,                )

           Defendants.  )

THE DEPOSITION OF PAUL DUGGAN

May 6, 2014

Chicago, Illinois

10:01 a.m.


Reported By:
Sheri E. Liss, CSR, RPR, CRR, CLR, RSA
Job No. 34197

**DEPOSITION OF PAUL DUGGAN**

1     A.   First of all, it's "Dug-gan."

2     Q.   I apologize.  Mr. Duggan.

3     A.   "Doo-gan" is one G, just phonetically.

4     Q.   Right.  I'll make sure to correct myself.

5     A.   I talked to Judy Niro, I talked to Ray Niro, and I probably saw a few documents.  I can't recall a specific name, but nothing -- a few documents.

6     Q.   How long did you speak to Judy Niro in preparation for this deposition?

7     A.   Probably one to two hours over time.

8     Q.   And when you say "over time," it wasn't one to two hours consecutively?

9     A.   No.  I've spoken to her on more than one occasion.

10    Q.   And the aggregate being one to two hours?

11    A.   Yes.

12    Q.   In preparation for this deposition, correct?

13    A.   Yes.

14    Q.   Was this in person or over the phone?

15    A.   Over the phone.

---

**DEPOSITION OF PAUL DUGGAN**

2     Q.   Do you recall when that was?

3     A.   As recently as yesterday.

4     Q.   Do you recall the date of when you first spoke with her regarding the preparation of this deposition?

7     A.   No.

8     Q.   Did she show you any documents in preparation for this deposition?

10    A.   No.

11    Q.   You said you also spoke with Mr. Niro in preparation for this deposition.  Could you tell me how long you spoke with Mr. Niro?

14    A.   Probably two or three times for 35 -- 30 to 60 minutes each time.

16    Q.   Was this in person or over the phone?

17    A.   Both.

18    Q.   How many times did you meet with Mr. Niro in person in preparation for this deposition?

21    A.   I think twice.

22    Q.   Where?

23    A.   At the Rosebud Restaurant on Rush Street.

25    Q.   On both occasions?

---

**DEPOSITION OF PAUL DUGGAN**

2     A.   Yes.

3     Q.   How often did you speak to Mr. Niro over the phone in preparation for this deposition?

5     A.   Probably a few times.

6     Q.   Did Mr. Niro show you any documents in preparation for this deposition?

8     A.   One that I recall.

9     Q.   What was it?

10    A.   It was an unsigned -- I think it was termed an investment agreement between Passignano and Forza.

13    Q.   Did you do anything else to prepare for your deposition today, for the deposition of Passignano Patent Consulting?

16    A.   Other than conversations with Judy Niro and Ray Niro?

18    Q.   Yes.

19    A.   No.

20    Q.   You testified earlier that Mr. Niro and Judy Niro asked you to be the 30(b)(6) designee for Passignano Patent Consulting; is that correct?

23    A.   Yes.  Actually, I'm not sure what my testimony was.  I would say I was requested by Mr. Niro, not Mrs. Niro, to represent Passignano.

---

**DEPOSITION OF PAUL DUGGAN**

2     Q.   Had you had any conversations with Judy Niro prior to the times you spoke to her in preparation for this deposition?

5     A.   I've known her for 31 years, yes, 31 years, since 1983, so I'd had numerous.

7     Q.   So you've had a relationship or an outstanding relationship with Ms. Niro outside of this.

10    A.   Outside of Passignano?

11    Q.   Correct.

12    A.   Right.  Correct.

13    Q.   Would you consider yourself friends with Ms. Niro?

15    A.   With Mrs. Niro?

16    Q.   Yes.

17    A.   Absolutely.

18    Q.   Are you a friend of Mr. Niro?

19    A.   Yes.

20    Q.   Can you talk to me about what Passignano Patent Consulting is?

22    MR. NIRO:  Objection.  "Talk to me," it's not a question.

24    MS. ALIKHAN:  What is it?

25    MR. NIRO:  Are you talking to him or me?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

DEPOSITION OF PAUL DUGGAN

BY MS. ALIKHAN:

Q.    Based on what?

A.    Based on my conversations with Mr. Niro who is Passignano's advisor.

Q.    Why did Passignano believe Forza was a good company to invest in?

A.    Their advisors. Mr. Niro thought that a combination of Mr. Kemp and the product and the industry was -- and the risk reward was sufficient to make an investment.

Q.    Did Forza have any product to offer at this time?

A.    I don't know.

Q.    Did Forza ever provide Passignano with samples of its product?

A.    I don't know.

Q.    Did Forza ever provide Passignano with research with respect to its product?

A.    I don't know.

Q.    Did Passignano have any information with respect to Forza's members' business acumen?

A.    I don't know.

Q.    Did Passignano have any knowledge that Mr. Kemp had previously filed for bankruptcy?

DEPOSITION OF PAUL DUGGAN

A.    I don't know.

Q.    Did Passignano have any knowledge as to Mr. Kemp's past business performance?

A.    I don't know.

Q.    Did Passignano have any knowledge with respect to Ms. Scheid's past business performance?

A.    I don't know.

Q.    If you could put Exhibit 3 to the side. I'm going to mark this as Duggan Exhibit 4, I believe we're on.

(Whereupon, Duggan Exhibit 4 marked as requested.)

(Whereupon, the document was tendered.)

BY MS. ALIKHAN:

Q.    Would you take a look at that document and let me know when you've reviewed it.

A.    I read it.

Q.    Have you seen this document before, Mr. Duggan?

A.    Yes.

Q.    The topics, it says "Investment Agreement," correct?

A.    Yes.

DEPOSITION OF PAUL DUGGAN

Q.    And it's between Raymond P. Niro and Passignano Patent Consulting ("investors") and Forza Technologies, LLC, and its members on the other hand.

Do you see that at the top?

A.    Yes.

Q.    And the effective date is blank day of September, 2011.

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    In this agreement it states that the "Investors shall pay Forza $500,000 in installments" and then it gives "as follows."

Do you see where I am in Paragraph 1 or Section 1?

A.    Yes.

Q.    $250,000 was to be paid within 10 days of the effective date of this agreement.

Did I read that correctly?

A.    Yes.

Q.    And then $250,000 was to be paid 10 days before the second installment payment is due for the purchase of the initial supply of nutritional

DEPOSITION OF PAUL DUGGAN

products from Premier Research Labs, which is estimated to be in November or December of 2011, correct?

A.    Yes.

Q.    Section 2 states that "Forza will then repay investors and provide a substantial premium for this initial investment and the risk associated with it as follows."

Do you see that?

A.    Yes.

Q.    Do you have any knowledge as to what the risk associated with this agreement actually was?

A.    One would be the performance of Premier to make the product correctly.

Q.    Anything else?

A.    There's a risk -- under financial theory, the only risk free rate of return is United States treasury bill, and everything above that has a risk. So a baseline for risk is United States treasury bill which is considered to be zero risk and everything above that in the investment world is considered to have risk.

