# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LK NUTRITION, LLC,                          )
                                         )
    Plaintiff,                  )
                                         )   Case No. 12-cv-7905
    v.                          )
                                         )   Judge Joan B. Gottschall
PREMIER RESEARCH LABS, LP                    )
                                         )
   Defendant and Counterclaimant )
                                         )
    v.                          )
                                         )
LK NUTRITION, LLC,                          )
LEE KEMP and MIA SCHEID                      )
                                         )
   Counterclaim Defendants       )
----------------------------------------------------------)
                                         )
MIA SCHEID and FITNESS ARTS,                 )
                                         )
    Counterclaimants,           )
                                         )
    v.                          )
                                         )
PREMIER RESEARCH LABS, LP                    )
                                         )
   Counterclaim Defendants,      )
                                         )
    and                         )
                                         )
ROBERT J. MARSHALL                           )
                                         )
   Third-party Defendant.        )

## MEMORANDUM OPINION & ORDER

Plaintiff LK Nutrition, LLC, formerly known as Forza Technologies, LLC ("Plaintiff" or

"Forza")[1] ("Flanagan") brings this suit against Premier Research Labs, LP ("Premier") alleging

breach of contract (Count I) and fraud (Count II) based on a failed business relationship between

the parties. Before the court is Premier's Motion for Partial Summary Judgment pursuant to

Federal Rule of Civil Procedure 56(c) ("motion"). Premier answered Forza's Amended

Complaint and asserted its counterclaims against Forza, Mia Scheid ("Scheid") and Lee Kemp

("Kemp"). Both Scheid and Kemp are members of Forza. Scheid answered Premier's

counterclaim and asserted her own third-party claims against Premier's principal, Dr. Robert

Marshall ("Marshall") for (1) tortious interference with business relations and prospective

economic advantage; and (2) unfair competition. Premier and Marshall now move for summary

judgment as to one part of Forza's breach of contract claim relating to the alleged non-

conformity of one of Forza's products and also moves for summary judgment as to Scheid's

third-party claims against Marshall. Also before the court is Premier's motion to strike the

expert testimony of Paul Duggan. For the reasons set forth below, Premier's partial motion for

summary judgment is granted in part and denied in part and its motion to strike is granted in part

and denied in part.

## I.     PREMIER'S MOTION FOR SUMMARY JUDGMENT

### A.  Background

The court takes the following facts from the parties' Local Rule 56.1 statements and

exhibits. The facts are undisputed unless expressly noted. Important facts, such as the time

period in which the relationship between Forza and Premier began are noticeably absent from

Premier's Statement of Facts and Forza's Statement of Additional Facts. In these instances, the

---

[1] During the time period relevant to the court's ruling, Plaintiff was known as Forza Technologies, LLC. Therefore, for the sake of clarity and simplicity, Plaintiff will be referred to as "Plaintiff" or "Forza" throughout this opinion.

court adopts the allegations of Forza's Amended Complaint. Forza's Amended Complaint alleges that Premier breached its contract with Forza by failing to timely supply the nutritional products specified by Forza, by failing to supply, package, and label any products before the 2012 Olympic trials, and by producing at least one product with trace amounts of a banned substance. [Am. Compl. ¶¶ 52-53, ECF No. 17.] Premier's motion for partial summary judgment pertains only to the breach of contract claim regarding the delivery of a product with trace amounts of a banned substance. It does not address the issues surrounding late delivery or mislabeling of products. The court, therefore, will recite only the facts that are pertinent to its ruling.

Forza (now known as LK Nutrition) is a Wisconsin limited liability company with its sole office in Palatine, Illinois. Forza has designed, developed, and formulated nutritional supplements for use by athletes, in particular, high school and college wrestlers. Premier is a Texas limited liability partnership and is in the business of making and selling nutritional products, including nutrition and dietary supplements.

Forza's two cofounders are Lee Kemp and Mia Scheid. Lee Kemp is a former collegiate wrestler from the University of Wisconsin who won three NCAA Wrestling Championships and three World Championships. Kemp is also a former Olympic wrestling coach. In addition to being a cofounder of Forza, Scheid is the sole owner of a business called Fitness Arts. [Def. 56.1 Statement of Facts ("SOF") ¶ 9, ECF No. 239-2.] Fitness Arts is a wellness center providing "exercise, corrective exercise, nutrition, wellness and consultation" services. [*Id.* ¶ 8.] Fitness Arts sells dietary supplements to its customers including Premier brand supplements. Premier's

principal[2] is Marshall.  Prior to the formation of the business relationship between Premier and Forza that is the subject of this litigation, Scheid received training and certification to practice Quantum Reflex Analysis ("QRA"), a kinesiology muscle testing procedure used to evaluate acupuncture points, from Marshall, the original developer of QRA.  [*Id.* ¶¶ 10-12.]  The relationship between Marshall and Scheid predates the business relationship between Premier and Forza.