So that's -- using that as a baseline, clearly a transaction like this would have

DEPOSITION OF PAUL DUGGAN

1 BY MS. ALIKHAN:
2
3     Q.   Have you seen this document before,
4 Mr. Duggan?
5     A.   I think so.
6     Q.   And this is FORZA015892 through
7 FORZA015898.
8         At the top it says, "Forza
9 Technologies, LLC, subscription agreement," correct?
10     A.   Yes.
11     Q.   What's the purpose of this document?
12     A.   To convert the Passignano loan of
13 $550,000 from a loan to a 25 percent interest in
14 Forza Technologies, LLC.
15     Q.   Why was that done?
16     A.   Specifically, I'm not sure.
17     Q.   So you're here today on behalf of
18 Passignano Patent Consulting Company, correct?
19     A.   Yes.
20     Q.   And you can't specifically answer why
21 this document was drafted?
22         MR. NIRO: I think he's answered that.
23 To -- I thought he said to convert the loan to an
24 ownership interest.
25

---

DEPOSITION OF PAUL DUGGAN

1 BY MS. ALIKHAN:
2
3     Q.   Why?
4     A.   Well, I can't speak for the issue of the
5 units. I can't speak for Forza.
6     Q.   Can you speak to the agreement? Can you
7 speak to why this document came into fruition?
8     A.   Well, from a -- I could speculate on the
9 Forza side, but on the Passignano side, they had an
10 investment of $550,000 cash and they were converting
11 it from a loan to an ownership of units.
12     Q.   Why?
13     A.   Well, it ended up being voided so I
14 really didn't -- when they looked to do it and then
15 when it had adverse tax consequences it was undone,
16 so I didn't spend a lot of time thinking into the
17 why.
18     Q.   It was signed by Bonnie Foley, member of
19 Passignano Patent Consulting, correct?
20     A.   Yes.
21     Q.   Does Bonnie Foley know why?
22     A.   She probably got advice from counsel,
23 but I'd be guessing would she know why. I don't
24 know.
25     Q.   Did you talk to Bonnie Foley in

---

DEPOSITION OF PAUL DUGGAN

1
2 preparation for your deposition today?
3     A.   No.
4     Q.   So you don't know why Passignano wanted
5 to convert their loan into a membership interest in
6 Forza?
7     A.   Like I said, it ended up being voided,
8 this agreement, so I didn't delve into the specifics
9 of it because it's void.
10     Q.   Sure. And I understand that it was
11 void.
12     A.   And I also can't speak for Forza.
13     Q.   I'm not asking you to speak for Forza.
14 I'm asking you to speak to why Passignano entered
15 into an agreement converting a loan into a
16 membership interest with Forza?
17     A.   The specific why, I don't know.
18     Q.   Was this based off the same initial loan
19 that was provided to Forza for $550,000, or was this
20 a different agreement?
21     A.   This was the same loan. The original
22 loan only came from Passignano, did not come from
23 Ray Niro. It came from Passignano. So that the
24 original investment agreement was effectively never
25 entered into because Niro didn't invest, Passignano

---

DEPOSITION OF PAUL DUGGAN

1
2 did. Passignano's converting their $550,000 loan
3 into a LLC interest.
4     Q.   Where is the agreement between
5 Passignano and Forza only with respect to that
6 $550,000 loan?
7         MR. NIRO: You mean on the agreements
8 that are already marked?
9 BY MS. ALIKHAN:
10     Q.   Yes. You testified that those were
11 never entered into, didn't you?
12     A.   I said I didn't see a signed copy of
13 those. Now, if you want to connect all the dots,
14 they're referring to a loan and they're going to
15 convert it. And Passignano had loaned -- tendered
16 previously $550,000 and now they're converting it
17 into a LLC interest.
18     Q.   Have you ever seen the executed document
19 where Passignano by itself loaned Forza Technologies
20 $550,000?
21         MR. NIRO: Other than the documents that
22 you already put in front of him?
23 BY MS. ALIKHAN:
24     Q.   In general, have you seen any documents
25 substantiating that?

---

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

# EXHIBIT
# F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FORZA TECHNOLOGIES, LLC, | |
| Plaintiff, | Civil Action No. 12-cv-07905 |
| v. | Honorable Joan B. Gottschall |
| PREMIER RESEARCH LABS, LP and ROBERT J. MARSHALL, individually. | |
| Defendants. | |

## PLAINTIFF'S RULE 26(a)(1) DISCLOSURES

In accordance with Fed.R.Civ.P. 26(a)(1), Plaintiff makes the following initial disclosures. These disclosures are preliminary and discovery is ongoing. Plaintiff reserves the right to correct, amend, or modify these disclosures based on new information

**A.     The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

1.     Mia Scheid
Forza Technologies, LLC
c/o Niro, Scavone, Haller & Niro

As presently advised, Ms. Scheid may have discoverable information relating to the background of Forza Technologies, LLC ("Forza"); the relationship and business dealings between Forza and Premier Research Labs, LP ("Premier"); the relationship and business dealings between Forza and Robert J. Marshall ("Marshall"); the allegations of fraud and misrepresentations by Marshall; and the harm caused by Premier and Marshall.

2.     Lee Kemp
       Forza Technologies, LLC
       c/o Niro, Scavone, Haller & Niro

As presently advised, Mr. Kemp may have discoverable information relating to the background of Forza; the relationship and business dealings between Forza and Premier; the relationship and business dealings between Forza and Marshall; the allegations of fraud and misrepresentations by Marshall; and the harm caused by Premier and Marshall.

3.     One or more employees or officers of Premier Research Labs, LP

As presently advised, one or more officers, directors, employees, partners, contractors, and/or managing agents of Premier (including but not limited to: Stephen Lermer, Sibelle Naumer Belcher, David Himel, Andrea Hall, Cheyenne Johnson, Sharla Hughes, and Hesaam Moallem) may have discoverable information relating to the factual and legal bases for Premier's defenses and/or claims in this suit; the organizational structure of Premier; the employment and responsibilities of Marshall; how Premier regularly conducts business with other companies; the revenue of Premier; Marshall's fraud and misrepresentations; the breach of contract with Forza; and the harm caused by Premier and Marshall.

4.     Robert J. Marshall

As presently advised, Marshall may have discoverable information relating to the factual and legal bases for Marshall's defenses and/or claims in this suit; the organizational structure of Premier; his employment and responsibilities at Premier and/or other companies; how Premier regularly conducts business with other companies; the revenue of Premier; his fraud and misrepresentations; the breach of contract with Forza; and the harm caused by himself and Premier.

**B.     A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party**

**and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

The following categories of documents may be used to support the claims asserted by Forza. However, Forza will not produce documents that are privileged or otherwise protected from disclosure in accordance with the Federal Rules of Civil Procedure. Plaintiff identifies the following categories of documents and things, which are located at 181 West Madison Street, Suite 4600, Chicago, Illinois, 60602.

1. Non-privileged company files of Forza.

2. Correspondence between Forza and Defendants.

3. Writings evidencing agreement between Forza and Defendants.

4. Development of Forza's products with Defendants.

5. Forza's products.

6. The effort, cost and expense in developing and producing Forza's products, including delays by Defendants.

7. Actions and inactions evidencing Defendants' breach of contract.

8. Damage and/or injury caused to Forza as a result of Defendants' breach of contract and other acts set forth in Forza's Amended Complaint.

Forza reserves the right to supplement and/or amend these initial disclosures as discovery progresses in this suit.

**C. A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing the nature and extent of injuries suffered.**

Forza seeks monetary damages adequate to compensate for Defendants' breach of contract and its expected sales and profits had the contract been performed. Plaintiff is also

entitled to an award of damages for fraud and exemplary damages for fraud. Plaintiff is also entitled to pre- and post- judgment interest.