On or about January or February of 2011, Forza began discussions with Marshall regarding its and Premier's ability to help Forza launch a new line of nutritional and dietary supplements specially formulated for athletes and, more specifically, for wrestlers.  The parties ultimately reached an agreement whereby Premier would manufacture, test, label, and package four products for Forza—FORCE, STRENGTH, POWER, and REVIVE (collectively, "supplements" or "products").  All four products were manufactured by Premier in Texas and delivered to Forza in Illinois.  [Pl. Add'l SOF ¶ 2, ECF No. 260.]  The parties agree that no formal written contract governing the sale or purchase of the products was ever executed.  Instead, "all material terms of the agreement between Forza, on the one hand, and Marshall and Premier, on the other, are contained in written communications between the parties."  [Def. SOF ¶ 2, ECF No. 239-2.]  These written communications essentially amounted to a number of emails that were exchanged between the parties.  The emails laid out certain terms of the agreement, including price, quantity, testing of the products, packaging and labeling of the products, and delivery.  [*Id.* ¶ 20; Pl. Add'l SOF ¶ 3.]

Forza contends that the emails also establish that the products were to be free of contaminants and that they were to satisfy anti-doping regulations.  [Pl. Add'l SOF ¶ 11.]  Forza

[2] According to the Amended Complaint, Premier is composed of a sole general partner—Texas Supplements, LLC, a Texas Limited Liability Company.  [AC ¶ 6, ECF No. 17.]  Texas Supplements, LLC is controlled by its sole member, Dr. Robert J. Marshall.

also contends that Premier knew that the products could not be contaminated with even trace amounts of banned substances. [Pl. Resp. to Def. SOF ¶ 20, ECF No. 260.] As evidence of Premier's knowledge, Forza states that Premier understood that the products it produced for Forza would be consumed by athletes who would be tested for banned substances. [Pl. Add'l SOF ¶ 12, ECF No. 260.] Forza also identifies a number of emails it sent Premier with links to websites containing anti-doping information. [*Id.* ¶ 11; Def. SOF, Exs. F-O, Q, S, T, V, Y, ECF No. 239-2.] Most of the emails contained only a Uniform Resource Locator ("URL"), or link, to an internet website that presumably[3] contained information regarding anti-doping policies and lists of banned substances. [*See, e.g.*, Def. SOF Ex. F, ECF No. 239-2.]

One email exchange between Premier and Forza in January 2012 details Forza's need for all four of the products produced by Premier to be tested for banned substances. [*Id.* Ex. M.] Forza indicated its need that the products to be tested; Forza also indicated hat it needed the products to be certified and approved for use by athletes. On January 31, 2012, Premier sent Forza an email detailing the preliminary results received from HFL Sport Science ("HFL") for anti-doping testing performed on REVIVE, FORCE, and POWER. [*Id.* Ex. Y.] HFL is an internationally recognized and accredited laboratory providing testing for athlete healthcare and nutritional supplements. [*Id.* Ex. S.] HFL is accredited for supplement analysis and has experience testing within the framework of the World Anti-Doping Agency ("WADA"). [*Id.*] The preliminary results revealed that REVIVE tested "clean," POWER tested "clean" on the tests it completed, and FORCE showed "traces of DHEA (a banned substance) below the reporting limit." [*Id.* Ex. Y.]

---

[3] The court attempted and failed to access a number of the websites sent to Premier by Forza. However, Premier does not argue that it was unable to access any of the websites provided by Forza. Rather, Premier argues that by sending "naked" links (links with no directions or commentary in the body of the email), Forza has failed to factually establish that the links alerted Premier to any duty to produce completely contaminant-free products. [Def. SOF ¶¶ 22-25, 29-32.]

Forza received the full and final HFL results on March 27, 2012. [*Id.* Ex. S.] The results revealed that all four of the supplements passed their respective tests. [*Id.*] However, as with the preliminary results, the final results revealed that while FORCE passed its tests, the screening tests indicated trace presence of DHEA below the specified reporting limit. [*Id.*] The results further indicate that "trace presence of DHEA does *not* indicate a positive result for DHEA and is not a danger to an athlete." [*Id.* (emphasis added).]

At around the same time, Forza published HFL's findings on its website and stated that "HFL Sport Science, World Anti-Doping Agency (WADA) accredited laboratory clears FORZA products." [Def. SOF Ex. T.] In addition to stating that HFL cleared its products, Forza posted the actual test results on the web, which, again, indicated that trace amounts of DHEA were found in POWER, but not enough to have to report it. [*Id.*] Forza also published a promotional flier for its products and stated that its products meet "the regulations set forth by WADA" and that "[a]ll this means your athletes compete *CLEAN* and *SAFE*." [*Id*. Ex. V (emphasis in original).] The web page promoting HFL's findings stayed active up to and subsequent to the filing of the present action. [Def. SOF ¶ 46.]