Forza is unable to calculate the precise amount of actual damages at this time due to the lack of discovery from Defendants' pertaining to Defendants. Forza will provide a precise computation of damages after it has obtained sufficient information through the discovery process. At a minimum, Forza expected it would have made at least $500,000 every 3 months had Defendants satisfied their obligations.

**D.** **For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Not applicable.

Respectfully submitted,

*/s/ Olivia T. Luk*

Raymond P. Niro
Olivia T. Luk
Gabriel I. Opatken
Niro, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Illinois 60602

*ATTORNEYS FOR FORZA TECHNOLOGIES, LLC.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 4, 2012 the foregoing

## PLAINTIFF'S RULE 26(a)(1) DISCLOSURES

was served upon the following counsel of record via electronic transmission.

Rakesh M. Amin
Ryan M. Kaiser
Amin Talati, LLC
55 West Monroe Street, Suite 3400
Chicago, Illinois 60603
ryan@amintalati.com

*/s/ Olivia T. Luk*
NIRO, HALLER & NIRO
Attorneys for Forza Technologies, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FORZA TECHNOLOGIES, LLC, | |
| Plaintiff, | Civil Action No. 12-cv-07905 |
| v. | Honorable Joan B. Gottschall |
| PREMIER RESEARCH LABS, LP and ROBERT J. MARSHALL, individually. | |
| Defendants. | |

## PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES

In accordance with Fed.R.Civ.P. 26(a)(1), Plaintiff makes the following supplemental initial disclosures. These disclosures are preliminary and discovery is ongoing. Accordingly, Plaintiff reserves the right to supplement, correct, amend, or modify these disclosures based on new information.

**A.      The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

1.      Mia Scheid
         Forza Technologies, LLC
         c/o Niro, Haller & Niro

As presently advised, Ms. Scheid may have discoverable information relating to the background of Forza Technologies, LLC ("Forza"); the relationship and business dealings between Forza and Premier Research Labs, LP ("Premier"); the relationship and business dealings between Forza and Robert J. Marshall ("Marshall"); the allegations of fraud and misrepresentations by Marshall; and the harm caused by Premier and Marshall.

2.    Lee Kemp
    Forza Technologies, LLC
    c/o Niro, Haller & Niro

As presently advised, Mr. Kemp may have discoverable information relating to the background of Forza; the relationship and business dealings between Forza and Premier; the relationship and business dealings between Forza and Marshall; the allegations of fraud and misrepresentations by Marshall; and the harm caused by Premier and Marshall.

3.    Woo Chun Paik
    Forza Technologies, LLC
    c/o Niro, Haller & Niro

As presently advised, Ms. Paik may have discoverable information relating to FORZA product formulations.

4.    One or more employees, agents, contractors or representatives of Premier
    Research Labs, LP

As presently advised, one or more officers, directors, employees, partners, contractors, and/or managing agents of Premier (including but not limited to: Stephen Lermer, Sibylle Naumer-Belcher, David Himel, Andrea Hall, Cheyenne Johnson, Sharla Hughes, and Hesaam Moallem) may have discoverable information relating to the factual and legal bases for Premier's defenses and/or claims in this suit; the organizational structure of Premier; the employment and responsibilities of Marshall; how Premier regularly conducts business with other companies; the revenue of Premier; Marshall's fraud and misrepresentations; the breach of contract with Forza; and the harm caused by Premier and Marshall.

5.    Robert J. Marshall

As presently advised, Mr. Marshall may have discoverable information relating to the factual and legal bases for Marshall's defenses and/or claims in this suit; the organizational structure of Premier; his employment and responsibilities at Premier and/or other companies;

how Premier regularly conducts business with other companies; the revenue of Premier; his fraud and misrepresentations; the breach of contract with Forza; and the harm caused by himself and Premier.

6. Hesaam Moallem
   3500 Wadley Place, Building B
   Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Moallem is General Counsel at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, and the relationship between the parties, including damages.

7. Stephen Lermer
   3500 Wadley Place, Building B
   Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Lermer is the VP of Operations at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

8. Sibylle Naumer-Belcher
   3500 Wadley Place, Building B
   Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Ms. Naumer-Belcher is the Production Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

9. Andrea Hall

As presently advised and in light of Defendants' Initial Disclosures, Ms. Hall was the Quality Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

10.  Nick Labinsky
     3500 Wadley Place, Building B
     Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Labinsky was the Laboratory Supervisor at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. As presently advised, Labinsky is now the Product Development Supervisor at Premier.

11.  Brian Zielinski
     3500 Wadley Place, Building B
     Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Zielinski was the Quality Engineer at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. As presently advised, Zielinski is now the Quality Assurance Manager at Premier.

12.  Dr. Roger J. Geronimo
     1625 Bay Hawk Lane or 1645 Bay Hawk Lane
     St. Augustine, FL 32084

As presently advised, Dr. Geronimo is President of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

13. Earon Kavanagh
    Contact Information Unknown

As presently advised, Mr. Kavanagh is Vice President of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

14. Scott Bazarrre
    Contact Information Unknown

As presently advised, Mr. Bazarre is Alumni Affairs Director of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

15. John Allison
    Leading Effect
    7637 N. Jersey Street
    Portland, OR 97203
    (206) 261-7543

As presently advised, Mr. Allison is Recording Secretary of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

16. Dennis Gronek, Esq.
    Gronek & Associates
    fdalaw@gronekassociates.com
    (312) 655-1800

As presently advised, Mr. Gronek may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

17.     Tim Harms
        Contact through counsel

As presently advised, Mr. Harms may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

18.     Brad Martin
        Contact through counsel

As presently advised, Mr. Martin may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

19.     One or more persons involved with Rock Point Logistics
        901 Bilter Rd.
        Aurora, IL 60502

As presently advised, one or more persons at Rock Point Logistics, including but not limited to Gil De La Paz, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

20.     One or more persons involved with WePackItAll
        2745 Huntington Dr.
        Duarte, CA 91010

As presently advised, one or more persons at WePackItAll, including but not limited to Sharla Hughes, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

21.     One or more persons involved with Chromatic Labels
        16782 Von Karman Ave.
        Building 33
        Irvine, CA 92606

As presently advised, one or more persons at Chromatic Labels, including but not limited to Mark Oshman, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

22. One or more persons involved with Mudd Advertising
211 West Wacker Drive (2nd Floor)
Chicago, IL 60606

As presently advised, one or more persons at Mudd Advertising may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

23. One or more persons involved with Logic PAKaging, Inc.
3530 W. Lake Center Drive
Santa Ana, CA 92704

As presently advised, one or more persons at Logic PAKaging, Inc., including but not limited to Lori Robinson, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

24. As presently advised, various third parties who were formerly employed by Marshall and/or Premier and/or offered employment by Marshall and/or Premier in Premier's Santa Monica (or other) office may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

**B.     A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

The following categories of documents may be used to support the claims asserted by Forza. However, Forza will not produce documents that are privileged or otherwise protected from disclosure in accordance with the Federal Rules of Civil Procedure. Forza identifies the following categories of documents and things, which are located at 181 West Madison Street, Suite 4600, Chicago, Illinois, 60602 and/or the offices of Forza.

7

1. Non-privileged company files of Forza.

2. Correspondence between Forza and Defendants.

3. Writings evidencing agreement between Forza and Defendants.

4. Development of Forza's products with Defendants.

5. Forza's products.

6. The effort, cost and expense in developing and producing Forza's products, including delays by Defendants.

7. Actions and inactions evidencing Defendants' breach of contract.

8. Damage and/or injury caused to Forza as a result of Defendants' breach of contract and other acts set forth in Forza's First Amended Complaint.