On August 30, 2012, Tim Weesner of Iowa State University, a potential customer of Forza, requested that the National Center for Drug Free Sport ("NCDFS") review two Forza products—STRENGTH and POWER—and make a recommendation regarding their safety and compliance with the rules governing anti-doping. [*Id.* ¶ 48.] Weesner reached out to the NCDFS because it was his understanding that FORCE "contains DHEA so that ma[de] [him] concerned about their other products." [*Id.* Ex. W.] The next day, on August 31, Forza emailed Premier and stated the following: "The trace amount of DHEA found in FORCE (herbal capsule) is concerning potential University athletic teams. Is there a report that shows how much

DHEA was found (isn't it a miniscule amount?)." [*Id.* Ex. Q.] Premier responded the same day

by stating that "[t]he trace level of [DHEA] showed on the screen but was below the 10ng/g

reporting limit and therefore not considered a positive test. No further quantification was

reported." [*Id.*]

On September 5, 2012, Forza emailed Premier stating that coaches are expressing their

concern over the positive test for trace amounts of DHEA and asking if FORCE can be retested.

[Def. SOF Ex. Q.] Premier responded by stating the following:

> I recall the conversation where Premier agreed to perform testing of each product
> to verify the absence of banned substances. Upon reviewing the reports from
> HFL, Premier shared the results with Forza for each product. You were made
> aware of the presence of DHEA below reportable limits in the FORCE product
> and you made the decision to proceed. If Forza, in studying its target markets,
> was aware that even a trace amount, below reportable limits, of a given banned
> substance is not acceptable, then different course of action should have been
> followed.
>
> You will need to seek expert opinion/advice on whether the trace amounts of
> DHEA present in FORCE is reason for concern when testing athletes for banned
> substances. Premier cannot supply you with that answer.
>
> I believe Premier has met its agreement to test the product for banned substances
> and report the findings to Forza.

[*Id.*]

On that same day, Ms. Becky Achen of the NCDFS responded to Weesner's August 30th

email by stating that Forza "might be a good company to stay away from. If they have had a

positive testing for contamination, even though it says it was a low level, it seems that would be

a red flag." [*Id.* Ex. W.] In response to Ms. Achen's answer to Mr. Weesner's inquiry regarding

the safety of Forza's products, Forza's attorney Ray Niro wrote to Mr. Achen on September 13,

2012 stating that her statements to Mr. Weesner were "categorically false and have damaged

both its business and reputation. [*Id.* Ex. X.] Mr. Niro's letter also stated that Forza's

supplements were "carefully formulated, used by Olympic athletes, and have repeatedly passed the most rigorous drug tests available." [*Id.*]

On May 16, 2013, Scheid, on behalf of Forza, sent a letter to Marshall and Premier asking that Premier "accept the return of [Forza's] complete remaining inventory of these products—FORCE, POWER, REVIVE, and STRENGTH—and that [Premier] refund [Forza] the full amount of [Forza's] payments to [Premier]." [Def. SOF Ex. R.] Forza explained that it has faced substantial resistance in the market place for the sale of any of its nutritional products that were supplied by Premier. One of the reasons for the resistance was the presence of DHEA in one of the products. [*Id.*] When Forza attempted to sell its products to major collegiate wrestling programs, it "discovered that the mere presence of the banned substance reflected negatively on the quality control practices of the manufacturer." [*Id.*] Forza goes on to state that "[s]ince September 2012, [it] ha[s] effectively been boycotted because of the presence of trace amounts of DHEA in products that [Premier] supplied to [it]." [*Id.*] Finally, Forza states the following:

> Although the amount of DHEA was not sufficient in itself to cause the products to be rejected, the fact that any DHEA was present in the products alone reflected negatively on the adequacy of [Premier's] manufacturing operation. In other words, the fact that the products were tainted with any amounts of DHEA showed that inadequate efforts were taken to clean your equipment after products containing DHEA were made. [Forza] now ha[s] learned that in June 2012, [Premier] actually took the steps to remedy the contamination issue, unfortunately too late for Forza.

[*Id.*]

Premier refused to provide a refund to Forza and also refused to accept the remaining inventory in Forza's possession. As a result, Forza filed the instant suit. As noted, Premier answered the complaint and asserted a counterclaim against Forza, Lee, and Scheid. In response to the counterclaim, Scheid asserted her third-party claims against Marshall. According to

Scheid, she and Marshall had an "understanding" that Marshall would give Scheid and Fitness Arts referrals while on a radio show that Marshall periodically hosted. [Pl. Add'l SOF ¶ 35, ECF No. 260.] This "understanding" started sometime in 2007 and came about when Scheid emailed Marshall stating, "We need referrals…Any mention of our practice on our radio show is as always greatly appreciated." [*Id.*] Scheid emailed Marshall four years later in October 2011 again asking for referrals. [*Id.* ¶ 36.] In addition to providing referrals to Scheid and Fitness Arts, Marshall also provided a 15% discount on its products to Fitness Arts from December 2011 to March 2013. Scheid contends that Marshall stopped endorsing her and Fitness Arts after the instant lawsuit was filed. [*Id.* ¶ 38.] As a result, Fitness Arts' sales declined. [*Id.* ¶ 39.]