Discovery has only just commenced and Forza reserves the right to supplement and/or amend these initial disclosures as discovery progresses in this suit.

**C. A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing the nature and extent of injuries suffered.**

Forza seeks monetary damages adequate to compensate for Defendants' breach of contract. As one measure of damages for breach of contract, Forza intends to seek the value of its expected sales and profits had the terms of the agreement been performed fully and satisfactorily. Forza also seeks an award of damages adequate to compensate for Defendants' fraud. In addition to compensatory damages for fraud, Forza intends to seek exemplary damages. Forza is also entitled to pre- and post-judgment interest.

Forza intends to prove damages for breach of contract based at least in part upon its expectation of the position in which it otherwise would have been had Marshall and Premier

fully performed their obligations to supply acceptable products meeting Forza's requirements and specifications. Forza believes that it could have sold substantial quantities of the products had they been timely delivered during the Olympic year and during the wrestling season as agreed by the parties. Supporting documents include, but are not limited to, Forza's Business Plan and its forecast of sales. Mia Scheid and Lee Kemp are most knowledgeable about Forza's expectancy and the sales and profit forecasts.

Fraud is an intentional tort and both compensatory and punitive damages are available to Forza. Here, Forza is entitled to both compensatory and punitive damages (sufficient to deter similar improper conduct in the future), including interest.

Forza anticipates that a qualified expert may rely upon at least the following as evidence of the injury sustained by Forza and directly caused by Defendants:

- The time, effort and money Forza spent for the creation and establishment of its business.

- The time, effort and money Forza spent for a license to be the exclusive supplier to USA Wrestling.

- The value of the time spent by employees of Forza, in particular, the amount of time spent above and beyond that required in the day-to-day operation of the business that was subsequently required as an effect of Defendants' conduct.

- Forza's accounting and legal expenses.

- Expenses paid to all third parties in relation to the Forza products contemplated in the parties' agreement including, but not limited to, WePackItAll, Chromatic Labels, Rockpoint Logistics, and Mudd Advertising.

Documents or other evidentiary material related to Forza's computation of damages and not privileged or protected from disclosure will be produced in accordance with the Agreed Protective Order.

**D.     For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Not applicable.

Respectfully submitted,

*/s/ Olivia T. Luk*

Raymond P. Niro
Olivia T. Luk
Gabriel I. Opatken
Niro, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Illinois 60602

*Attorneys for Forza Technologies, LLC.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 19, 2012 the foregoing

**PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES**

was served upon the following counsel of record via electronic transmission.

Rakesh M. Amin
Ryan M. Kaiser
Amin Talati, LLC
55 West Monroe Street, Suite 3400
Chicago, Illinois 60603
rakesh@amintalati.com
ryan@amintalati.com

*/s/ Olivia T. Luk*
NIRO, HALLER & NIRO
Attorneys for Forza Technologies, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FORZA TECHNOLOGIES, LLC, | |
| Plaintiff, | Civil Action No.  12-cv-07905 |
| v. | |
| PREMIER RESEARCH LABS, LP and ROBERT J. MARSHALL, individually. | Honorable Joan B. Gottschall Magistrate Judge Young B. Kim |
| Defendants. | |

## PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES

In accordance with Fed.R.Civ.P. 26(a)(1) and the Court's Order (Dkt. 43), Plaintiff makes the following supplemental initial disclosures. These disclosures are preliminary and discovery is ongoing.  Accordingly, Plaintiff reserves the right to supplement, correct, amend, or modify these disclosures based on new information.

**A.    The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

 1. Mia Scheid
   Forza Technologies, LLC
   c/o Niro, Haller & Niro

As presently advised, Ms. Scheid may have discoverable information relating to the background of Forza Technologies, LLC ("Forza"); the relationship and business dealings between Forza and Premier Research Labs, LP ("Premier"); the relationship and business dealings between Forza and Robert J. Marshall ("Marshall"); the allegations of fraud and misrepresentations by Marshall and the harm caused by Premier and Marshall; tortious interference with business relations and prospective economic advantage by Marshall; and unfair competition by Marshall.

2. Lee Kemp
  Forza Technologies, LLC
  c/o Niro, Haller & Niro

As presently advised, Mr. Kemp may have discoverable information relating to the background of Forza; the relationship and business dealings between Forza and Premier; the relationship and business dealings between Forza and Marshall; the allegations of fraud and misrepresentations by Marshall; and the harm caused by Premier and Marshall.

3. Woo Chun Paik
  Forza Technologies, LLC
  c/o Niro, Haller & Niro

As presently advised, Ms. Paik may have discoverable information relating to FORZA product formulations.

4. One or more employees, agents, contractors or representatives of Premier
  Research Labs, LP

As presently advised, one or more officers, directors, employees, partners, contractors, and/or managing agents of Premier (including but not limited to: Linda Forbes, Sibylle Naumer-Belcher, David Himel, Cheyenne Johnson, Sharla Hughes, and Hesaam Moallem) may have discoverable information relating to the factual and legal bases for Premier's defenses and/or claims in this suit; the organizational structure of Premier; the employment and responsibilities of Marshall; how Premier regularly conducts business with other companies; the revenue of Premier; Marshall's fraud and misrepresentations; the breach of contract with Forza; and the harm caused by Premier and Marshall.

5. Robert J. Marshall

As presently advised, Mr. Marshall may have discoverable information relating to the factual and legal bases for Marshall's defenses and/or claims in this suit; the organizational structure of Premier; his employment and responsibilities at Premier and/or other companies;

2

how Premier regularly conducts business with other companies; the revenue of Premier; his fraud and misrepresentations; the breach of contract with Forza; and the harm caused by himself and Premier; his actions that have caused tortious interference with Mia Scheid's business relations and prospective economic advantage; and unfair competition.

6.     Hesaam Moallem
       3500 Wadley Place, Building B
       Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Moallem is General Counsel at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, and the relationship between the parties, including damages.

7.     Stephen Lermer

As presently advised and in light of Defendants' Initial Disclosures, Mr. Lermer is the former VP of Operations at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

8.     Sibylle Naumer-Belcher
       3500 Wadley Place, Building B
       Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Ms. Naumer-Belcher is the Production Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

9.     Andrea Hall

As presently advised and in light of Defendants' Initial Disclosures, Ms. Hall was the Quality Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

10. Nick Labinsky
3500 Wadley Place, Building B
Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Labinsky was the Laboratory Supervisor at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. As presently advised, Labinsky is now the Product Development Supervisor at Premier.

11. Brian Zielinski
3500 Wadley Place, Building B
Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Zielinski was the Quality Engineer at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. As presently advised, Zielinski is now the Quality Assurance Manager at Premier.