## B. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505. The existence of a factual dispute alone is not sufficient to defeat a summary judgment motion,

instead the non-moving party must present definite, competent evidence to rebut the summary

judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## C. Analysis

### i. Breach of Contract Claim[4]

Premier argues that trace amounts of DHEA in one of the products it made for Forza did

not breach any agreement between it and Forza. More specifically, Premier argues that there

was no language in the contract prohibiting trace presence of contaminants. Moreover, Premier

argues that Forza admitted that trace contamination of one its products did not render the goods

non-conforming. Even if the presence of trace contamination made the product "non-

conforming," Premier argues that Forza's acceptance of the product with knowledge of the non-

conformity precludes revocation of acceptance.

The issue of non-conformance is complicated by the fact that there was no written

agreement between the parties. Instead, the "contract" consisted of a number of emails sent back

and forth establishing price, quantity, and delivery. Forza argues that it sent Premier information

about banned substances in nutritional supplements on a number of occasions, and that this line

of communication established that Forza's products were to be free from any banned substances.

It is uncontested that Premier was aware that these products would be marketed to college

athletes and Olympic athletes, and that these athletes would be required to pass stringent drug

tests. Moreover, Forza sent Premier a list of ingredients for each of the products that were to be

manufactured by Premier. [Pl. Add'l SOF, Tab 1, PRL 000238.] Not listed among those

ingredients for any of the products is DHEA. This fact is uncontested. Also uncontested is the

---

[4] There was a choice of law issue regarding whether Illinois or Texas law governed the contract in dispute.
However, in its reply brief, Premier "concede[d] that Illinois law applies to [Forza]'s breach of contract claim."
[Reply in Support of Mot. for Summary Judgment, p. 3, ECF No. 269.] Therefore, the court will apply Illinois law
and the Illinois Uniform Commercial Code ("UCC"). 810 ILCS 5/2-101 *et seq.*

fact that DHEA is a banned substance. Therefore, it is incontrovertible that the products manufactured by Premier should not contain DHEA. 810 ILCS 5/2-313(1)(b) ("Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description.")

Premier argues that Forza's actions preclude it from arguing that the goods were non-conforming. Specifically, Premier states that Forza took the following actions *after* it became aware of the presence of trace amounts of DHEA in FORCE: (1) Forza marketed its products as "clean" and "safe," to prospective customers; (2) Forza sent a letter to Ms. Achen of the NCDSF stating that its products "have repeatedly passed the most rigorous drug tests available;" and (3) when Forza attempted to revoke its acceptance of the products manufactured by Premier, it sent a letter to Premier stating that "the amount of DHEA [found in FORCE] was not sufficient in itself to cause the products to be rejected." Based on these admissions, Premier argues that the presence of DHEA did not render the products non-conforming.

However, the statements cited above support Forza's assertion that, at the time that the products were delivered, it was not aware that even trace amounts of DHEA would make the products unsaleable. It is entirely possible that Forza accepted the goods, despite the presence of trace amounts of DHEA (which, of course, was not an ingredient in any of its products), because it thought that the product could still be sold. After months of trying to sell the product, it became clear that even trace amounts of DHEA made the product unsaleable. A jury could find that Forza *should* have known that trace amounts of a banned substance in its products would make it difficult, if not impossible, to market it and sell it to college and Olympic athletes. However, whether the product was non-conforming is a question of fact. 810 ILCS 5/2-314 (2)

("Goods to be merchantable must be at least such as…are fit for the ordinary purposes for which such goods are used.").

Further, once Forza discovered that the trace presence of DHEA made the product unsaleable, it sought to revoke its acceptance. *Canadian Pacific Railway Co. v. Williams-Hayward Protective Coatings, Inc.*, 2005 WL 782698, at *27 (N.D. Ill. Apr. 6, 2005) ("In essence, when a buyer has already accepted goods, he may revoke acceptance when a nonconformity substantially impairs the value of goods."). Premier argues that even if Forza attempted to revoke its acceptance through its May 2013 letter, the revocation was untimely. According to Premier, Forza knew in January 2012 that FORCE contained trace amounts of DHEA. Premier argues that a 16-month delay is unreasonable. *Princeton Indus. Prods. v. Precision Metals, Corp.*, 120 F.Supp.3d 812, 824 (N.D. Ill. 2015) (finding a one-year delay in revocation to be unreasonable). Forza, on the other hand, argues that it discovered the non-conformity only in September 2012 after it was told by a number of prospective buyers that they could not purchase Forza products because of the trace presence of DHEA. Viewing the facts most favorably to Forza, the delay would be approximately 8 months as opposed to 16. However, some courts have found even a 3-month delay to be unreasonable. *Intervale Steel Corp. v. Borg & Beck Div., Borg–Warner Corp.*, 578 F.Supp. 1081, 1085–88 (E.D.Mich. 1984), *aff'd without opinion*, 762 F.2d 1008 (6th Cir. 1985) (rejection was ineffective where attempted three months after delivery). Nevertheless, whether an attempted revocation of acceptance is valid typically hinges on material questions of fact. *Canadian Pacific Railway*, 2005 WL 782698 at *27 (citing *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App.3d 313, 320-21, 242 Ill.Dec. 738, 722 N.E.2d 227 (Ill. App. Ct. 1999)).