12. Dr. Roger J. Geronimo
1625 Bay Hawk Lane or 1645 Bay Hawk Lane
St. Augustine, FL 32084

As presently advised, Dr. Geronimo is President of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

13. Earon Kavanagh
    Contact Information Unknown

As presently advised, Mr. Kavanagh is Vice President of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

14. Scott Bazarrre
    Contact Information Unknown

As presently advised, Mr. Bazarre is Alumni Affairs Director of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

15. John Allison
    Leading Effect
    7637 N. Jersey Street
    Portland, OR 97203
    (206) 261-7543

As presently advised, Mr. Allison is Recording Secretary of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

16. Dennis Gronek, Esq.
    Gronek & Associates
    fdalaw@gronekassociates.com
    (312) 655-1800

As presently advised, Mr. Gronek may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

17. Tim Harms
    Contact through counsel

As presently advised, Mr. Harms may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

18. Brad Martin
    Address unknown

As presently advised, Mr. Martin may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

19. One or more persons involved with Rock Point Logistics
    901 Bilter Rd.
    Aurora, IL 60502

As presently advised, one or more persons at Rock Point Logistics, including but not limited to Gil De La Paz, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

20. One or more persons involved with WePackItAll
    2745 Huntington Dr.
    Duarte, CA 91010

As presently advised, one or more persons at WePackItAll, including but not limited to Sharla Hughes, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

21. One or more persons involved with Chromatic Labels
    16782 Von Karman Ave.
    Building 33
    Irvine, CA 92606

As presently advised, one or more persons at Chromatic Labels, including but not limited to Mark Oshman, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

22. One or more persons involved with Mudd Advertising
    211 West Wacker Drive (2nd Floor)
    Chicago, IL 60606

As presently advised, one or more persons at Mudd Advertising may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

23. One or more persons involved with Logic PAKaging, Inc.
    3530 W. Lake Center Drive
    Santa Ana, CA 92704

As presently advised, one or more persons at Logic PAKaging, Inc., including but not limited to Lori Robinson, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

24. As presently advised, various third parties who were formerly employed by Marshall and/or Premier and/or offered employment by Marshall and/or Premier in Premier's Santa Monica (or other) office may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

25. Jennifer Gibson
    U.S. Olympic Committee
    1 Olympic Plaza
    Colorado Springs, CO 80909

Ms. Gibson may have knowledge of harm suffered by Forza as a result of contaminated product manufactured by Premier.

26. Becky Achen
    The National Center for Drug Free Sport, Inc.
    2537 Madison Ave.
    Kansas City, MO 64108

Ms. Achen may have knowledge of harm suffered by Forza as a result of contaminated product manufactured by Premier.

27. Kevin Johnson
    Iowa State Head Wrestling Coach
    Jacobson Athletic Building
    Ames, Iowa 50011-1140

Mr. Johnson may have knowledge relating to harm suffered by Forza, including damages.

28. Tim Weesner
    Iowa State Wrestling
    Jacobson Athletic Building
    Ames, Iowa 50011-1140

Mr. Johnson may have knowledge relating to harm suffered by Forza, including damages.

29. Larry Nugent
    USA Wrestling
    6155 Lehman Drive
    Colorado Springs, CO 80918

Mr. Nugent may have knowledge relating to harm suffered by Forza, including damages.

30. Mike Ripley
    Contact through counsel

Mr. Ripley may have knowledge relating to harm suffered by Forza, including damages.

31. Cheyenne Johnson
    Address unknown

Ms. Johnson may have discoverable information relating to the allegations in the First Amended Complaint.

To the extent additional individuals with knowledge relevant to this dispute are identified, Forza will identify them pursuant to the Federal Rules of Civil Procedure and the Local Rules. Forza reserves its right to supplement or delete from this list of individuals as more information is obtained through investigation and discovery. By listing any individual herein,

Forza does not waive its right to object to any discovery requests or deposition notices concerning such individual.

**B.     A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

The following categories of documents may be used to support the claims asserted by Forza. However, Forza will not produce documents that are privileged or otherwise protected from disclosure in accordance with the Federal Rules of Civil Procedure. Forza identifies the following categories of documents and things, which are located at 181 West Madison Street, Suite 4600, Chicago, Illinois, 60602 and/or the offices of Forza.

1.     Non-privileged company files of Forza.

2.     Correspondence between Forza and Defendants.

3.     Writings evidencing agreement between Forza and Defendants.

4.     Development of Forza's products with Defendants.

5.     Forza's products.

6.     The effort, cost and expense in developing and producing Forza's products, including delays by Defendants.

7.     Actions and inactions evidencing Defendants' breach of contract.

8.     Damage and/or injury caused to Forza as a result of Defendants' breach of contract and other acts set forth in Forza's First Amended Complaint.

All documents and evidentiary materials that contain or reference confidential, proprietary, or otherwise protected business information will only be made available subject to the terms of the stipulated protective order. Additional documentary evidence and testimony that Forza may use to support its claims or defenses will be identified and produced as discovery

continues. Forza reserves the right to supplement and/or amend these initial disclosures if PRL and/or Forza locate or produce additional documents, including expert reports.

**C.     A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing the nature and extent of injuries suffered.**

Computation of damages will be produced following discovery from PRL and expert analysis.  At this time, Forza seeks monetary damages adequate to compensate for Defendants' breach of contract. As one measure of damages for breach of contract, Forza intends to seek the value of its expected sales and profits had the terms of the agreement been performed fully and satisfactorily.  Forza is also entitled to pre- and post-judgment interest.  Scheid seeks monetary damages against PRL and Marshall for losses and injuries, plus interest and cost, sustained by the acts of tortious interference and unfair competition.

Forza intends to prove damages for breach of contract based at least in part upon its expectation of the position in which it otherwise would have been had Marshall and Premier fully performed their obligations to supply acceptable products meeting Forza's requirements and specifications.  Forza believes that it could have sold substantial quantities of the products had they been timely delivered during the Olympic year and during the wrestling season as agreed by the parties. Supporting documents include, but are not limited to, Forza's Business Plan and its forecast of sales.  Mia Scheid and Lee Kemp are most knowledgeable about Forza's expectancy and the sales and profit forecasts.

Forza anticipates that a qualified expert may rely upon at least the following as evidence of the injury sustained by Forza and directly caused by Defendants:

- The time, effort and money Forza spent for the creation and establishment of its business.

- The time, effort and money Forza spent for a license to be the exclusive supplier to USA Wrestling.

- The value of the time spent by employees of Forza, in particular, the amount of time spent above and beyond that required in the day-to-day operation of the business that was subsequently required as an effect of Defendants' conduct.

- Forza's accounting and legal expenses.

- Expenses paid to all third parties in relation to the Forza products contemplated in the parties' agreement including, but not limited to, WePackItAll, Chromatic Labels, Rockpoint Logistics, and Mudd Advertising.

Documents or other evidentiary material related to Forza's computation of damages and not privileged or protected from disclosure will be produced in accordance with the Agreed Protective Order.

**D.** **For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Not applicable.

Respectfully submitted,

*/s/ Olivia T. Luk*

Raymond P. Niro
Olivia T. Luk
Gabriel I. Opatken
Niro, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Illinois 60602

**Attorneys for Forza Technologies, LLC.**

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 14, 2013 the foregoing

**PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES**

was served upon the following counsel of record via electronic transmission.

Rakesh M. Amin
Ryan M. Kaiser
Amin Talati, LLC
55 West Monroe Street, Suite 3400
Chicago, Illinois 60603
rakesh@amintalati.com
ryan@amintalati.com

*/s/ Olivia T. Luk*
NIRO, HALLER & NIRO
Attorneys for Forza Technologies, LLC

FORZA TECHNOLOGIES, LLC,

      Plaintiff,

v.

PREMIER RESEARCH LABS, LP,

      Defendant and Counterclaimant,

v.

FORZA TECHNOLOGIES, LLC,
LEE KEMP and MIA SCHEID,

      Counterclaim-Defendants.