Even if revocation was untimely, Forza correctly asserts that it is not precluded from asserting a breach of contract claim. Rather, it simply alters the type of relief to which it is entitled. For example, 810 ILCS 5/2-607, which applies when a buyer has accepted the non-conforming goods, states the following:

> Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for non-conformity."

810 ILCS 5/2-607(2). The next section, which applies when a buyer revokes acceptance, states the following:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> > (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
> >
> > (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

810 ILCS 5/2-608.

Here, Premier argues that neither 810 ILCS 5/2-607 or 5/2-608 applies because Forza failed to properly revoke acceptance. Although 5/2-607 would preclude Forza from revoking acceptance, it would not preclude Forza from stating a claim for a breach of contract. Instead, 810 ILCS 5/2-714 provides for damages for the seller's breach when the buyer has accepted the goods (5/2-607), whereas 810 ILCS 5/2-711 provides for damages for the seller's breach when the buyer has revoked its acceptance (5/2-608). Therefore, whether Forza properly revoked

acceptance matters for determining damages should a jury find in its favor at trial. Nevertheless, whether Forza did or did not revoke acceptance is a question for the jury. Therefore, Premier's motion for summary judgment as to the breach of contract claim is denied.

### ii. Scheid's Third-Party Claims

Scheid has asserted two third-party claims against Marshall: (1) tortious interference with prospective business expectancy; and (2) common law unfair competition. Scheid's third-party claims are premised on two alleged actions taken by Marshall: (1) discontinuing a price discount for Scheid and Fitness Arts and discontinuing any referrals to Scheid and Fitness Arts; and (2) Marshall's alleged disparaging comments of Scheid.

To succeed on a claim for tortious interference with prospective business or economic advantage under Illinois law, a plaintiff must show that: (1) it had a reasonable expectation of entering into a valid business relationship; (2) the defendant knew of the plaintiff's expectancy; (3) the defendant purposefully interfered to prevent the plaintiff's legitimate expectancy from being fulfilled; and (4) the plaintiff suffered damages resulting from such interference. *Uline, Inc. v. JIT Packaging, Inc.*, 437 F.Supp.2d 793, 800 (N.D. Ill. 2006) (citing *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004); *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170–71 (7th Cir. 1993); *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 657, 568 N.E.2d 870, 878 (1991); *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 482, 230 Ill.Dec. 229, 241, 693 N.E.2d 358, 370 (1998)).

Conversely, in Illinois, the common law tort of unfair competition encompasses a "broad spectrum of law" and it is difficult to determine exactly what elements are required in order to prove such a claim. *Integrated Genomics, Inc. v. Kyrpide*, No. 06 C 6706, 2008 WL 630605, *13 (N.D. Ill. 2008*); see also Zenith Elecs. Corp. v. Exzec, Inc.*, No. 93 C 5041, 1997 WL

798907 at *14 (N.D.Ill.1997) (observing that "the common law tort of unfair competition encompasses a 'broad spectrum of law'" and noting that the "court has not found[ ] an Illinois case which definitively sets forth the elements of a common law unfair competition claim for all factual scenarios."). "Stating a claim for unfair competition under Illinois common law is not a simple task because the Illinois courts have not specifically enumerated the requisite elements." *BlueStar Mgmt. v. The Annex Club*, LLC, 2010 WL 2802213, *9 (N.D. Ill. 2010) (citing *Custom Bus. Sys., Inc. v. Boise Cascade Corp.*, 68 Ill.App.3d 50, 52, 385 N.E.2d 942, 944, 24 III. Dec. 801 (Ill. App. Ct. 1979)). Indeed, the Seventh Circuit has stated that "the law of unfair competition ... is elusive; its elements escape definition." *Wilson v. Electro Marine*, 915 F.2d 1110, 1118 (7th Cir. 1990). While some courts have analyzed Illinois common law unfair competition claims under the "rubric" of a tortious interference with prospective business expectancy claim, *see Zenith Electronics Corp.*, 1997 WL 798907 at *14, others have noted that "Illinois courts have ... recognized that the Uniform Deceptive Trade Practices Act ("UDTPA") has codified most aspects of the common law tort of unfair competition." *BlueStar*, 2010 WL 2802213 at *9 (citing Custom Bus. Sys., 68 Ill.App.3d at 52–53, 24 Ill.Dec. 801, 385 N.E.2d 942); *see also McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1174 (7th Cir. 1986) (noting that the court need not address plaintiff's claim "that the defendants had engaged in unfair competition in violation of Illinois common law" because the "Illinois Deceptive Trade Practices Act is merely a codification of the Illinois common law of unfair competition.") (internal citations omitted).