---

MIA SCHEID,

      Counterclaimant,

v.

PREMIER RESEARCH LABS, LP,

      Counterclaim Defendant,

and

ROBERT J. MARSHALL,

      Third-party Defendant.

Civil Action No. 12-cv-07905

Honorable Joan B. Gottschall

## PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES

In accordance with Fed.R.Civ.P. 26(a)(1) and the Court's Order (Dkt. 63), Plaintiff makes the following supplemental initial disclosures. These disclosures are preliminary and discovery is ongoing. Accordingly, Plaintiff reserves the right to supplement, correct, amend, or modify these disclosures based on new information.

**A.     The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

1.     Mia Scheid
       Forza Technologies, LLC
       c/o Niro, Haller & Niro

As presently advised, Ms. Scheid may have discoverable information relating to the background of Forza Technologies, LLC ("Forza"); the relationship and business dealings between Forza and Premier Research Labs, LP ("Premier"); the relationship and business dealings between Forza and Robert J. Marshall ("Marshall"); the allegations of fraud and misrepresentations by Marshall and the harm caused by Premier and Marshall; tortious interference with business relations and prospective economic advantage by Marshall; unfair competition by Marshall; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

2.     Lee Kemp
       Forza Technologies, LLC
       c/o Niro, Haller & Niro

As presently advised, Mr. Kemp may have discoverable information relating to the background of Forza; the relationship and business dealings between Forza and Premier; the relationship and business dealings between Forza and Marshall; the allegations of fraud and misrepresentations by Marshall; the harm caused by Premier and Marshall; and Premier's Counterclaims.

3.     Woo Chun Paik
       Forza Technologies, LLC
       c/o Niro, Haller & Niro

As presently advised, Ms. Paik may have discoverable information relating to FORZA product formulations.

4.      One or more employees, agents, contractors or representatives of Premier
        Research Labs, LP

As presently advised, one or more officers, directors, employees, partners, contractors, and/or managing agents of Premier (including but not limited to: Linda Forbes, Sibylle Naumer-Belcher, David Himel, Sharla Hughes, Brian Zielinski, Nick Labinsky, and Hesaam Moallem) may have discoverable information relating to the factual and legal bases for Premier's defenses and/or claims in this suit; the organizational structure of Premier; the employment and responsibilities of Marshall; how Premier regularly conducts business with other companies; the revenue of Premier; Marshall's fraud and misrepresentations; the breach of contract with Forza; harm caused by Premier and Marshall; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

5.      Robert J. Marshall

As presently advised, Mr. Marshall may have discoverable information relating to the factual and legal bases for Marshall's defenses in this suit; the organizational structure of Premier; his employment and responsibilities at Premier and/or other companies; how Premier regularly conducts business with other companies; the revenue of Premier; his fraud and misrepresentations; the breach of contract with Forza; and the harm caused by himself and Premier; his actions that have caused tortious interference with Ms. Scheid's business relations and prospective economic advantage; unfair competition; DHEA contamination; product mislabeling; manufacturing and cleaning protocols; personal financial resourses; Premier's financial resources; Marshall's radio show and broadcast; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

6.      Hesaam Moallem
        3500 Wadley Place, Building B
        Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Moallem is General Counsel at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, including damages; DHEA contamination; product mislabeling; manufacturing and cleaning protocols; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

7.      Stephen Lermer

As presently advised and in light of Defendants' Initial Disclosures, Mr. Lermer is the former VP of Operations at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, the manufacture of FORZA products, including damages; DHEA contamination; product mislabeling; manufacturing and cleaning protocols; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

8.      Sibylle Naumer-Belcher
        3500 Wadley Place, Building B
        Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Ms. Naumer-Belcher is the Production Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, the manufacture of FORZA products, including damages; DHEA contamination; product mislabeling; manufacturing and cleaning protocols; Premier's Counterclaims; and Ms. Scheid's Counterclaims.

9.  Andrea Hall

As presently advised and in light of Defendants' Initial Disclosures, Ms. Hall was the Quality Manager at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, manufacturing and cleaning protocols, DHEA contamination, product mislabeling, and the manufacture of FORZA products, including damages.

10.  Sharlee LaLime

As presently advised, Ms. LaLime was an employee at Premier, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages.

11.  Nick Labinsky
     3500 Wadley Place, Building B
     Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Labinsky was the Laboratory Supervisor at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, DHEA contamination, product mislabeling, manufacturing and cleaning protocols, and the manufacture of FORZA products, including damages. As presently advised, Mr. Labinsky is now the Product Development Supervisor at Premier.

12.  Brian Zielinski
     3500 Wadley Place, Building B
     Austin, TX 78728

As presently advised and in light of Defendants' Initial Disclosures, Mr. Zielinski was the Quality Engineer at Premier during the time FORZA products were being manufactured, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, DHEA contamination, product mislabeling, manufacturing and cleaning protocols, and the manufacture of FORZA products, including damages. As presently advised, Mr. Zielinski is now the Quality Assurance Manager at Premier.

13.   Dr. Roger J. Geronimo
      1625 Bay Hawk Lane or 1645 Bay Hawk Lane
      St. Augustine, FL 32084

As presently advised, Dr. Geronimo is President of Columbia Pacific University, and may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Marshall's education.

14.   Dennis Gronek, Esq.
      Gronek & Associates
      fdalaw@gronekassociates.com
      (312) 655-1800

As presently advised, Mr. Gronek may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. However, Forza does not intend to call Mr. Gronek as a witness in this lawsuit. Any knowledge or information Mr. Gronek may have is privileged.

15.   Tim Harms
      Contact through counsel

Mr. Harms may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the

parties, and the manufacture of FORZA products, including damages. However, Forza does not intend to call Mr. Harms as a witness in this lawsuit.

16.     Brad Martin
        Address unknown

Mr. Martin may have discoverable information relating to the allegations in the First Amended Complaint, including knowledge of Premier, Marshall, the relationship between the parties, and the manufacture of FORZA products, including damages. However, Forza does not intend to call Mr. Martin as a witness in this lawsuit.

17.     One or more persons involved with Rock Point Logistics
        901 Bilter Rd.
        Aurora, IL 60502

As presently advised, one or more persons at Rock Point Logistics, including but not limited to Gil De La Paz, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages. However, Forza does not intend to call any employee from Rock Point Logistics as a witness in this lawsuit.

18.     One or more persons involved with WePackItAll
        2745 Huntington Dr.
        Duarte, CA 91010

As presently advised, one or more persons at WePackItAll, including but not limited to Sharla Hughes, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages. However, Forza does not intend to call any employee from WePackItAll as a witness in this lawsuit.

19.     One or more persons involved with Chromatic Labels
        16782 Von Karman Ave.
        Building 33
        Irvine, CA 92606

As presently advised, one or more persons at Chromatic Labels, including but not limited to Mark Oshman, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages. However, Forza does not intend to call any employee from Chromatic Labels as a witness in this lawsuit.

20.     One or more persons involved with Mudd Advertising
        211 West Wacker Drive (2nd Floor)
        Chicago, IL 60606

As presently advised, one or more persons at Mudd Advertising may have knowledge of Premier, Marshall, and the relationship between the parties, including damages. However, Forza does not intend to call any employee from Mudd Advertising as a witness in this lawsuit.