No matter how Scheid's claim is framed, it still fails. First, there is no evidence that Premier was under a continuing duty or obligation to offer discounts on its products or to offer referral services indefinitely. In fact, the evidence in the record supports the argument that

Marshall may have referred clients to Scheid more as a favor than as a binding commitment. Second, Marshall's statement that he was unaware of whether Scheid was still practicing QRA can hardly be seen as purposeful interference. Finally, and most fatal to Scheid's claims, no evidence has been put forward that Scheid suffered damages as a result of Marshall's alleged actions. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007))); *See also Muehlbaurer v. General Motors Corp.*, 2008 WL 4542650, *5 (N.D. Ill. July 22, 2008) (summary judgment proper where nonmoving party failed to identify evidence of damages); *Diedrich v. Ocwen Loan Servicing, LLC*, 2015 WL 4113391, *1 (E.D. Wis. July 8, 2015) (same); *Tradesmen Intern., Inc. v. Black*, 2011 WL 5330589, *8 (C.D. Ill. Nov. 7, 2011) (same). Accordingly, the motion for summary judgment as to Scheid's third-party claims is granted.

## II.     PREMIER'S MOTION TO STRIKE

Premier has moved to disqualify Forza's proposed damages expert, Paul Duggan, and to strike his report. As an initial matter, Premier does not dispute Duggan's qualifications as an expert. [Def. Mot. to Strike, p. 4 n.2, ECF No. 234.] Rather, Premier argues that Duggan's report should be stricken and his testimony barred because his opinions are unreliable and will not assist a trier of fact. More specifically, Premier argues that Duggan improperly bases his opinions on an untested Forza internal sales projection without independently verifying or testing the assumptions made in the internal projection. Moreover, according to Premier, Duggan's calculation of damages relies on unreliable methods, such as the value of an athlete endorsement, the value of non-existent patents, and the value of the "exclusive endorsement" that Forza had

with USA Wrestling.  Finally, Premier argues that Duggan's testimony regarding direct damages is nothing more than simple arithmetic—adding numbers that were provided to him by Forza—bereft of any substantiation or analysis.

The admissibility of expert evidence is governed by Federal Rule of Evidence ("Rule") 702.  Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise."  Fed. R. Evid. 702.  The rule requires that "(1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case."  *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *see also Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert."  *Winters v. Fur–Con Inc.*, 498 F.3d 734, 741–42 (7th Cir. 2007) (citation and internal quotation marks omitted).  The expert's proponent bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

To gauge reliability, it must first be determined whether the expert is qualified in the relevant field, and whether his reasoning or methodology is valid.  *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.  *Accord United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).  The expert must employ for the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.  And of course, the expert's testimony must be relevant to the task at hand.  *Daubert*, 509 U.S. at 591, 599, 113

S.Ct. 2786.  Just as proof of negligence in the air will not do, *Palsgraf v. Long Island RR*, 248 N.Y. 339, 344, 162 N.E. 99 (1928) (Cardozo, C.J.), neither will proof of expertise in the abstract. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 320 (N.D. Ill. 2008).  A Nobel laureate in physics could not help the jury in a medical malpractice case.  *Id*.

## A.  Lost Profits

There are two categories of monetary damages at issue in Duggan's report: (1) lost profits and (2) direct losses.  Duggan's estimation of loss for each category of monetary damage relies on different types of information that was provided to him.  For lost profits, Duggan's report relies almost entirely on a deposition given by Michael Earl Ripley, a Certified Public Accountant who created a business plan for Forza in order to pitch to investors, as well as related documents.  In his report, Duggan states that it is his belief that Forza would have achieved profits of at least $10 million for the three-year period from 2012 through 2014 were it not for the breach of contract and fraudulent conduct of Premier.  Duggan's $10 million estimation of lost profits is slightly less than the $11.3 million in profit that Ripley estimated in his business plan for the same time period.  During his deposition, Duggan admits that his "report deals with actual expenses lost…[I]t's not a lost profits calculation, that's Mr. Ripley's report."  [Def. Mot. to Strike, Ex. A, 153:3-6 (Duggan), ECF No. 234.]  In response to questions regarding his $10 million lost profits estimate, Duggan stated that he "took the Ripley plan, he (Ripley) did the work, and I said even with a range of error it would be $10 million."  [*Id*., 153:21-23.]  When asked if he did anything to test the assumptions within Ripley's business plan, Duggan stated he "read the plan and [he] thought they were reasonable" based his "knowledge, skills, training, experience, working with businesses."  [*Id.* 154:2-3, 5-6.]

When an expert premises his opinions on an assumption, the assumption must be reliable.