21.     One or more persons involved with Logic PAKaging, Inc.
        3530 W. Lake Center Drive
        Santa Ana, CA 92704

As presently advised, one or more persons at Logic PAKaging, Inc., including but not limited to Lori Robinson, may have knowledge of Premier, Marshall, and the relationship between the parties, including damages. However, Forza does not intend to call any employee from Logic PAKaging, Inc. as a witness in this lawsuit.

22.     As presently advised, various third parties who were formerly employed by Marshall and/or Premier and/or offered employment by Marshall and/or Premier in Premier's Santa Monica (or other) office may have knowledge of Premier, Marshall, and the relationship between the parties, including damages.

23.     Jennifer Gibson
        U.S. Olympic Committee
        1 Olympic Plaza
        Colorado Springs, CO 80909

Ms. Gibson may have knowledge of harm suffered by Forza as a result of contaminated product manufactured by Premier.

24.    Becky Achen
The National Center for Drug Free Sport, Inc.
2537 Madison Ave.
Kansas City, MO 64108

Ms. Achen may have knowledge of harm suffered by Forza as a result of contaminated product manufactured by Premier.

25.    Kevin Jackson
Iowa State Head Wrestling Coach
Jacobson Athletic Building
Ames, Iowa 50011-1140

Mr. Jackson may have knowledge relating to harm suffered by Forza, including damages. However, Forza does not intend to call Mr. Jackson as a witness in this lawsuit.

26.    Tim Weesner
Iowa State Wrestling, Athletic Trainer
Jacobson Athletic Building
Ames, Iowa 50011-1140

Mr. Weesner may have knowledge relating to harm suffered by Forza, including damages. However, Forza does not intend to call Mr. Weesner as a witness in this lawsuit.

27.    Larry Nugent
USA Wrestling
6155 Lehman Drive
Colorado Springs, CO 80918

Mr. Nugent may have knowledge relating to harm suffered by Forza, including damages. However, Forza does not intend to call Mr. Nugent as a witness in this lawsuit.

28.    Mike Ripley
Contact through counsel

Mr. Ripley may have knowledge relating to harm suffered by Forza, including damages. However, Forza does not intend to call Mr. Ripley as a witness in this lawsuit.

29.    Cheyenne Johnson
Address unknown

Ms. Johnson may have discoverable information relating to the allegations in the First Amended Complaint. However, Forza does not intend to call Ms. Johnson as a witness in this lawsuit.

To the extent additional individuals with knowledge relevant to this dispute are identified, Forza will identify them pursuant to the Federal Rules of Civil Procedure and the Local Rules. Forza reserves its right to supplement or delete from this list of individuals as more information is obtained through investigation and discovery. By listing any individual herein, Forza does not waive its right to object to any discovery requests or deposition notices concerning such individual.

**B.    A copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

The following categories of documents may be used to support the claims asserted by Forza. Forza has produced document responsive to discovery served by Premier. However, Forza will not produce documents that are privileged or otherwise protected from disclosure in accordance with the Federal Rules of Civil Procedure. Forza identifies the following categories of documents and things, which are located at 181 West Madison Street, Suite 4600, Chicago, Illinois, 60602 and/or the offices of Forza.

1.    Non-privileged company files of Forza.

2.    Correspondence between Forza and Defendants.

3.    Writings evidencing agreement between Forza and Defendants.

4.    Development of Forza's products with Defendants.

5.      Forza's products.

6.      The effort, cost and expense in developing and producing Forza's products, including delays by Defendants.

7.      Analyses of products supplied by PRL and labels for such products.

8.      Actions and inactions evidencing Defendants' breach of contract.

9.      Damage and/or injury caused to Forza as a result of Defendants' breach of contract and other acts set forth in Forza's First Amended Complaint.

All documents and evidentiary materials that contain or reference confidential, proprietary, or otherwise protected business information are subject to the terms of the stipulated protective order. Additional documentary evidence and testimony that Forza may use to support its claims or defenses will be identified and produced as discovery continues. Forza reserves the right to supplement and/or amend these supplemental disclosures if Premier and/or Forza locate or produce additional documents, including expert reports.

**C.      A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing the nature and extent of injuries suffered.**

Computation of damages will be produced following discovery from Premier and expert analysis. At this time, Forza seeks monetary damages adequate to compensate for Defendants' breach of contract. As one measure of damages for breach of contract, Forza intends to seek the value of its expected sales and profits had the terms of the agreement been performed fully and satisfactorily. Forza is also entitled to pre- and post-judgment interest. Ms. Scheid seeks monetary damages against Premier and Marshall, to be determined through discovery and at

trial, for losses and injuries, plus interest and cost, sustained by the acts of tortious interference and unfair competition.

Forza intends to prove damages for breach of contract based at least in part upon its expectation of the position in which it otherwise would have been had Marshall and Premier fully performed their obligations to supply acceptable products meeting Forza's requirements and specifications, including properly labeled products that accurately reflected the actual contents of each product and products that would not be red-listed because of the presence of banned substances. Forza believes that it could have sold substantial quantities of properly labeled products had they been timely delivered during the Olympic year and during the wrestling season as agreed by the parties. Supporting documents include, but are not limited to, Forza's Business Plan and its forecast of sales. Ms. Scheid and Mr. Kemp are most knowledgeable about Forza's expectancy and the sales and profit forecasts.

Forza anticipates that a qualified expert may rely upon at least the following as evidence of the injury sustained by Forza and directly caused by Defendants:

- The time, effort and money Forza spent for the creation and establishment of its business.

- The time, effort and money Forza spent for a license to be the exclusive supplier to USA Wrestling.

- The value of the time spent by employees of Forza, in particular, the amount of time spent above and beyond that required in the day-to-day operation of the business that was subsequently required as an effect of Defendants' conduct.

- Forza's accounting and legal expenses.

- Expenses paid to all third parties in relation to the Forza products contemplated in the parties' agreement including, but not limited to, WePackItAll, Chromatic Labels, Rockpoint Logistics, Logic PAKaging, and Mudd Advertising.

- Projected volumes of sales and profits.

Documents or other evidentiary material related to Forza's computation of damages and not privileged or protected from disclosure will be produced in accordance with the Agreed Protective Order.

**D.    For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Not applicable.

Respectfully submitted,

*/s/ Olivia T. Luk*
Raymond P. Niro
Olivia T. Luk
Gabriel I. Opatken
Niro, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
Tel:    (312) 236-0733
Fax:    (312) 236-3137
***Attorneys for Forza Technologies, LLC***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 26, 2013 the foregoing

**PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES**

was served upon the following counsel of record via electronic transmission.


Rakesh M. Amin
Ryan M. Kaiser
Saira J. Alikhan
AMIN TALATI, LLC
55 West Monroe Street, Suite 3400
Chicago, Illinois 60603
ryan@amintalati.com
rakesh@amintalati.com
saira@amintalati.com
Tel:   (312) 327-3328
Fax:   (312) 884-7352
*Attorneys for Defendants*


/s/ Olivia T. Luk
NIRO, HALLER & NIRO
*Attorneys for Forza Technologies, LLC*

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


FORZA TECHNOLOGIES, LLC,          )

          Plaintiffs,     )

     vs.                          )     Civil No. 12-cv-07905

PREMIER RESEARCH LABS, LP    )

and ROBERT J. MARSHALL,       )

individually,                  )

          Defendants.    )


THE DEPOSITION OF LEROY P. KEMP

July 24, 2014

Chicago, Illinois

9:01 a.m.