*Victory Records, Inc. v. Virgin Records America, Inc.*, 2011 WL 382743, *2 (N.D. Ill. Feb. 3, 2011). The Seventh Circuit has held, however, that an assumption based on the internal projections of the expert's sponsor lacks the reliability demanded by Rule 702. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (a party's "internal projections…rest on its say-so rather than a statistical analysis," and "represent[] hopes rather than the results of scientific analysis."); s*ee also ZF Meritor LLC v. Eaton Corp.*, 646 F.Supp.2d 663, 667 (D. Del. 2009) (excluding testimony of expert who "did not apply his own assumptions based upon his expertise, to any financial data in order to project" the party's future performance, but who instead "relied on" the party's own internal financial projections "without knowing…the validity of the underlying data and assumptions upon which the [projections] were based.") This is particularly so where, as here, the proposed expert offered no basis in the narrative portion of his expert report for concluding that Forza's internal projections provide an acceptable foundation for an expert's opinion in his field. *Victory Records*, 2011 WL 382743 at *2.

Moreover, during his deposition, Duggan stated that his conclusion that the report prepared by Ripley was reasonable based on his knowledge, skills, training, and experience working with businesses. This is not enough. *Zenith*, 395 F.3d at 418 ("Asked repeatedly during his deposition what methods he *had* used to generate projections, [the proposed expert] repeatedly answered 'my expertise' or some variant…which is to say that he either had no method or could not describe one. He was relying on intuition, which won't do.") (emphasis in original). Thus, while opinion testimony regarding damages founded on a party's internal projections might be permissible when delivered by a lay witness under Rule 701, *see United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010); *Donlin v. Phillips Lighting N. Am. Corp.*,

581 F.3d 73, 81 (3rd Cir. 2009); *DUO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687 (5th Cir. 2003); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 705-06 (4th Cir. 1990), it may not be delivered by a witness with the "gloss of expertise" under Rule 702. *Victory Records*, 2011WL 382743 at *2.

Forza may argue that Duggan's opinions regarding lost profits are based on more than Ripley's report, but the evidence demonstrates that the foundation for Duggan's opinions, beyond the Ripley report, is still lacking and easily discounted. First, Duggan states that Forza "formulated a proprietary line of supplements" and even sought "patent protections for its formulations." [Def. Mot. to Strike, Ex. B p. 6, ECF No. 234.] As a result, "proprietary formulations covered by a patent gave LK/Forza a potentially exclusive position in its space." [*Id.*, pp. 6-7.] However, Duggan admits in his deposition that he was unaware if any of Forza's products were ever patented, unaware of the status of any patents, unaware of whether any patents were issued, never reviewed the patent applications, and was unaware of whether the United States Patent and Trademark Office had offered any opinion as to the patentability of the products in Forza's application. [Def. Mot. to Strike, Ex. A, p. 128:5-25; 129:1-4, ECF No. 234.]

Moreover, Duggan advances the theory that Forza's high profit potential was "reasonably certain" because Lee Kemp's "name and image was associated with the LK/Forza products much like Michael Jordan is associated with Nike shoes." [Def. Mot. to Strike, Ex. B, p. 7, ECF No. 234.] "He is like the Michael Jordan of amateur wrestling." [*Id.*] During his deposition, Duggan attempted to explain the basis for his comparison between Lee Kemp and Michael Jordan.

**Q:** And in your report you liken [Kemp] to Michael Jordan as the Michael Jordan of amateur wrestling, right?

**A:** Yes

**Q:** What's your basis for that?

**A:** It's an analogy.  Michael Jordan was, if you looked at the greatest basketball players, he'd be listed as top 10.  If you looked at greatest wrestlers Lee Kemp's listed in the top 10.

*** 

**Q:** What do you base that information on?

**A:** As I answered before, I Googled greatest wrestlers and it includes Lee Kemp, John Smith, Cael Sanderson and others.

*** 

**Q:** Have you done any research with respect to athlete endorsements of products?

**A:** No.

**Q:** Have you done any research with respect to the wrestling consumers?

**A:** No.

**Q:** In Paragraph 17 of your report, you compare Nike and Michael Jordan to Fitness Arts and the LK/Forza brand.  What research did you do to determine the success of Michael Jordan with Nike?

**A:** in the news last week they listed Michael Jordan as the highest paid athlete in the world last year based on a combination of salary and endorsements.  So that's only a recent anecdote, but the Michael Jordan association to Nike in creating the Air Jordan brand has been legendary and has put Jordan as the highest paid athlete in sports in calendar 2014.

**Q:** So one of the bases is based on a news report from last week?

**A:** No. It only confirms my –

**Q:** Your speculation?

**A:** Not my speculation.  The success of Nike and its association with Tiger Woods and Michael Jordan.

**Q:** Based on what research?

**A:** Over time I've owned Nike stock, analyzed their sales, their sales growth. It has been a very powerful stock in the market. From time to time I invest with Jackson in consumer brands so I'm aware of it on a sometimes casual and sometimes very intense basis, depending on where my investments are made.