Reported By:
Cynthia J. Conforti, CSR, RPR, CRR
Job No. 35098

# DEPOSITION OF LEROY P. KEMP

A. That's true. However, wrestling is year round, but we took into consideration that there was going to be a group that will just be more seasonal.

Q. Okay. And in the next subheading, four, it says:

After one year with club or program, wrestler will -- wrestler will forecasted to buy every month or buy entire 12 months.

So in the table at the top of this page, it estimates the first three years' sales. It looks like you've assumed that by year two the wrestlers that were only taking four months worth of product would now be buying the product 12 months out of the year. Is that accurate?

A. Yes.

Q. And what did you base that forecast on?

A. The key thing was the referrals from the high level athletes. If -- if they were using the products repeatedly, visible to high school wrestlers, we felt that if they -- we could get them on the products for a year, have success with the endorsements from high level athletes like Jordan

# DEPOSITION OF LEROY P. KEMP

Burroughs, we felt that we could get that type of consistency out of athletes.

Q. Okay. And did -- did Jordan Burroughs ever provide a testimonial for Forza's products?

A. He sampled them while he was at the Olympic trials, and he on air gave us his own -- his own feelings about the products.

Q. And did that result in your estimation here that the wrestlers would go from buying four months of products in year one to buying an entire 12 months in year two? Did it have the effect that you intended for it to have?

A. Well, it didn't have the effect because we didn't have the product. We didn't have the other endorsements that we needed. We didn't have not just Iowa State, but hopefully, you know, four or five universities, and the Olympic team was comprised of eight individuals. We didn't have the other seven individuals. We didn't have product. We didn't have the ability to get them on the product.

See, after the Olympic trials in April, they were going to be training all the way through until July, and my goal was to be at the

# DEPOSITION OF LEROY P. KEMP

training center with product teaching them how to use it. Mia was making her schedule available to be there as well.

The executive director or our contact within USA Wrestling said that because their offices are right in Colorado Springs that a lot of athletes come through their office, and he said, "Lee, if your product is available and athletes are using it, you're going to get some traction," but those two things didn't happen. It wasn't available. We didn't even have product to even give to them for a long time.

Q. Well, you had it in April of 2012; right?

A. In small quantities. I mean it was just a small quantity that came to Iowa City to the Olympic trials. Literally it was just...

Q. When did you get a large quantity?

A. I don't know exactly. It was after that.

Q. Was it a week after?

A. No, it was -- I'd have to look at our sales records.

Q. Well -- okay. What did a month's

# DEPOSITION OF LEROY P. KEMP

supply of the Forza program cost?

A. Somewhere around 130 bucks, something like that. I'd have to actually -- I think that may actually even be in here.

Q. A full year's supply though --

A. Full year --

Q. -- estimated would cost about 1,500 bucks; right?

A. Yes.

Q. Did Forza do any research to determine whether a high school wrestler or even a club wrestler aged 8 to 14 would be willing to pay $1,500 a year for a dietary supplement?

A. What we knew, what I knew and Mia knew that athletes were buying nutritional products anyway, and I looked at research. I mean it's just readily available on-line, but even in my own personal experience with coaches, most athletes are taking at least a protein supplement anyway. They're going to GNC and buying it and paying 30 bucks, 30 to 40 bucks a month on just protein. But we knew that athletes were spending a lot more than that for other things.

Q. How did you know that? How did you

DEPOSITION OF LEROY P. KEMP

1   know that 18 -- 8 to 14 year olds were spending more
2   than 40 bucks a month on supplements?
3
4      A.     Coaches would tell me that. I would
5   ask the question. I -- personal experience, what I
6   used myself when I competed. Advocare, the -- the
7   key representative from Advocare. They had a whole
8   line of products that they sold to wrestlers, and
9   they successfully did it for two Olympic cycles.
10      Q.     Did Advocare tell you how much revenue
11   they generated from sales to wrestlers?
12      A.     No.
13      Q.     Did you ask them?
14      A.     All I asked was, "Was it lucrative for
15   you and were you successful?" And he said, "yes."
16      Q.     How big of a company is Advocare?
17      A.     I don't know.
18      Q.     Do you know how long they have been in
19   business?
20      A.     No.
21      Q.     Do you know how many products they
22   sell?
23      A.     No.
24      Q.     Do you know what their annual revenue
25   is?

DEPOSITION OF LEROY P. KEMP

1
2      A.     No.
3      Q.     So you don't know what their avenue
4   revenue towards wrestlers is?
5      A.     No.
6      Q.     If it was so lucrative, Advocare's
7   deal with USA Wrestling, if that was so lucrative
8   for Advocare, why did they stop?
9      A.     My -- I don't know exactly. So I
10   can't even -- all I know is it was a multilevel
11   marketing company, first of all, and the guy who
12   spearheaded that was the Olympic coach and a college
13   coach, so his effort translated into a lot of sales
14   in that whole pyramid thing. And so his -- and he
15   made a lot of money from it, from his influence as
16   being the Olympic coach, being a college coach. He
17   was a coach at Oklahoma State University, a major
18   college program, and he was the Olympic coach when
19   -- when they won the team title, which was
20   unprecedented.
21          And he used all that to help promote
22   the product, the fact that he was the Olympic coach,
23   the fact that the athletes were on it, visibly on
24   it, and I was there during that time watching all
25   that.

DEPOSITION OF LEROY P. KEMP

1
2      Q.     You said that they were an M -- that
3   Advocare is an MLM company. What does that mean?
4      A.     A multilevel marketing company.
5      Q.     Is that a different business model
6   than the one Forza follows?
7      A.     I don't know anything about multilevel
8   marketing companies other than the guy I'm referring
9   to didn't own Advocare like I own Forza. He became
10   a distributor of Advocare.
11      Q.     So he was a distributor in a
12   multilevel marketing company.
13      A.     Um-hmm.
14      Q.     Okay. And you're not aware of how
15   multilevel marketing companies work.
16      A.     I have some inkling of that whole
17   thing I guess, but not really, no.
18      Q.     Well, what -- well, is that a no or
19   a --
20      A.     No, I don't -- I don't know how that
21   works. I know that he was a distributor, and he got
22   -- he got a commission on everything that was sold,
23   and he sold a lot of product using his influence as
24   an Olympic coach, using his influence as a college
25   coach, and a lot of guys were on it.

DEPOSITION OF LEROY P. KEMP

1
2          I remember being at the training camps
3   and having -- all the top guys would be -- after
4   practice they'd be all taking the stuff, and there
5   would be high school wrestlers around, and, you
6   know, he hustled like I'm trying to hustle. You
7   know, he got the -- he got himself out there.
8         MR. VICKREY: Before another question
9   is asked, could we take a lunch break? It's 12:33.
10         MR. KAISER: Yeah, you know what? I
11   just have -- I mean I've three or four lines
12   away from the close of this document, so why don't
13   we do that. Maybe five minutes.
14         MR. VICKREY: Okay.
15   BY MR. KAISER:
16      Q.     All right. So just to wrap up on
17   this, Forza's not an MLM company.
18      A.     No.
19      Q.     It practices a different business
20   model entirely.
21      A.     [Nonverbal response.]
22      Q.     Oh, yeah. What is the name of this
23   man that you're referring to at Advocare?
24      A.     His name was Joe, Joseph Seay,
25   S-E-A-Y.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099