**Q:** What were Nike's sales prior to its enlisting of Michael Jordan?

**A:** I don't have that information.

**Q:** What were their sales after?

**A:** Higher.

**Q:** Based on what?

**A:** Reality.

[Def. Mot. to Strike, Ex. A. pp. 133:25; 134:2-9, 22-25; 137:25; 138:2-25; 139:2-17, ECF No. 234.]

What's clear from the exchange above is that Duggan has no real basis for comparing Lee Kemp (a top-10 wrestler, according to Google) and Michael Jordan on the subject of celebrity athlete endorsements and marketability. Duggan did not research the market with respect to wrestling consumers [*Id.* p. 137:25; 138:2-6] and does not know, with any specificity, Jordan's impact on the market for Nike [*Id.* p. 138:7-25; 139:2-17]. Simply put, Duggan's knowledge regarding Jordan's impact on Nike is no greater than the jury's knowledge and therefore provides no value.[5]

Finally, Forza advances the theory that it is not a "new" business, but rather a "continuation" of Fitness Arts, which affects the projection for lost profits. Premier, of course, argues that Forza is a separate business from Fitness Arts and should therefore be compared to

---

[5] The court rejects the authorities cited in Forza's response to Premier's motion to strike supporting its argument regarding the value of celebrity endorsements. [Plaintiff Resp. to Def. Mot. to Strike, p 12, ECF No. 236.] Duggan never reviewed any of the authority that Premier argues supports its theory that Kemp's celebrity endorsement was valuable and the court sees no reason to take judicial notice of it. These are materials that perhaps should have been provided to Mr. Duggan. The court will not correct for Forza's failure to do so.

comparable businesses in the market in order to project potential lost profits. Duggan admits that he did not study the market for nutritional supplements, in part, because of the notion that Forza is a continuation of Fitness Arts and is, therefore, an already established business that can use its own past expenses and revenues to project future lost profits ("yardstick approach"). Assuming *arguendo* that Forza is correct in stating that it is a "continuation" of Fitness Arts, then it *may* be able to establish that Forza lost profits as a result of Premier's actions. However, Duggan cannot opine on the *extent* of lost profits because the figures proffered by Duggan are based wholly on Ripley's report. The actual analysis of lost profits was completed by Ripley and not Duggan, which Duggan freely admits. Duggan merely provides the "gloss of expertise" for Ripley's opinion. Without more evidence that the $10 million lost profits figure as quoted by Duggan was achieved through some sort of expert analysis or methodology by Duggan, the court will not allow Duggan to opine regarding lost profits.

### B.  Direct Losses

Duggan estimates that, in addition to lost profits, Forza suffered $2,759,928.70 in "direct losses." Duggan attributes these "direct losses" to problems caused by Premier in the following ways: "(1) Premier failed to timely supply product in December 2011 for introduction to the 2012 Olympic year; (2) many of the Premier products that were supplied were mislabeled and, thus, not saleable; (3) some of the products were tainted with a banned substance, DHEA, which reflected poorly on LK/Forza's image and its source of supply, making it virtually impossible for them to sell products to amateur athletes." [Def. Mot. to Strike, Ex. B, p. 9, ECF No. 234.] In coming to his conclusion that Forza suffered $2,759,928.70 in direct losses, Duggan relied on financial documents maintained by Forza in the ordinary course of business, including balance sheets, sales records, and expense reports. Given Duggan's expertise, knowledge, and

experience in accounting, it is reasonable for himto base his opinion on the financial records and documents maintained by Forza. *Kumho Tire*, 526 U.S. at 150.

While Premier argues that Duggan's opinions are based on information provided to him by Forza as opposed to his own independent calculations and verifications, this argument goes to the weight or credibility of Duggan's opinion, not the reliability or admissibility of his methods. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

Finally, Premier argues that Duggan's opinions were based, in part, on documents that were not disclosed until after his report was produced, thereby violating Rule 26(a) and (e). However, Premier was not prejudiced by Forza's untimely disclosure because the documents were produced almost a month before Duggan's deposition, where he answered questions about the documents. *Hannah's Boutique, Inc. v. Surdej*, 2015 WL 3856551, *10 (N.D. Ill. June 19, 2015) (The disclosure "gave Plaintiff's counsel more than one month to review the Sales Spreadsheets before deposing Dr. Kneuper on December 3, 2014.") Accordingly, the court denies Premier's motion with respect to the documents in question.

### III.    CONCLUSION

For the reasons stated above, Premier's motion for summary judgment [239] is granted in part and denied in part. The court grants summary judgment in favor of Premier as to Scheid's third-party claims and denies summary judgment as to Forza's breach of contract claims. Further, the court grants in part and denies in part Forza's motion to strike the expert report and

disqualify Forza's expert from offering testimony [234]. Forza's expert may not offer opinions regarding Forza's alleged lost profits but may offer testimony regarding Forza's alleged direct losses. Status is set for October 5, 2016 at 9:30 a.m.

Date:   September 19, 2016                                    _____/s/_____

                                                             Joan B. Gottschall
                                                             United States District Judge